ACCEPTED
03-15-00262-CV
6432956
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 4:45:15 PM
JEFFREY D. KYLE
CLERK

# No. 3-15-00262-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 4:45:15 PM
JEFFREY D. KYLE
Clerk

*In the Court of Appeals*
*Third District of Texas — Austin*

**TEXAS ASSOCIATION OF ACUPUNCTURE
AND ORIENTAL MEDICINE,**

*Appellant,*

**v.**

**TEXAS BOARD OF CHIROPRACTIC EXAMINERS AND YVETTE
YARBROUGH, EXECUTIVE DIRECTOR IN HER OFFICIAL CAPACITY,**

*Appellees.*

*On Appeal from 201st District Court, Travis County, Texas*
*Cause No. D-1-GN-14-000355*

# BRIEF OF APPELLANT
# TEXAS ASSOCIATION OF ACUPUNCTURE
# AND ORIENTAL MEDICINE

Craig T. Enoch
Melissa A. Lorber
Shelby O'Brien
**ENOCH KEVER PLLC**
600 Congress Avenue, Suite 2800
Austin, Texas 78701
(512) 615-1200 / (512) 615-1198 fax

***Attorneys for Appellant***

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

| Appellant (Plaintiff) | |
|---|---|
| Texas Association of Acupuncture and Oriental Medicine ("Association") | *Trial and Appellant counsel:*<br><br>Craig T. Enoch<br>Melissa A. Lorber<br>Shelby O'Brien<br>**ENOCH KEVER PLLC**<br>600 Congress Avenue, Suite 2800<br>Austin, Texas 78701 |

| Appellees (Defendants) | |
|---|---|
| Texas Board of Chiropractic Examiners and Yvette Yarbrough, Executive Director in her Official Capacity<br>(collectively "Chiropractic Board") | *Trial and Appellate counsel:*<br><br>Joe H. Thrash<br>Assistant Attorney General<br>Administrative Law Division<br>P.O. Box 12548<br>Austin, Texas 78711 |

## STATEMENT OF THE CASE

| | |
|---|---|
| ***Nature of the Case:*** | This is an Administrative Procedures Act challenge to the validity of Chiropractic Board rules that authorize chiropractors to engage in the unlicensed practice of acupuncture. The Association sought to invalidate these rules and alternatively sought a declaration under the Uniform Declaratory Judgment Act that the statutory scheme purportedly authorizing chiropractors to practice acupuncture is unconstitutional.[1] At issue is whether (1) the rules are invalid because acupuncture is outside the statutory scope of chiropractic, and (2) in the alternative, the statutory scheme purportedly authorizing chiropractors to practice acupuncture violates the constitutional prohibitions against the Legislature preferring one school of medicine and enacting legislation that contains more than one subject. |
| ***Trial Court:*** | The 201st District Court of Travis County, Texas; Cause No. D-1-GN-14-000355. |
| ***Trial Court Disposition:*** | The trial court granted the Chiropractic Board's motion for summary judgment and denied the Association's competing motion.[2] |

---

[1] Clerk's Record ("CR") 3-19, 50-65, 716-32.

[2] Appendix ("App.") A.

## STATEMENT REGARDING ORAL ARGUMENT

This is an appeal of the trial court's summary judgment in a suit in which the Association challenged Chiropractic Board rules that authorize chiropractors to engage in the unlicensed practice of acupuncture. This case requires the Court to consider the validity of administrative rules, evaluate the constitutionality of statutes, and determine the extent to which an agency can adopt rules authorizing its licensees to engage in an occupational practice that is regulated by a different regulatory board. The Association believes oral argument would be helpful in the Court's determination of these important issues of administrative law.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................i

STATEMENT OF THE CASE................................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

INDEX OF AUTHORITIES................................................................. vii

ISSUES PRESENTED................................................................. xiii

INTRODUCTION ......................................................................................1

STATEMENT OF FACTS ...........................................................................4

    A.    Acupuncture and chiropractic are distinct practices regulated by separate regulatory boards...................................................................4

    B.    Despite the Chiropractic Chapter's prohibition on needle use, the Chiropractic Board has repeatedly asserted that chiropractors may practice acupuncture and other procedures requiring needle use...........................................................6

    C.    The Legislature amended the Acupuncture Chapter to define acupuncture as the "nonincisive, nonsurgical" insertion of an acupuncture needle. ...............................................................9

    D.    The Chiropractic Board adopted rules expressly authorizing chiropractors to practice acupuncture without a license from the Acupuncture Board.......................................................12

    E.    This Court invalidated several Chiropractic Board rules, including a rule authorizing chiropractors to use needles, but the Chiropractic Board has refused to repeal its rules authorizing needle use and the practice of acupuncture. ...................13

SUMMARY OF ARGUMENT ........................................................................16

ARGUMENT ..............................................................................................18

I.    Because acupuncture is outside the statutory scope of chiropractic, the Chiropractic Board's rules authorizing chiropractors to practice acupuncture without a license from the Acupuncture Board are invalid. ......................................................................18

A.  The Chiropractic Board only has authority to adopt rules consistent with its statutory grant from the Legislature. .......................18

B.  The Chiropractic Chapter unambiguously prohibits chiropractors from performing procedures involving needles, including acupuncture, because there is only one exception for needles—those used for diagnostic blood draws. ..............................20

    1.  The Chiropractic Chapter broadly instructs that 'incisive" encompasses incisions made by needles into the skin. .............20

    2.  Statutory construction principles confirm that the Chiropractic Chapter prohibits all needle use except for needles used for diagnostic blood draws. ................................21

    3.  Chiropractic is limited to specific techniques on discrete parts of the body while acupuncture is a separate medical profession in which practitioners treat the whole body. ...........26

C.  The Chiropractic Board's interpretation of the Acupuncture Chapter as indirectly expanding the scope of chiropractic is entitled to no deference because it is unreasonable. ...........................28

    1.  The Chiropractic Board's interpretation contravenes the regulatory purpose of occupational statutes and creates a public health risk. ..................................................................28

    2.  It is unreasonable for the Chiropractic Board to rely on another profession's scope of practice statute to allow its practitioners to practice a procedure that is prohibited under the Chiropractic Chapter. ................................................34

        a.  The Chiropractic Board has impermissibly latched onto one word ("nonincisive") in the Acupuncture Chapter to redefine its own scope of practice. ...............34

        b.  Legislative history supports that the amendment to the definition of acupuncture in the Acupuncture Chapter did not grant the Chiropractic Board the authority to regulate acupuncture. ..................................37

        c.      The Court should decline to read the Acupuncture Chapter and Chiropractic Chapter in *pari materia* to create an exemption for acupuncture in the Chiropractic Chapter.............................................................42

    D.     The Chiropractic Board's interpretation of the Acupuncture Chapter is entitled to no deference because the Chiropractic Board's expertise is chiropractic, not acupuncture. ............................45

    E.     The Chiropractic Board's rules are invalid because they impermissibly allow chiropractors to practice acupuncture in violation of the Acupuncture Chapter. ...............................................46

    F.     The rules are invalid because they authorize chiropractors to engage in the unauthorized practice of medicine................................47

II.    Alternatively, the statutory scheme purportedly authorizing chiropractors to practice acupuncture violates the Texas Constitution because the Legislature may not favor one school of medicine over another nor enact legislation containing more than one subject. ..................49

    A.     The statutory scheme purportedly authorizing chiropractors to practice acupuncture with significantly less education and training in acupuncture than licensed acupuncturists violates Texas Constitution, Article XVI, Section 31. .....................................50

    B.     The legislation that purportedly authorized chiropractors to practice acupuncture violates the one-subject rule in Texas Constitution, Article III, Section 35(a). .............................................52

III.   The Chiropractic Board's statute of limitations defense fails as a matter of law. ..........................................................................................54

PRAYER ...................................................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................................61

CERTIFICATE OF SERVICE ................................................................................61

APPENDIX ..............................................................................................................62

# INDEX OF AUTHORITIES

**CASES**

*Andrews v. Ballard*
  498 F. Supp. 1038 (S.D. Tex. 1980)........................................................33, 47, 52

*AT&T Commc'ns of Tex., L.P. v. Sw. Bell Tel. Co.*
  186 S.W.3d 528 (Tex. 2006) ...............................................................37

*Bd. of Water Eng'gs v. City of San Antonio*
  283 S.W.2d 722 (Tex. 1955) ...............................................................53

*Beeman v. Livingston*
  __ S.W.3d __, 2015 WL 4072404 (Tex. June 26, 2015)............................ 23-24

*Brooks v. Texas Medical Board*
   No. 03-14-00239-CV, 2015 WL 3827327 (Tex. App.—Austin
  June 18, 2015, no pet. h.)........................................................ 36, 48-49

*C. Hayman Constr. Co. v. Am. Indem. Co.*
  471 S.W.2d 564 (Tex. 1971) ...........................................................52

*CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities*
  263 S.W.3d 448 (Tex. App.—Austin 2008), *aff'd* 324 S.W.3d 95
  (Tex. 2010)........................................................................23

*City of Houston v. Clark*
  197 S.W.3d 314 (Tex. 2006) .............................................................33

*City of Rockwall v. Hughes*
  246 S.W.3d 621 (Tex. 2008) .............................................................25

*City of Round Rock v. Rodriguez*
  399 S.W.3d 130 (Tex. 2013) .............................................................38

*Commonwealth v. Schatzberg*
  371 A.2d 544 (Pa. Cmwlth. 1977)................................................33, 47

*DLB Architects, P.C. v. Weaver*
  305 S.W.3d 407 (Tex. App.—Dallas 2010, pet. denied)...................................43

*Dvorken v. Lone Star Indus., Inc.*
  740 S.W.2d 565 (Tex. App.—Fort Worth 1987, no writ)................................58

*Entergy Gulf States, Inc. v. Summers*
   282 S.W.3d 433 (Tex. 2009) ................................................................37

*Ex parte Halsted*
   182 S.W.2d 479 (Tex. Crim. App. 1944) ....................................47, 51

*Fazio v. Cypress/GR Houston I, L.P.*
   403 S.W.3d 390 (Tex. App.—Houston [1st Dist.] 2013, pet.
   denied)...................................................................................................23

*Grasso v. Cannon Ball Motor Freight Lines*
   81 S.W.2d 482 (Tex. Com. App. 1935)...............................................39

*Greater Houston P'ship v. Paxton*
   __ S.W.3d __, 2015 WL 3978138 (Tex. June 26, 2015)............................24, 42

*Heine v. Tex. Dept. of Pub. Safety*
   92 S.W.3d 642 (Tex. App.—Austin 2002, pet. denied) .............................. 55-56

*Howlett v. Tarrant Cnty.*
   301 S.W.3d 840 (Tex. App.—Fort Worth 2009, pet. denied)...........................43

*In re JMR*
   149 S.W.3d 239 (Tex. App.—Austin 2004, no pet.)..........................................43

*In re Smith*
   333 S.W.3d 349 (Tex. 2011) ................................................................19

*Jessen Assocs., Inc. v. Bullock*
   531 S.W.2d 593 (Tex. 1976) ................................................................52

*Jose Carreras, M.D., P.A. v. Marroquin*
   339 S.W.3d 68 (Tex. 2011)...................................................................25

*Kelley v. Raguckas*
   270 N.W.2d 665 (Mich. App. 1978)....................................................47

*Kuntz v. Khan*
   No. 03–10–00160–CV, 2011 WL 182882 (Tex. App.—Austin
   2011, no pet.) .......................................................................................23

*LeCroy v. Hanlon*
   713 S.W.2d 335 (Tex. 1986) ................................................................52

*Mid-Century Ins. Co. of Tex. v. Kidd*
997 S.W.2d 265 (Tex. 1999) ................................................................23

*Nat'l Media Corp. v. City of Austin*
No. 03-12-00188-CV, 2014 WL 4364815 (Tex. App.—Austin
Aug. 27, 2014, no pet.) ................................................................ 43-44

*Nw. Austin Municipal Util. Dist. No. 1 v. City of Austin*
274 S.W.3d 820 (Tex. App.—Austin 2008, pet. denied) ............................ 58-59

*People v. Roos*
514 N.E.2d 993 (Ill. 1987) ................................................................47

*Physician Assistants Bus. Alliance of Tex., LLC v. Tex. Med. Bd.*
No. 03-12-00735-CV, 2015 WL 681010 (Tex. App.—Austin Feb.
13, 2015, no pet.) ................................................................ 19-20, 23

*Pruett v. Harris Cnty. Bail Bond Bd.*
249 S.W.3d 447 (Tex. 2008) ................................................................19

*Pub. Util. Comm'n of Tex. v. City of Pub. Serv. Bd. of San Antonio*
53 S.W.3d 310 (Tex. 2001)................................................................18

*R.R. Comm'n of Tex. v. Lone Star Gas Co.*
844 S.W.2d 679 (Tex. 1992) ................................................................18

*R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future and Clean Water*
336 S.W.3d 619 (Tex. 2011) ................................................................19

*Ritchie v. Rupe*
443 S.W.3d 856 (Tex. 2014) ................................................................24

*Robinson v. Crown Cork & Seal Co., Inc.*
335 S.W.3d 126 (Tex. 2010) ................................................................37

*Rodriguez v. Tex. Workforce Comm'n*
986 S.W.2d 781 (Tex. App.—Corpus Christi 1999, pet. denied) ......................42

*Rogers v. Tex. Bd. of Architectural Exam'rs*
390 S.W.3d 377 (Tex. App.—Austin 2011, no pet.)................................20, 45

*Schlichting v. Tex. State Bd. of Medical Exam.*
310 S.W.2d 557 (Tex. 1958) ................................................................50

*Sommermeyer v. State*
713 S.W.2d 183 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd)................53

*State v. $1,760.00 in U.S. Currency*
406 S.W.3d 177 (Tex. 2013) .................................................................24

*State v. Rich*
339 N.E.2d 630 (Ohio 1975) ................................................................47

*State v. Won*
528 P.2d 594 (Ore. App. 1974)...........................................................47

*State Agencies v. R.R. Comm'n of Tex.*
421 S.W.3d 690 (Tex. App.—Austin 2014, no pet.)........................................34

*State Office of Pub. Util. Council v. Pub. Util. Comm'n of Tex.*
131 S.W.3d 314 (Tex. App.—Austin 2004, pet. denied) ...........................23, 57

*Teem v. State*
183 S.W. 1144 (Tex. Crim. App. 1916) ............................................47

*Tex. Ass'n of Psychological Assoc. v. Tex. State Bd. for Exam'rs of Psychologists*
439 S.W.3d 597 (Tex. App.—Austin 2014, no pet.)........................................55

*Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*
375 S.W.3d 464 (Tex. App.—Austin 2012, pet. denied)
........................................5-9, 13-14, 19, 21-22, 25, 28, 38, 44-45, 49, 54-55, 57

*Tex. Dep't of Transp. v. Sefzik*
355 S.W.3d 618 (Tex. 2011) (per curiam) ......................................................50

*Tex Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Exam'rs*
254 S.W.3d 714 (Tex. App.—Austin 2008, pet. denied).................19, 23, 48, 52

*Tex. State Bd. of Barber Exam'rs v. Beaumont Barber College, Inc.*
454 S.W.2d 729 (Tex. 1970) ...............................................................28, 56

*Tex. State Bd. of Chiropractic Examiners v. Abbott*
391 S.W.3d 343 (Tex. App.—Austin 2013, no pet.)............................. 25, 42-44

*Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*
458 S.W.3d 552, 554 (Tex. App.—Austin 2014, pet. filed) ..............................55

*Tex. State Bd. of Public Accountancy v. Fulcher*
515 S.W.2d 950 (Tex. Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.) ..................................................................................36, 56

*Tex. Water Comm'n v. Brushy Creek Mun. Util. Dist.*
917 S.W.2d 19 (Tex. 1996)..................................................................40

*TGN-NOPEC Geophysical Co. v. Combs*
340 S.W.3d 432 (Tex. 2011) ...............................................................23

*Thompson v. Tex. State Bd. of Med. Exam'rs*
570 S.W.2d 123 (Tex. App.—Tyler 1978, writ refused n.r.e.) .........46

*Transp. Ins. Co. v. Maksyn*
580 S.W.2d 334 (Tex. 1979) ...............................................................40

*West Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*
107 S.W.3d 558 (Tex. 2003) .........................................................41, 54

*Wilson v. State Bd. of Naturopathic Examiners*
298 S.W.2d 946 (Tex. Civ. App.—Austin 1957, writ ref'd n.r.e.) ....50

## RULES, STATUTES & OTHER PROVISIONS

22 TEX. ADMIN. CODE § 75.17 ...........................................12-15, 57-59

22 TEX. ADMIN. CODE § 75.21 ...........................................13-15, 57-59

22 TEX. ADMIN. CODE § 78.13 .......................................14-16, 22, 57-59

22 TEX. ADMIN. CODE § 78.14 ........................... 14-16, 27, 30-32, 57-59

22 TEX. ADMIN. CODE § 78.15 ...................................................14, 58

22 TEX. ADMIN. CODE § 183.2 .................................................... 29-30

22 TEX. ADMIN. CODE § 183.4 .................................................... 29-30

22 TEX. ADMIN. CODE § 183.20 .......................................................30

22 TEX. ADMIN. CODE § 184.4 .........................................................29

TEX. CIV. PRAC. & REM. CODE § 16.051...............................17, 54, 56, 58

TEX. CIV. PRAC. & REM. CODE § 37.004...............................................50

TEX. CIV. PRAC. & REM. CODE § 37.006...............................................50

TEX. CONST. art. III, § 35(a)...................................................17, 40, 49, 52

TEX. CONST. art. XVI, § 31 ........................................................17, 49, 50

TEX GOV'T CODE § 311.026.................................................................42

TEX. OCC. CODE § 151.002 ..........................................................6, 48, 51

TEX. OCC. CODE § 151.052 .....................................6, 47-48, 51-52

TEX. OCC. CODE § 201.002 ........................5, 15, 20-21, 24, 26-27, 46

TEX. OCC. CODE § 201.152 ...................................................................5

TEX. OCC. CODE § 201.1525 ..........................................................8, 12

TEX. OCC. CODE § 201.1526.................................................................12

TEX. OCC. CODE § 205.001 ...........................................9, 26, 46, 52

TEX. OCC. CODE § 205.101 .................................................................47

TEX. OCC. CODE § 205.201 .................................................................46

TEX. OCC. CODE § 205.203 ....................................................29, 33, 52

TEX. OCC. CODE § 205.206 ....................................................29, 33, 52

TEX. OCC. CODE § 205.255 .........................................................30, 52

## OTHER AUTHORITIES

Act of May 29, 1997, 75th Leg., R.S., ch. 1170, § 1 .............................9, 39

Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 8 ...........................8, 12

Tex. Att'y Gen. Op. DM-471 (1998)................................................. 11-12

Tex. Att'y Gen. Op. DM-472 (1998)...................................................8, 12

Tex. Att'y Gen. Op. DM-415 (1996)........................................................7

Tex. S.B. 1601, 82nd Leg., R.S. (2011)..............................................11, 39

## ISSUES PRESENTED

**ISSUE 1:** Because acupuncture is outside the statutory scope of chiropractic, the Chiropractic Board's rules authorizing chiropractors to practice acupuncture without a license from the Acupuncture Board are invalid.

**ISSUE 2:** Alternatively, the statutory scheme purportedly authorizing chiropractors to practice acupuncture violates the Texas Constitution because the Legislature may not favor one school of medicine over another nor enact legislation containing more than one subject.

**ISSUE 3:** The Chiropractic Board's statute of limitations defense fails as a matter of law.

# INTRODUCTION

Acupuncture and chiropractic are governed by distinct chapters of the Occupations Code and are subject to regulation by separate administrative boards. In these two chapters, the Legislature has set forth the unique training and education requirements for each healthcare profession. And the Legislature has granted each governing board the authority to regulate the healthcare profession within its expertise—the Chiropractic Board regulates the practice of chiropractic and the Texas State Board of Acupuncture Examiners ("Acupuncture Board") regulates the practice of acupuncture. Statutes governing healthcare professions like chiropractic and acupuncture serve a critical function: they protect the public by ensuring baseline standards that the public can assume have been met when seeking a particular healthcare treatment.

In this case, the Association challenged Chiropractic Board rules that authorize chiropractors to practice acupuncture without a license from or oversight by the Acupuncture Board. The Chiropractic Board adopted these rules even though the Chiropractic Chapter limits chiropractic to treatment of the musculoskeletal system and expressly prohibits chiropractors from performing incisive procedures, with only one narrow exception for the use of needles for diagnostic blood draws.

1

The Chiropractic Board performs no regulatory oversight over the practice of acupuncture by its licensees, has no expertise in acupuncture, and does not require its licensees to complete the education and training the Legislature has statutorily determined is necessary for the safe practice of acupuncture. Licensed acupuncturists must complete at least 2,625 hours in acupuncture training in a four-year degree program. But the Chiropractic Board requires chiropractors to complete only a paltry 100 hours of acupuncture instruction, with no requirement of actual clinical training. The Chiropractic Board does not know how many or which chiropractors practice acupuncture in Texas or if those chiropractors have met even these minimal "standards" for the practice of acupuncture. This is simply one strand in a larger pattern for the Chiropractic Board—authorizing healthcare practices that far exceed what is "chiropractic," even after censure by the Legislature, the courts, and state officials.

Recognizing nothing in Texas Occupations Code, Chapter 201 ("Chiropractic Chapter")[3] authorized the practice of acupuncture by its licensees, the Chiropractic Board creatively commandeered a term in the Chapter 205 ("Acupuncture Chapter")[4]—defining acupuncture as the "nonincisive, nonsurgical" insertion of acupuncture needles. The Board has twisted that term

---

[3] The Chiropractic Chapter is attached as App. C.

[4] The Acupuncture Chapter is attached as App. D.

2

into an "outside the Chapter" exception to the Chiropractic Chapter's prohibition on incisive procedures. But the Acupuncture Chapter does not mention chiropractors, does not excuse chiropractors from obtaining a license from the Acupuncture Board, does not except chiropractors from the minimum education and training hours the Legislature has determined are required to safely and effectively perform the procedure, and does not remove chiropractors from oversight by the Acupuncture Board when practicing acupuncture.

The Court should reject the Chiropractic Board's effort to pile so much meaning on the term "nonincisive" in the Acupuncture Chapter. The Chiropractic Board's hijacking of a term in another occupation's governing statute to reinvent its own scope of practice creates a statutory scheme in which practitioners and the public are required to hop-scotch between the Acupuncture Chapter and the Chiropractic Chapter (and potentially various other Occupations Code chapters and agency rules) to determine what procedures chiropractors are authorized to perform. If the Chiropractic Board's rules are allowed to stand, this Court's conclusion will create a precedent where a regulatory board may simply pronounce that its practitioners can perform another healthcare profession without complying with the regulatory framework required by state law. The Chiropractic Board's novel interpretation is unreasonable and unworkable.

In adopting and improperly amending rules authorizing the unlicensed practice of acupuncture, the Chiropractic Board has exceeded the scope of its statutory authority and the rules should be declared invalid. Alternatively, the statutory scheme purportedly authorizing chiropractors to practice acupuncture without a license or oversight by the Acupuncture Board violates the provisions of the Texas Constitution prohibiting legislation that favors one branch of medicine or contains more than one subject. The Court should reverse the trial court's judgment and render judgment for the Association.

## STATEMENT OF FACTS

### A. Acupuncture and chiropractic are distinct practices regulated by separate regulatory boards.

The Texas Occupations Code is delineated into chapters, each regulating distinct professions. Each of those chapters requires specific training and licensing unique to each profession to ensure persons practicing those professions are well-trained in their chosen field. Because the Legislature sets forth education and training requirements unique to each profession, Texas consumers are able to safely choose from providers who are appropriately qualified to practice a particular procedure. The Chiropractic Chapter governs the practice of chiropractic; the Acupuncture Chapter governs the practice of acupuncture.

As is true with other regulated professions, chiropractors may only perform procedures that are within the statutory scope of the practice of chiropractic, and

4

the Chiropractic Board may only adopt rules governing chiropractic. *See* TEX. OCC. CODE §§ 201.002, 201.152. Under the Chiropractic Chapter, chiropractors are limited to treating the musculoskeletal system. *See id.* § 201.002(b)(1)-(2).[5] And incisive procedures—defined by that chapter as "making an incision into any tissue, cavity, or organ by any person or implement"—are expressly identified as outside the scope of chiropractic practice. *See id.* §§ 201.002(a)(3), (b)(2).[6]

The Chiropractic Chapter's prohibition against incisive procedures identifies only one exception: "the use of a needle for the purpose of drawing blood for diagnostic testing." *Id.* § 201.002(a)(3). Thus, the Chiropractic Chapter considers the use of a needle to be an incisive procedure. Nothing in the Chapter cross-references the Acupuncture Chapter, lists acupuncture as an exception to the prohibition on incisive procedures, or otherwise specifies that a chiropractor can practice acupuncture or any other procedure involving needles (except diagnostic blood draws).

---

[5] Chiropractors may also improve the subluxation complex, which is a category of spinal disorders, using nonincisive, nonsurgical procedures such as adjustment and manipulation. *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 468 (Tex. App.—Austin 2012, pet. denied). Because subluxation refers to a disorder of the spine, for ease of reference in this brief, the term musculoskeletal is used to encompass this term.

[6] Surgical procedures are also prohibited, but there is no dispute that acupuncture is not a surgical procedure. *See* TEX. OCC. CODE § 201.002(a)(4), (b)(2).

Finally, though chiropractic is a healthcare profession, the Chiropractic Board is not overseen by the Texas Medical Board, and chiropractors are exempt from complying with the Texas Medical Practice Act—but only to the extent they engage *strictly* in the practice of chiropractic. *See id.* §§ 151.002(13), 151.052. The Chiropractic Chapter prohibits the use of needles by chiropractors; thus, when a chiropractor practices acupuncture, he is not strictly engaged in the practice of chiropractic.

**B.    Despite the Chiropractic Chapter's prohibition on needle use, the Chiropractic Board has repeatedly asserted that chiropractors may practice acupuncture and other procedures requiring needle use.**

Since the 1990s, the Chiropractic Board has controversially asserted that acupuncture and other procedures involving needles, such as needle electromyography ("needle EMG"), are within the scope of the practice of chiropractic. *See Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 375 S.W.3d 464, 469 (Tex. App.—Austin 2012, pet. denied).[7] The Legislature responded to this controversy in 1995 by enacting the current statutory language in the Chiropractic Chapter prohibiting chiropractors from practicing incisive procedures, with only the one exception for diagnostic blood draws. *Id.* When the Chapter was amended to prohibit incisive procedures, Representative Janek explained that

---

[7] This Court's *Texas Medical Association* opinion is attached as App. F.

6

"[t]his amendment would take out any ability by the chiropractors to put needles into people." *Id.* n.7. Soon after, in light of this amendment, the Attorney General issued an opinion declaring that acupuncture is outside the scope of the practice of chiropractic. Tex. Att'y Gen. Op. No. DM-415 (1996). The Attorney General reached this conclusion because the sole exception to the prohibition on the performance of incisive procedures was diagnostic blood draws. *Id.* Thus, the Attorney General reasoned that all other procedures involving needles were outside the statutory scope of chiropractic. *Id.*

Disregarding the Attorney General's opinion, the Chiropractic Board nonetheless continued asserting that its practitioners could practice acupuncture.[8] This was simply another chapter in the Chiropractic Board's long history of attempting to aggrandize the practice of chiropractic far beyond what is "chiropractic," not only as commonly understood but as defined by statute:

- The Chiropractic Board claimed chiropractors could perform needle EMG. An administrative law judge found that needle EMG was not within the scope of chiropractic, but the Chiropractic Board continued to advise chiropractors that they could perform the procedure.[9] It continued to do so until this Court shut down the practice by concluding that needle EMG is an incisive procedure. *See Tex. Med. Ass'n*, 375 S.W.3d at 481-82, 497.

---

[8] CR 577.

[9] *Id.*

7

- The Chiropractic Board claimed that chiropractors may perform manipulation under anesthesia ("MUA"). Consequently, the Legislature amended the Chiropractic Chapter to prohibit chiropractors from performing MUA,[10] but the Chiropractic Board continued advising chiropractors that they could perform the procedure.[11] Again, it was not until this Court mandated that MUA is a surgical procedure that the Chiropractic Board finally conceded that MUA was outside the scope of chiropractic. *See id.* at 488.

- The Chiropractic Board contended that chiropractors could inject substances into patients. The Attorney General opined that the injection of substances is the use of a needle and is thus outside the scope of chiropractic. *See* Tex. Att'y Gen. Op. DM-472 (1998). The Chiropractic Board ignored this opinion and continued advising chiropractors that they could perform procedures involving needles (like needle EMG).[12]

- The Comptroller found that the Chiropractic Board had refused to comply with legislative enactments by failing to develop rules clarifying restrictions on performing incisive and surgical procedures, and recommended that the Chiropractic Board adopt rules establishing clear guidelines on the permissible scope of practice.[13] The Chiropractic Board declined to do so until forced to by the Legislature, despite the fact that it gave the Comptroller written assurances that it had begun the process of developing rules.[14] *See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 8 (codified as TEX. OCC. CODE § 201.1525).

---

[10] CR 578.

[11] *Id.*

[12] CR 577.

[13] CR 578.

[14] *Id.*

8

- The Chiropractic Board evaded rule challenges and input from stakeholders by issuing opinions informing chiropractors that they could perform various procedures, rather than adopting rules. *Tex. Med. Ass'n*, 375 S.W.3d at 470.[15]

## C. The Legislature amended the Acupuncture Chapter to define acupuncture as the "nonincisive, nonsurgical" insertion of an acupuncture needle.

In 1997, in the course of the Acupuncture Board's sunset review, the Legislature amended the Acupuncture Chapter to define acupuncture as the "nonincisive, nonsurgical" insertion of an acupuncture needle. *See* Act of May 29, 1997, 75th Leg., R.S., ch. 1170, § 1 (Senate Bill 361) (codified as TEX. OCC. CODE § 205.001(2)). This is the language the Chiropractic Board relies on to argue that the definition of acupuncture in the Acupuncture Chapter constitutes both an exception to the Chiropractic Chapter's prohibition against needle use and an invitation for chiropractors to practice acupuncture without a license from or oversight by the Acupuncture Board.

The bill's legislative history demonstrates that:

---

[15] CR 574-80.

9

- The Acupuncture Board's sunset bill originated in the Senate. Senator Madla offered an amendment amending the definition of acupuncture in the Acupuncture Chapter by inserting the term "nonsurgical, nonincisive" in an apparent indirect attempt to allow chiropractors to practice acupuncture.[16] The Senate passed the legislation as amended.[17]

- When the bill was heard in the House Committee on Public Health, Representative Gray offered amendments that removed the "nonincisive, nonsurgical" amendment to the Acupuncture Chapter that had been adopted in the Senate and instead amended the *Chiropractic Chapter* to expressly authorize chiropractors to practice acupuncture, set forth training and education requirements, and provide for oversight by the Chiropractic Board.[18]

- The legislation proceeded to the House floor. The House committee amendments providing direct authority for chiropractors to practice acupuncture were struck on point of order because the sunset bill was limited to the function of the *Acupuncture Board* and the proposed amendments to the *scope of chiropractic* were not germane to the bill.[19]

- Ultimately, the bill was sent to conference committee where the conferees reinserted the "nonincisive, nonsurgical" amendment to the definition of acupuncture in the Acupuncture Chapter that had previously been added in the Senate.[20]

Notably, the Chiropractic Chapter was not amended to affirmatively allow chiropractors to practice acupuncture, even though there was an effort to do so. And nothing in Senate Bill 361 gave the Chiropractic Board the authority to adopt

---

[16] CR 455, 466.

[17] *Id.*

[18] CR 512.

[19] CR 515-16.

[20] CR 526, 534, 536.

rules authorizing chiropractors to practice acupuncture or created an exemption for chiropractors from the Acupuncture Chapter's education and licensing requirements. Indeed, Representative Gray cautioned that amending the definition of acupuncture in the Acupuncture Chapter would put the practice of acupuncture by chiropractors under regulation by the Acupuncture Board, not the Chiropractic Board.[21] Since Senate Bill 361's enactment, legislation has unsuccessfully been proposed to authorize chiropractors to practice acupuncture under regulation by the Chiropractic Board. *See* Tex. S.B. 1601, 82nd Leg., R.S. (2011).

Nonetheless, relying on the amendment to the Acupuncture Chapter, the Attorney General reversed course, reasoning that the Chiropractic Chapter and Acupuncture Chapter should be read *in pari materia* since both regulate healthcare professions. Tex. Att'y Gen. Op. DM-471 (1998). Improperly reading the chapters together, the Attorney General reached the unsound conclusion that acupuncture had become within the statutory scope of the practice of chiropractic simply by virtue of the amendment to the Acupuncture Chapter. *Id.* That same day, the Attorney General also issued a contradictory opinion concluding that the use of needles continued to exceed the statutory scope of chiropractic, with the statutory

---

[21] CR 478-80.

11

exception of blood draws and the "new exception" for acupuncture recognized in DM-471. Tex. Att'y Gen. Op. DM-472 (1998).

**D.    The Chiropractic Board adopted rules expressly authorizing chiropractors to practice acupuncture without a license from the Acupuncture Board.**

A few years later, in the course of the Chiropractic Board's 2004 sunset review, the Sunset Advisory Committee criticized the Chiropractic Board for its systematic refusal to comply with the confines of the Chiropractic Chapter's scope of practice provision.[22] It found that "[t]he Board has a history of acting unilaterally to expand scope of practice in a way that seems to indicate a greater interest in promoting the profession than following the law and protecting patients."[23]

In response, during the 2005 legislative session, the Legislature enacted a provision requiring the Chiropractic Board to adopt rules clarifying which specific activities are included in the scope of the practice of chiropractic. *See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 8 (codified at TEX. OCC. CODE §§ 201.1525-.1526). In 2006, the Chiropractic Board responded by promulgating 22 Texas Administrative Code § 75.17, formally authorizing chiropractors to perform manipulation under anesthesia, acupuncture, and needle EMG. Subsequently, in

---

[22] CR 574, 577-798.

[23] CR 577.

12

2009, the Chiropractic Board enacted 22 Texas Administrative Code § 75.21, which set forth parameters for the practice of acupuncture by chiropractors.

**E.     This Court invalidated several Chiropractic Board rules, including a rule authorizing chiropractors to use needles, but the Chiropractic Board has refused to repeal its rules authorizing needle use and the practice of acupuncture.**

The Texas Medical Association challenged several of the Chiropractic Board's newly adopted scope of practice rules, including those authorizing chiropractors to perform needle EMG, on grounds that needle EMG is an incisive procedure involving a needle and thus is outside the statutory scope of chiropractic. *See Tex. Med. Ass'n*, 375 S.W.3d at 472. The district court agreed and invalidated several of the rules, including Rule 75.17(a)(3), which expressly authorized chiropractors to use needles. At the time of the suit, Rule 75.17(a)(3) stated:

> (3) Needles may be used in the practice of chiropractic under standards set forth by the Board but may not be used for procedures that are incisive or surgical.
>
> > (A)  The use of a needle for a procedure is incisive if the procedure results in the removal of tissue other than for the purpose of drawing blood.
> >
> > (B)  The use of a needle for a procedure is surgical if the procedure is listed in the surgical section of the CPT Codebook.

This Court affirmed the portion of the district court's judgment invalidating Rule 75.17(a)(3), concluding that needle EMG is an incisive procedure. *See Tex.*

13

*Med. Ass'n*, 375 S.W.3d at 497.[24] In response to the Court's decision, in 2013, the Chiropractic Board repealed or amended several rules related to needle EMG that were declared invalid by the district court, but ***declined to repeal*** Rule 75.17(a)(3) and other rules authorizing needle use by chiropractors. That same year the Chiropractic Board amended Rule 75.21 to specify that chiropractors must comply with the chiropractic scope of practice when performing acupuncture.

In January 2015, after the summary judgment hearing in this case, but before the trial court's judgment, the Chiropractic Board repealed Rules 75.17 and 75.21 as part of a non-substantive reorganization of its rules, then renumbered Rule 75.17 as Rules 78.13 and 78.15, and renumbered Rule 75.21 as Rule 78.14. *See* 40 Tex. Reg. 376, 379 (2015). In the current version of the rules, Rule 78.13 provides that a person practices chiropractic if he or she performs "nonsurgical, nonincisive procedures," and expressly authorizes needles to be used if they are not used for incisive, surgical procedures. 22 TEX. ADMIN. CODE §§ 78.13(b)(1)(B), (b)(2). Conversely, Rule 78.15 excludes from the practice of chiropractic "incisive or surgical procedures." *Id.* §§ 78.15(a)(1), (b)(1)(A), (b)(2)(A). Rule 78.13 also narrowly defines an incision as "a cut or surgical wound; also, a division of the soft

---

[24] The Texas Medical Association also challenged rules related to other procedures, including MUA. These rules were also invalidated by the district court. This Court affirmed most of the district court's judgment, including the portion invalidating the MUA rule, but remanded other claims.

14

parts made with a knife or hot laser," *id.* § 78.13(a)(4), despite the fact that the Chiropractic Chapter broadly defines an incisive procedure as an incision into "any tissue, cavity, or organ by *any* person or implement," Tᴇx. Occ. Cᴏᴅᴇ § 201.002(a)(3) (emphasis added).

Thus, by crafting a definition of "incision" that is far narrower than the Chiropractic Chapter's broad definition of incisive, the Chiropractic Board has enlarged the class of invasive procedures chiropractors are allowed to perform beyond that allowed in the Chiropractic Chapter. Further, Rules 78.13(e)(2)(C) and 78.14 specifically authorize chiropractors to practice acupuncture in violation of the Chiropractic Chapter and with minimal education and training "standards" for the practice of acupuncture by chiropractors.

The Association filed suit challenging the Chiropractic Board's rules that authorize chiropractors to practice acupuncture—former 22 Texas Administrative Code §§ 75.17(a)(3), (b)(4), (e)(2)(C), and 75.21,[25] which are now 22 Texas Administrative Code §§ 78.13(a)(4), (b)(2), (e)(2)(C), and 78.14.[26] The parties filed competing motions for summary judgment. After a hearing, the trial court granted the Chiropractic Board's motion and denied the Association's motion.

---

[25] The rules repealed in January 2015 can be found in the record at CR 213-24.

[26] The new version of the rules is attached as App. B.

15

## SUMMARY OF ARGUMENT

The Court should invalidate the Chiropractic Board's rules that authorize chiropractors to practice acupuncture without a license from or oversight by the Acupuncture Board because the chiropractic scope of practice does not include the practice of acupuncture. *See* 22 TEX. ADMIN. CODE §§ 78.13(a)(4), (b)(2), (e)(2)(C), 78.14. The Chiropractic Chapter limits the practice of chiropractic to treatment of the musculoskeletal system and expressly prohibits chiropractors from performing incisive procedures, except for diagnostic blood draws. Under established principles of statutory construction, since the prohibition against incisive procedures includes an exception for a needle used for one purpose, the prohibition encompasses needles used for other purposes—including acupuncture.

With a single-minded focus on purported legislative intent, the Chiropractic Board has argued that the Legislature intended to exempt chiropractors practicing acupuncture from the Acupuncture Chapter's licensing requirements when it amended the Acupuncture Chapter to define acupuncture as the "nonincisive" insertion of an acupuncture needle. But the Legislature's intent about an enactment is expressed through the statutory language. And nothing in the Acupuncture Chapter (or Chiropractic Chapter) grants chiropractors the authority to practice acupuncture without a license from or oversight by the Acupuncture Board. Further, even if it is appropriate to consider legislative history, the Chiropractic

16

Board's argument fails because the history does not support that the amendment successfully authorized chiropractors to practice acupuncture without a license. The Chiropractic Board's interpretation of the Acupuncture Chapter and Chiropractic Chapter is unreasonable and entitled to no deference.

Alternatively, if Senate Bill 361's amendment to the Acupuncture Chapter expanded the scope of chiropractic as set forth in the Chiropractic Chapter to include acupuncture, the statutory scheme is unconstitutional. First, it creates a regime in which chiropractors can practice acupuncture with virtually no training in the procedure while acupuncturists must complete extensive education and training to become licensed. This violates the Texas Constitution's prohibition against preference for one school of medicine over another. *See* TEX. CONST. art. XVI, § 31. Second, it violated the one-subject rule because that bill concerned the continuation and functions of the Acupuncture Board, not the scope of the practice of chiropractic. *See id.* art. III, § 35(a).

Finally, the Chiropractic Board's affirmative defense of limitations fails as a matter of law. The Board urges that because it has for more than four years illegally authorized chiropractors to practice acupuncture, the residual statute of limitations in Texas Civil Practice and Remedies Code, Section 16.051 allows it to continue to exceed its statutory authority and violate Texas law, daily and with impunity. No court has applied the residual statute of limitations to an

17

Administrative Procedures Act declaratory judgment action challenging the validity of agency rules. But even if it applied, the four-year limitations period has not expired because the Chiropractic Board amended the challenged rules in 2013 and 2015 and the rules are a continuing and ongoing violation of state law.

The Association urges the Court to reverse and render judgment for the Association declaring the Chiropractic Board's rules authorizing chiropractors to practice acupuncture are invalid or, alternatively, the statutory scheme authorizing chiropractors to practice acupuncture is unconstitutional. In the further alternative, if the Court believes any fact issue exists, the Association requests that the Court remand for a new trial.

## **ARGUMENT**

### **I.**

**Because acupuncture is outside the statutory scope of chiropractic, the Chiropractic Board's rules authorizing chiropractors to practice acupuncture without a license from the Acupuncture Board are invalid.**

**A.    The Chiropractic Board only has authority to adopt rules consistent with its statutory grant from the Legislature.**

An agency's power to make rules is dependent on a valid statutory grant. *Pub. Util. Comm'n of Tex. v. City of Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001); *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). In determining whether rules were adopted or amended within an agency's statutory grant, a court must consider whether each rule (1) contravenes

18

specific statutory language, (2) runs counter to the objectives of the underlying statute, or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the statutory provisions. *Physician Assistants Bus. Alliance of Tex., LLC v. Tex. Med. Bd.*, No. 03-12-00735-CV, 2015 WL 681010, at \*2 (Tex. App.—Austin Feb. 13, 2015, no pet.); *Tex. Med. Ass'n*, 375 S.W.3d at 474; *Tex Orthopaedic Ass'n v. Tex. State Bd. of Podiatric Med. Examiners*, 254 S.W.3d 714, 719 (Tex. App.—Austin 2008, pet. denied). "Absent specific or implied statutory authority, an agency rule is void." *Physician Assistants Bus. Alliance*, 2015 WL 681010, at \*2.

Further, though courts give great weight to an agency's interpretation of a statute, this deferential standard of review only applies if the language of a statute is ambiguous, and courts give even less deference when legislative intent is at issue. *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011); *In re Smith*, 333 S.W.3d 349, 356 (Tex. 2011). Additionally, an agency's construction of a statute must be reasonable. *Tex. Citizens for a Safe Future and Clean Water*, 336 S.W.3d at 625. And notably, if an agency attempts to regulate activities outside the scope of its statutory grant, the rule is void regardless of how reasonable it may be. *Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 452 (Tex. 2008). Relatedly, a court grants no deference to an agency's interpretation in regard to issues that do not lie within the agency's

expertise. *Rogers v. Tex. Bd. of Architectural Exam'rs*, 390 S.W.3d 377, 384 (Tex. App.—Austin 2011, no pet.).

The Chiropractic Board's rules authorizing chiropractors to practice acupuncture contravene the plain statutory language and objectives of the Chiropractic Chapter. And the Chiropractic Board's effort to co-opt the Acupuncture Chapter to redefine chiropractic is entitled to no deference because its interpretation is unreasonable, and acupuncture is neither subject to the Chiropractic Board's regulation nor within its expertise.

**B.**	**The Chiropractic Chapter unambiguously prohibits chiropractors from performing procedures involving needles, including acupuncture, because there is only one exception for needles—those used for diagnostic blood draws.**

**1.**	**The Chiropractic Chapter broadly instructs that 'incisive" encompasses incisions made by needles into the skin.**

If a statute is unambiguous, a court looks no further beyond the literal text. *Physician Assistants Bus. Alliance*, 2015 WL 681010, at *2. The Chiropractic Chapter defines, without ambiguity, what is "chiropractic." A person practices chiropractic if the person (1) "uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body," or (2) "performs nonincisive, nonsurgical procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system." TEX. OCC. CODE § 201.002(b).

20

"Incisive," in turn, is defined as "making an incision into any tissue, cavity, or organ by any person or implement," with one exception for "the use of a needle for the purpose of drawing blood for diagnostic testing." *Id.* § 201.002(a)(3).

Acupuncture is an invasive procedure in which acupuncturists use needles to penetrate skin. The Chiropractic Chapter specifically instructs that incisive procedures include those procedures in which an incision is made into ***any*** tissue, cavity, or organ by ***any*** person or implement. *Id.* § 201.002(a)(3). Skin is both a tissue and an organ,[27] and a needle is an "implement" for making an incision.[28] Thus, a needle penetrating skin is an incisive procedure expressly prohibited by the Chiropractic Chapter.[29]

### 2. Statutory construction principles confirm that the Chiropractic Chapter prohibits all needle use except for needles used for diagnostic blood draws.

The legal question raised in this case was not answered by this Court's decision in *Texas Medical Association*. The Court noted that differences might

---

[27] *See* Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/skin; https://www.aad.org/dermatology-a-to-z/for-kids/about-skin; http://www.webmd.com/skin-problems-and-treatments/picture-of-the-skin.

[28] Dictionary.com, available at http://dictionary.reference.com/browse/implement) (defining "implement" as an article used in some activity, especially an instrument, tool, or utensil).

[29] Indeed, Yvette Yarbrough, the Executive Director of the Chiropractic Board, admitted at a 2012 Chiropractic Board meeting that acupuncture is "in practice" an incisive procedure, and that chiropractors may practice the procedure only by latching onto the definition of acupuncture in the Acupuncture Chapter (discussed further below). Chiropractic Board July 11, 2012 ad hoc meeting, at 1:46:00, available at https://www.tbce.state.tx.us/Hearings/Acupuncture20120711.MP3.

21

exist between the "technical" and "ordinary" meanings of "incisive," and that the "technical" meaning may be limited to a "cut" (such as by an instrument with a beveled edge) while the ordinary meaning may also include "piercing." *See* 375 S.W.3d at 479-80. The Court observed that it could be such a distinction that would explain how acupuncture needles would be capable of being inserted in a "nonincisive" manner under the Acupuncture Chapter. *Id.* at 481.

But the Court did not reach the question of whether "incisive" as used in the Chiropractic Chapter— "making an incision into any tissue, cavity, or organ by any person or implement"—is limited to "cutting" as stated in the Chiropractic Board's Rule 78.13(a)(4). The Medical Board did not challenge that definition in the Chiropractic Board's rules. *Id.* at 480. The Association challenges that definition now and urges the Court to conclude, as a matter of statutory construction, that the term "incisive" in the Chiropractic Chapter encompasses all needle use (save the one listed exception for needles used for diagnostic blood draws), regardless of whether a needle has a beveled edge.

First, under the doctrine of *expressio unius est exclusio*, the fact that a needle used for diagnostic purposes is the ***only*** exception to the Chiropractic Chapter's prohibition on "incisive" procedures conveys both the Legislature's belief that needles are incisive and intent to prohibit chiropractors from using needles for other purposes:

22

- The Legislature is presumed to choose its words carefully and include or exclude particular words purposefully. *TGN-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011); *Tex Orthopaedic Ass'n*, 254 S.W.3d at 719.

- When the Legislature intends to include a particular term in a statute, it does so expressly. *See Beeman v. Livingston*, __ S.W.3d __, 2015 WL 4072404, at *4 (Tex. June 26, 2015).

- When a statute lists specific exceptions to its application, the intent is clear that no other exceptions shall apply. *Mid-Century Ins. Co. of Tex. v. Kidd*, 997 S.W.2d 265, 273 (Tex. 1999). This is especially true when the exception is of the same type expressly included—here, procedures involving needles. *Fazio v. Cypress/GR Houston I, L.P.*, 403 S.W.3d 390, 421 (Tex. App.—Houston [1st Dist.] 2013, pet. denied); *CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coal. of Cities*, 263 S.W.3d 448, 464 (Tex. App.—Austin 2008), *aff'd* 324 S.W.3d 95 (Tex. 2010).

- A rule is void if it conflicts with a statute's plain language, and a rule may not change the scope of a legislatively mandated exception. *Physician Assistants Bus. Alliance*, 2015 WL 681010, at *3; *see also State Office of Pub. Util. Council v. Pub. Util. Comm'n of Tex.*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied).

In adopting and later amending rules authorizing chiropractors to practice acupuncture, the Chiropractic Board has read into its scope of practice statute an additional exception to the prohibition on needle use that is not there. In the process, the Chiropractic Board has impermissibly attempted to narrow the scope of what is "incisive." This Court has rejected similar efforts to read into scope of practice statutes terms that are not included. *See, e.g.*, *Kuntz v. Khan*, No. 03–10–00160–CV, 2011 WL 182882, at *7-8 (Tex. App.—Austin 2011, no pet.).

23

Had the Legislature intended for chiropractors to practice acupuncture, it could have listed acupuncture as a second exception to the prohibition against incisive procedures. Or the Legislature could have defined chiropractic as including acupuncture, along with the other practices expressly listed, such as the adjustment and manipulation of the musculoskeletal system. *See* TEX. OCC. CODE §§ 201.002(a)(3), (b). Indeed, legislation that would have authorized chiropractors to practice acupuncture has been proposed and rejected on three occasions. *See* Part I.C.2.b, *infra*. The Chiropractic Board may not imply the practice of acupuncture into its scope of practice statute where it has been excluded.

Second, it is also most consistent with the context of the Chiropractic Chapter to interpret "incisive" as encompassing all procedures involving needles, including acupuncture. Courts look to dictionary definitions for the meaning of a term used in a statute and apply the definition that is most consistent with its use in the statute. *Beeman*, 2015 WL 4072404, at *4; *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013). And courts "rely on the doctrine of *noscitur a cociis* ("it is known by its associates") to avoid ascribing to a word a meaning so broad that it is incommensurate with the statutory context. *Beeman*, 2015 WL 4072404, at *4; *see also Ritchie v. Rupe*, 443 S.W.3d 856, 869 (Tex. 2014). Contextual clues come from the words immediately surrounding a term. *See Greater Houston P'ship v. Paxton*, __ S.W.3d __, 2015 WL 3978138, at *5-7

24

(Tex. June 26, 2015). When read in its contextual environment, the Chiropractic Chapter's prohibition on incisive procedures encompasses acupuncture because by including blood draw needles within the definition of incisive, the Legislature intended for "incisive" to encompass other needles as well.

Third, the Court should not read the term "incisive" in a manner that leads to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008); *Tex. State Bd. of Chiropractic Examiners v. Abbott*, 391 S.W.3d 343, 347 (Tex. App.—Austin 2013, no pet.). An acupuncture needle is a needle and, as Representative Janek observed during debate on Senate Bill 361, "a needle is a needle."[30] It is absurd to contemplate a statutory scheme in which it is necessary to examine each needle used in a particular practice under a magnifying glass to determine whether it has a beveled edge or not. *See Jose Carreras, M.D., P.A. v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011). This is not what the Legislature intended when it amended the Chiropractic Chapter to prohibit incisive procedures. *See Tex. Med. Ass'n*, 375 S.W.3d at 469 n.7.

---

[30] CR 493.

25

**3. Chiropractic is limited to specific techniques on discrete parts of the body while acupuncture is a separate medical profession in which practitioners treat the whole body.**

Additionally, while acupuncture treats and mitigates "a human condition," TEX. OCC. CODE § 205.001(2), chiropractic is limited to treating the musculoskeletal system, *id.* § 201.002(b). Acupuncture cannot be included within the statutory scope of chiropractic because acupuncture is not limited to treatment of the musculoskeletal system and so, by its very nature, exceeds the scope of chiropractic. Acupuncture is also a separate medical practice and profession, with its own history and philosophical and theoretical underpinnings, entirely separate from that of chiropractic.

In adopting rules authorizing chiropractors to practice acupuncture, the Chiropractic Board has authorized its licensees to practice an entirely different type of medicine. The rules are akin to an Acupuncture Board rule authorizing acupuncturists to practice chiropractic or dentistry—professions regulated by separate regulatory boards with distinct licensing requirements. And the Chiropractic Board has not only authorized its licensees to practice a different medical profession, but has unilaterally exempted them from the education, training, and licensing requirements mandated by the Legislature and the regulatory board that *does* regulate that profession. The Chiropractic Board's rules

26

undermine and devalue the education and training of those who lawfully perform acupuncture and put the public at risk of untrained practitioners.

The fact that the Chiropractic Board has included a limitation in its acupuncture rule that the "therapeutic modalities" used in performing acupuncture "must comply with the chiropractic scope of practice as defined by Texas Occupations Code § 201.002" does nothing to make the Board's rules valid. *See* 22 TEX. ADMIN. CODE § 78.14(a). The limitation instead creates a circular argument: the scope of the practice of chiropractic, as defined in the Chiropractic Chapter, does not include acupuncture. The Board cannot simply "make" chiropractic include acupuncture by purportedly limiting acupuncture to a statutory scope that does not include acupuncture in the first place.

*In sum*, because the Chiropractic Chapter unambiguously prohibits chiropractors from using needles (except for diagnostic blood draws) and limits chiropractic to treatment of the musculoskeletal system, and chiropractic and acupuncture are entirely separate healthcare professions with discreet enabling statutes, the Chiropractic Board exceeded its statutory authority in adopting, and later amending, rules authorizing chiropractors to practice acupuncture. The Court should render judgment for the Association and declare the rules invalid.

**C.** **The Chiropractic Board's interpretation of the Acupuncture Chapter as indirectly expanding the scope of chiropractic is entitled to no deference because it is unreasonable.**

**1.** **The Chiropractic Board's interpretation contravenes the regulatory purpose of occupational statutes and creates a public health risk.**

The Chiropractic Board's interpretation of its scope of practice statute is entitled to no deference because it contravenes the purpose of the Occupation Code's regulation of healthcare professions and creates a public health risk. The purpose of healthcare regulations is to protect public health and safety. *Tex. State Bd. of Barber Exam'rs v. Beaumont Barber College, Inc.*, 454 S.W.2d 729, 731 (Tex. 1970). This is why each chapter of the Occupations Code, including the Acupuncture and Chiropractic Chapters, sets forth specific educational and training requirements for a person to become licensed to perform a particular profession. But by authorizing chiropractors to practice acupuncture without completing the education and training requirements statutorily required for acupuncture, the Chiropractic Board controverts the purpose of the Acupuncture Chapter and creates a public health risk. *Tex. Med. Ass'n*, 375 S.W.3d at 474.

For acupuncturists licensed by the Acupuncture Board under the Acupuncture Chapter:

28

- Acupuncturists are statutorily required to complete an intensive course of study to lawfully practice acupuncture. Before an acupuncturist may become licensed to practice acupuncture, a prospective licensee must complete at least 1,800 instructional hours from an accredited acupuncture school and satisfy at least two terms of a resident course of clinical instruction (although, as explained below, Acupuncture Board rules require acupuncture education to far exceed these statutory minimums). *See* TEX. OCC. CODE §§ 205.203, 205.206; 22 TEX. ADMIN. CODE § 183.4.[31]

- An applicant must attend an acupuncture school that is accredited or is a candidate for accreditation by the Accreditation Commission for Acupuncture and Oriental Medicine ("ACAOM"). *See* 22 TEX. ADMIN. CODE §§ 183.2(2), 183.4(a)(4). ACAOM requires a minimum of four years of oriental medicine and acupuncture study (a minimum of 146 semester credits or 2,625 hours, including 870 hours of clinical training).[32] All three acupuncture schools in Texas exceed these minimum requirements.[33]

- An applicant must have passed the Council of Colleges of Acupuncture and Oriental Medicine Clean Needle Technique course and practical examination. *See id.* § 184.4(a)(6).[34]

---

[31] The Acupuncture Board's rules establishing education and training requirements are attached as App. E.

[32] *See* ACAOM Accreditation Manual, at 26, available at http://www.acaom.org/documents/accreditation_manual_712.pdf.

[33] *See* AOMA Graduate School of Integrative Medicine, Graduate Program Catalog 2014-2015, at 15, available at http://aoma.edu/assets/uploads/files/AOMA_MAcOM_2014-15-w.pdf; Texas Health and Science University, Masters of Science in Acupuncture and Oriental Medicine Curriculum, available at http://www.thsu.edu/our-programs/ms-aom-curriculum/; American College of Acupuncture and Oriental Medicine, 2015-2016 Catalog, at 16-18, available at http://acaom.edu/attachments/Catalog.pdf.

[34] *See* Council of Colleges of Acupuncture and Oriental Medicine Clean Needle Technique Manual, Best Practices for Acupuncture Needle Safety and Related Procedures (2015), available at http://www.ccaom.org/downloads/7thEditionManualEnglishPDFVersion.pdf.

- An applicant must sit for the full series of National Certification Commission for Acupuncture and Oriental Medicine ("NCCAOM") examinations, the requirements of which parallel ACAOM program criteria. *See* 22 TEX. ADMIN. CODE §§ 183.2(19), 183.4(a)(5), (6).[35]

- Acupuncturists must complete seventeen hours of continuing education each year to enhance the licensee's acupuncture knowledge, skills, and competence. This includes training in acupuncture, herbology, biomedicine, and ethics. TEX. OCC. CODE § 205.255; 22 TEX. ADMIN. CODE § 183.20.

In contrast, the Chiropractic Chapter does not include any statutorily approved training or education requirements for chiropractors to practice acupuncture—because it does not authorize chiropractors to practice acupuncture. Rather, by rule, the Chiropractic Board has created a lackluster regime of questionable education and credentialing requirements:

- Chiropractors must only complete a meager 100 hours of acupuncture education and training to practice the procedure, with no specifications as to the content of that training and no clinical training requirement—grossly inadequate as compared to the course of study mandated in the Acupuncture Chapter and Acupuncture Board rules. *See* 22 TEX. ADMIN. CODE § 78.14.[36]

---

[35] *See* National Certification Commission of Acupuncture and Oriental Medicine Eligibility Requirements, available at http://www.nccaom.org/applicants/eligibility-requirements.

[36] CR 248-49l *see also generally* NBCE, Acupuncture Examination, available at http://mynbce.org/wp-content/uploads/2015/07/acu_2015.pdf. The Chiropractic Board denied at the trial court that chiropractors may complete the 100 hours of instruction without a clinical component because "no course without clinical instruction has been approved by the Board." CR 249-50. Yet Parker University is a chiropractic college approved by the Board for providing acupuncture training, and it does not require any clinical training in acupuncture. *See* Texas Board of Chiropractic Examiners meeting on acupuncture, July 11, 2012, at 2:04-2:07, available at http://www.tbce.state.tx.us/Hearings/Acupuncture20120711.MP3; *see also* Parker University, Texas State Board Approvals, available at http://ce.parker.edu/state-board-approvals/texas/.

- Effective January 1, 2010, a chiropractor must successfully complete either the standardized certification examination in acupuncture offered by the National Board of Chiropractic Examiners ("NBCE") *or* the examination offered by the NCCAOM to practice acupuncture. *Id.* § 78.14(d). As explained above, the NCCAOM examination is the examination required by the Acupuncture Board to become a licensed acupuncturist and requires at least 2,625 hours of training, but the NBCE examination requires a mere ***100 hours*** of classroom instruction.[37]

- The 100 hours of acupuncture instruction used to qualify for NBCE certification in acupuncture is typically taught as continuing education, not as for-credit coursework that is part of any degree program or core curriculum.[38] The 100-hour "continuing education" course in acupuncture may be taken while still training in chiropractic—thus allowing students of chiropractic to learn an entirely new discipline before even having completed the foundational chiropractic curriculum.[39] Further, nothing prohibits chiropractors from completing most of the course online. *See id.* § 78.14.[40]

- Chiropractors need not complete any continuing education in acupuncture.[41] *Id.*

Importantly, removing chiropractors from the licensing requirements of the Acupuncture Board also removes them from the Acupuncture Board's oversight. And the Chiropractic Board has admitted that it is not regulating the practice of

---

[37] *See* NBCE, Acupuncture Examination, at 3, available at http://mynbce.org/wp-content/uploads/2015/07/acu_2015.pdf.

[38] For instance, at Parker University, the acupuncture course is a continuing education course. *See* Parker University Continuing Education, Acupuncture Program–Basic, available at http://ce.parker.edu/programs/acupuncture-program-basic/.

[39] *See id.* (allowing chiropractic students to enroll in the program).

[40] CR 248-49.

[41] CR 250.

31

acupuncture by chiropractors.[42] The Chiropractic Board does not require chiropractors to receive a certificate or license endorsement from the Board to practice acupuncture. *Id.* It also does not track how many chiropractors, and which chiropractors, are practicing acupuncture and whether these chiropractors have completed the Board's minimal acupuncture training requirements.[43] The Chiropractic Board has instead advised its licensees that it trusts that chiropractors will "exercise reasonable care of the safety of patients" and has warned that any chiropractor who performs acupuncture without training "does so at his or her own risk."[44] As the Sunset Advisory Committee has observed, the Chiropractic Board's position appears to be buyer beware: the Board declines to regulate the practice of acupuncture by chiropractors while simultaneously authorizing them to perform the procedure.[45]

---

[42] CR 249-51.

[43] CR 249-51, 253. At the summary judgment hearing, the Chiropractic Board's counsel did not know the number either: "We have evidence that over 1,400—over 1,000—the number is not 100 percent clear—over 1,000 chiropractors in Texas do practice acupuncture as a part of their practice." Reporter's Record ("RR") 18.

[44] CR 284. At the summary judgment hearing, the Chiropractic Board's counsel confirmed that this is the Chiropractic Board's stance: "We think chiropractors are responsible. They are going to practice their profession in a safe way. If they think they need more than 100 hours of training in order to incorporate acupuncture into their practice, they are going to receive that additional training." RR 28. And "we would think that a chiropractor who is incorporating acupuncture into his practice is going to seek continuing education. It's just not specifically required to be within that particular scope. But it's up to each individual chiropractor to ensure that they are practicing their profession in a safe and effective manner." RR 29.

[45] CR 577.

The consequence of the Chiropractic Board's construction of the Chiropractic Chapter (and the one word it latches onto in the Acupuncture Chapter) is a potential threat to public safety and health. Chiropractors lack the education and training the Legislature has determined are statutorily required for the safe performance of acupuncture, and those under-trained practitioners are not subject to oversight by either the Acupuncture Board or the Chiropractic Board. *See* TEX. OCC. CODE §§ 205.203, 205.206; *see also Andrews v. Ballard*, 498 F. Supp. 1038, 1054 (S.D. Tex. 1980) ("An acupuncture needle in unskilled hands can cause serious damage."); *Commonwealth v. Schatzberg*, 371 A.2d 544, 547 (Pa. Cmwlth. 1977) (chiropractors should not practice acupuncture because "acupuncture can cause immediate and serious medical problems");[46] *see also City of Houston v. Clark*, 197 S.W.3d 314, 318 (Tex. 2006) (in construing a statute, a court should consider the consequences of a particular construction).

---

[46] *See also* National Institute of Health's National Center for Complementary and Integrative Health, Acupuncture: What You Need to Know, available at https://nccih.nih.gov/health/acupuncture/introduction#hed4 (advising that acupuncture is safe when performed by experienced, well-trained practitioners, but can cause serious side effects when improperly performed).

**2. It is unreasonable for the Chiropractic Board to rely on another profession's scope of practice statute to allow its practitioners to practice a procedure that is prohibited under the Chiropractic Chapter.**

**a. The Chiropractic Board has impermissibly latched onto one word ("nonincisive") in the Acupuncture Chapter to redefine its own scope of practice.**

One of the fundamental principles of administrative law is that because an agency is a creature of the Legislature, the agency only has the powers expressly stated in its governing statute. *State Agencies v. R.R. Comm'n of Tex.*, 421 S.W.3d 690, 699 (Tex. App.—Austin 2014, no pet.). The agency may not create or exercise what really amounts to a new or additional power. *Id.* And while an agency possesses some implied powers that are necessary to fulfill its express functions, it may not, "through the guise of implied powers, exercise what is effectively a new power, or a power contrary to a statute." *Id.*

In the face of an unambiguous prohibition in the Chiropractic Chapter against the use of needles, the Chiropractic Board has pursued an indirect route in its crusade to allow chiropractors to insert needles into patients without adequate training or oversight. The Board has inventively latched onto the definition of acupuncture as the "nonincisive" insertion of acupuncture needles in the Acupuncture Chapter to create an exception to the Chiropractic Chapter's prohibition against needle use. And the Chiropractic Board has contended that the amendment to the Acupuncture Chapter's definition of acupuncture was intended

34

to create a "carve out" from that chapter so that chiropractors could practice acupuncture without a license from or oversight by the Acupuncture Board. This is patently unreasonable. But even if that was the Legislature's intent, the Legislature failed to accomplish this purpose. Nothing in the Chiropractic Chapter authorizes the Chiropractic Board to use a definition in another chapter of the Occupations Code to evade the plain limitations of its scope of practice statute. And there is no authority supporting that a regulatory body may exempt its licensees from obtaining a license to perform a medical profession regulated by another state board.

There are several reasons the Chiropractic Board's novel theory fails. First, chiropractors and the public would be precluded from determining the "real" scope of chiropractic by consulting the Chiropractic Chapter. Instead, they would be required to review the entire Occupations Code—and guess which parts also apply to chiropractic. And it would not be enough to read the Occupations Code. As discussed in the next section, because the Chiropractic Board primarily relies on legislative debate in the enactment of Senate Bill 361 to support its unreasonable interpretation, a person would also need to review legislative history, including legislative debate, to glean what "chiropractic" actually is.

Second, condoning one of the Chiropractic Board's many attempts at statutory manipulation would defeat an important purpose of occupational

35

statutes—to put the public on notice of the permissible scope of a professional's practice and to protect the integrity of medical professions. Chiropractors are prohibited from claiming to practice a profession they are not licensed to practice. In *Brooks v. Texas Medical Board*, the Court recently concluded that because a chiropractor's website suggested that her practice was not limited to the evaluation of the biomechanical condition of the spine and musculoskeletal system (i.e., the practice of chiropractic), she was engaging in the unlicensed practice of medicine. No. 03-14-00239-CV, 2015 WL 3827327, at *1, 5 (Tex. App.—Austin June 18, 2015, no pet. h.). In so holding, the Court adopted the Medical Board's rationale that "the lay public would be confused about the scope of her practice if she omitted words defining chiropractic treatment, such as 'spinal' or 'musculoskeletal,' from her website." *Id.* at *4.

The same rationale applies here. If a chiropractor cannot ***advertise*** that he performs a procedure that is not truly "chiropractic," then surely a chiropractor cannot ***perform*** the procedure without a license from the agency that regulates the procedure. *See Tex. State Bd. of Public Accountancy v. Fulcher*, 515 S.W.2d 950, 954 (Tex. Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.) (statutes regulating the practice of professions are necessary to ensure practitioners possess the "requisite degree of skill in learning in professions which affect the public" to protect the public "against fraud [and] deception as the consequence of ignorance

36

and incompetence"). The Court should not sanction the Chiropractic Board's fast and loose interpretation of the Chiropractic and Acupuncture Chapters, nor allow the Board to devalue the profession of acupuncture in this manner.

> **b.** **Legislative history supports that the amendment to the definition of acupuncture in the Acupuncture Chapter did not grant the Chiropractic Board the authority to regulate acupuncture.**

To support its stance that the amendment to the definition of acupuncture in the Acupuncture Chapter was intended to allow chiropractors to practice acupuncture without a license from or oversight by the Acupuncture Board, the Chiropractic Board has heavily relied on comments made by an individual legislator (Representative Gray) in committee during Senate Bill 361's debate. The Court should not be persuaded.

It is well-established that comments and testimony by members of the Legislature do not evince legislative intent. As the Texas Supreme Court has repeatedly counseled, "a single statement by a single legislator does not evidence legislative intent and does not determine legislative intent." *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 191-92 (Tex. 2010); *see also AT&T Commc'ns of Tex., L.P. v. Sw. Bell Tel. Co.*, 186 S.W.3d 528-29 (Tex. 2006). "The Legislature does not speak through individuals—even its members—in committee hearings, in bill analyses and reports, in legislative debate, or in pre- and post-enactment commentary; it speaks through its enactments." *Entergy Gulf States,*

37

*Inc. v. Summers*, 282 S.W.3d 433, 447 (Tex. 2009) (Hecht, J., concurring). Further, it is inappropriate to look to legislative history when statutory text is unambiguous. *City of Round Rock v. Rodriguez*, 399 S.W.3d 130, 137 (Tex. 2013).

Regardless, legislative history, including Representative Gray's comments, nonetheless counsels the opposite of what the Chiropractic Board asserts. The Legislature has repeatedly declined to enact legislation authorizing chiropractors to practice acupuncture under regulation by the Chiropractic Board. Before 1995, the Chiropractic Chapter did not expressly prohibit chiropractors from performing procedures involving needles, leading to disputes about whether those sorts of practices were within the statutory scope of chiropractic. *See Tex. Med. Ass'n*, 375 S.W.3d at 469. To resolve those disputes, in 1995, the Legislature amended the Chiropractic Chapter to explicitly prohibit chiropractors from performing "incisive, surgical" procedures (with the exception of using needles for diagnostic blood draws). *See id.* The impetus of this change was a floor amendment offered by Representative Uher that contained the current limitation on nonincisive procedures, but with broad exceptions for needle use, including for acupuncture and needle EMG. *Id.* n.7. His amendment, however, was amended by Representative Janek to strip these exceptions from the bill, leaving the narrow exception for diagnostic blood draws. *Id.* When presenting this amendment, Representative Janek stated that "[t]his amendment would take out any ability by

38

the chiropractors to put needles into people." *Id.* Representative Uher's amendment was ultimately adopted, but as circumscribed by Representative Janek's amendment.

The next session, Representative Gray attempted to amend Senate Bill 361 (the Acupuncture Board's sunset bill) to expressly authorize chiropractors to practice acupuncture, but these amendments were stripped from the bill before enactment because they were not germane.[47] Instead, as ultimately enacted, the Acupuncture Chapter was amended to define acupuncture as "nonincisive." *See* Act of May 29, 1997, 75th Leg., R.S., ch. 1170, § 1. Since Senate Bill 361's enactment, there has been further attempt to amend the Chiropractic Chapter to authorize chiropractors to practice acupuncture under regulation by the Chiropractic Board—and this legislation also failed to pass. *See* Tex. S.B. 1601, 82nd Leg., R.S. (2011).

Thus, the Legislature has repeatedly rejected attempts to amend the Chiropractic Chapter to include acupuncture within the scope of chiropractic, and "[n]o court could justify putting into a statute by implication what both Houses of the Legislature had expressly rejected by decisive votes." *Grasso v. Cannon Ball Motor Freight Lines*, 81 S.W.2d 482, 485 (Tex. Com. App. 1935); *see also Tex.*

---

[47] *See supra*, pp. 9-10.

*Water Comm'n v. Brushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 23 (Tex. 1996) ("courts should decline to infer a limitation in a statute that the Legislature has explicitly rejected"); *Transp. Ins. Co. v. Maksyn*, 580 S.W.2d 334, 338 (Tex. 1979) ("Courts should be slow to put back that which the Legislature has rejected.").

Further, Representative Gray's proposed amendments to the Chiropractic Chapter in Senate Bill 361 to authorize chiropractors to practice acupuncture without a license from the Acupuncture Board were stricken on points of order because the amendments were not germane to the subject of the bill. The Legislature's germaneness rules mirror the Texas Constitution's prohibition on legislation containing more than one subject. *Compare, e.g.*, Texas House Rules for the 84th Legislature, Rule 4, § 41, and Rule 11, § 2, *with* TEX. CONST. art. III, § 35(a). As explained in Part II.B below, the fact that the Legislature could not constitutionally authorize chiropractors to practice acupuncture in the Acupuncture Board's sunset bill negates any argument that the sunset bill's change in the definition of acupuncture impacted the practice of acupuncture by chiropractors. "The Legislature cannot do by indirection what it cannot do directly." *See West*

40

*Orange-Cove Consol. Indep. Sch. Dist. v. Alanis*, 107 S.W.3d 558, 600 (Tex. 2003)

(quoting *Jernigan v. Finley*, 38 S.W. 24, 26 (Tex. 1896)).[48]

Finally, Representative Gray's statements that the Chiropractic Board has relied on for support actually undermine the Board's argument. Representative Gray acknowledged during committee debate on Senate Bill 361 that amending the definition of acupuncture in the Acupuncture Chapter would not enable chiropractors to practice acupuncture without a license from the Acupuncture Board. She explained that:

> The Senate bill included language that put [the practice of acupuncture by chiropractors] under the Acupuncture Board. … What the [House's] amendments would do is put [the practice of acupuncture by chiropractors] under the Chiropractic Board but with certain guidelines. … [An amendment authorizing chiropractors to practice acupuncture] needs to be in the practice act as it relates to chiropractors and not [ ] under the Board of Acupuncture Examiners.[49]

---

[48] The Chiropractic Board's counsel stated at the summary judgment hearing that the Chiropractic Board's position is that Senate Bill 361 authorized chiropractors to practice acupuncture without a license through the "back door" because "it was not as easy, politically" to directly authorize them to do so. RR 40.

[49] CR 478-80, 483.

Thus, post-Senate Bill 361, chiropractors practicing acupuncture must still obtain a license from the Acupuncture Board and remain within the oversight of that agency.[50]

### c. The Court should decline to read the Acupuncture Chapter and Chiropractic Chapter *in pari materia* to create an exemption for acupuncture in the Chiropractic Chapter.

The Chiropractic Board has also attempted to utilize the doctrine of "*in pari materia*" to justify using the definition of acupuncture in the Acupuncture Chapter to inform the scope of the practice of chiropractic in the Chiropractic Chapter. Extrinsic tools of statutory construction are not available when a statute is unambiguous. *Greater Houston P'ship*, 2015 WL 3978138, at 5. But even if the Court believes the relevant statutes are ambiguous, the Court should decline to use this tool.

First, the doctrine of *in pari materia* is inapplicable. Texas Government Code, Section 311.026(b) codified this common-law doctrine, and the statute only applies if a conflict between statutes is irreconcilable. *Abbott*, 391 S.W.3d at 348. While it is true that courts read conflicting statutes together to harmonize them, there is no conflict here. *See Rodriguez v. Tex. Workforce Comm'n*, 986 S.W.2d 781, 783 (Tex. App.—Corpus Christi 1999, pet. denied). One does not need to read

---

[50] Indeed, there are chiropractors who are dually licensed by the Chiropractic and Acupuncture Boards and therefore lawfully practice acupuncture.

42

the Acupuncture Chapter to determine the scope of chiropractic since that scope is found solely in the Chiropractic Chapter. Thus, not only are the two chapters not "irreconcilable," there is no conflict at all because each chapter discreetly applies to a different profession.

Second, for two statutes that do not reference each other to be *in pari materia*, they must have been enacted with the ***same object or purpose*** in mind. *See, e.g., Nat'l Media Corp. v. City of Austin*, No. 03-12-00188-CV, 2014 WL 4364815, at *2 (Tex. App.—Austin Aug. 27, 2014, no pet.); *Abbott*, 391 S.W.3d at 348; *Howlett v. Tarrant Cnty.*, 301 S.W.3d 840, 846 (Tex. App.—Fort Worth 2009, pet. denied). "The adventitious occurrence of like or similar phrases, or even of similar subject matters, in laws enacted for wholly different ends will not justify applying the doctrine." *Abbott*, 391 S.W.3d at 349; *see also In re JMR*, 149 S.W.3d 239, 292 (Tex. App.—Austin 2004, no pet.). To determine whether two statutes share a common purpose, courts must consider whether the statutes were ***clearly written to achieve the same objectives***. *See In re JMR*, 149 S.W.3d at 292-94 (emphasis added); *Abbott*, 391 S.W.3d at 350. And if two statutes were enacted "many years apart for different purposes and objectives," they are not to be read *in pari materia. DLB Architects, P.C. v. Weaver*, 305 S.W.3d 407, 410 (Tex. App.—Dallas 2010, pet. denied).

43

Based on these principles, this Court has refused to read *in pari materia* separate statutory or regulatory provisions that do not clearly share the same purpose. *See In re JMR*, 149 S.W.3d at 294 (trespass statute in the Penal Code and trespass statute in the Education Code could not be read *in pari materia* because one was intended to protect a property interest while the other was intended to protect the safety of those on school grounds); *National Media Corp.*, 2014 WL 4364815, at *1-2 (City's Zoning Code and Sign Regulations Code could not be read *in pari materia* since they did not touch on the same subject, have the same purpose, or relate to the same objective); *Abbott*, 391 S.W.3d at 347-49 (statutory provisions regarding patient confidentiality did not share the same purpose as provisions concerning the confidentiality of Chiropractic Board investigations and so could not be read *in pari materia*).

As in these cases, the legislation limiting chiropractic to "nonincisive" procedures, and the later legislation limiting acupuncture to "nonincisive" needle insertion, did not share the same object or purpose, nor were they enacted during the same legislative session. To the contrary, the legislation limiting chiropractic to nonincisive procedures (except for diagnostic blood draws) was enacted to prohibit chiropractors from performing procedures involving needles. *See Tex. Med. Ass'n*, 375 S.W.3d at 469 n.7, 477-78. The legislation limiting acupuncture to the nonincisive insertion of an acupuncture needle was enacted as part of the

44

Acupuncture Board's sunset bill—not as part of any legislation concerning chiropractic. The Chiropractic Board may not apply an amendment to the Acupuncture Chapter to end-run the Chiropractic Chapter's prohibition against needle use.

**D.    The Chiropractic Board's interpretation of the Acupuncture Chapter is entitled to no deference because the Chiropractic Board's expertise is chiropractic, not acupuncture.**

Because the Chiropractic Board's expertise is chiropractic (not acupuncture), its interpretation of the Acupuncture Chapter is entitled to no deference. *Rogers*, 390 S.W.3d at 384. To defer to the Chiropractic Board's construction would be akin to deferring to a conclusion by the Acupuncture Board that acupuncturists may practice nursing or physical therapy without a license from the relevant occupational board or the intensive education and training required for the practice. Further, notably, the agencies that do possess expertise about the scope of the practice of acupuncture—the Acupuncture Board and the Texas Medical Board (which oversees the Acupuncture Board)—believe that the Acupuncture Chapter does not broaden the scope of the practice of chiropractic to include acupuncture. *See Tex. Med. Ass'n*, 375 S.W.3d at 477-78.[51] If the Court is going to grant deference, it should defer to those agencies, not the Chiropractic Board.

---

[51]    *See also* CR 401-02, 408-13, 762-64. The Attorney General declined to accept the Acupuncture Board's 2013 request for opinion due to the *Texas Medical Association* litigation.

**E.** **The Chiropractic Board's rules are invalid because they impermissibly allow chiropractors to practice acupuncture in violation of the Acupuncture Chapter.**

The Chiropractic Board's rules are also invalid because they unlawfully authorize chiropractors to practice acupuncture in violation of the Acupuncture Chapter. To practice acupuncture, a person must hold a license issued by the Acupuncture Board. *See* TEX. OCC. CODE § 205.201. The Acupuncture Chapter specifically mandates that "a person may *not* practice acupuncture in this state unless the person holds a license to practice acupuncture issued by the acupuncture board under this chapter." *Id.* § 205.201 (emphasis added). The only exception is for healthcare professionals *licensed under another statute of this state* and *acting within the scope of the license*. *See id.* § 205.003(a) (emphasis added).

Thus, the only way a chiropractor is exempt from the requirements of the Acupuncture Chapter is if the chiropractor is practicing within the scope of *chiropractic* as defined in the chiropractor's licensing statute: *the Chiropractic Chapter.* Under the express terms of the Chiropractic Chapter, chiropractors are prohibited from performing procedures involving needles, save for diagnostic blood draws, and are limited to treating the musculoskeletal portion of the body. *See id.* § 201.002. Within the scope of their licensing statute, chiropractors may not practice acupuncture—which by its statutory definition requires the use of needles and treats the entire body. *Id.* § 205.001(2).

46

**F.** **The rules are invalid because they authorize chiropractors to engage in the unauthorized practice of medicine.**

The Chiropractic Board's rules also authorize chiropractors to engage in the unauthorized practice of medicine. Historically, only physicians could perform most medical procedures, including chiropractic and acupuncture. *See Thompson v. Tex. State Bd. of Med. Exam'rs*, 570 S.W.2d 123, 130 (Tex. App.—Tyler 1978, writ refused n.r.e.); *Teem v. State*, 183 S.W. 1144, 1147-48 (Tex. Crim. App. 1916). Over time, the Legislature exempted various healthcare professionals, including chiropractors, from adhering to the requirements of the Medical Practice Act. But the Legislature has never severed the practice of acupuncture from its historical roots as a practice of medicine under the authority of the Texas Medical Board. *See, e.g.*, *Andrews*, 498 F. Supp. at 1039-40. As a result, acupuncturists continue to be subject to the supervision of the Texas Medical Board, though with separate licensing requirements, and are not fully excluded from the scope of the Medical Practice Act. *See, e.g.*, Tex. Occ. Code §§ 151.052, 205.101. Other states similarly have historically considered acupuncture to constitute the practice of medicine. *See, e.g.*, *People v. Roos*, 514 N.E.2d 993, 996 (Ill. 1987). And many courts—including in Texas—have held that a chiropractor's practice of acupuncture constitutes the unauthorized practice of medicine. *See Kelley v. Raguckas*, 270 N.W.2d 665, 625-26 (Mich. App. 1978); *Schatzberg*, 371 A.2d at 46-47; *State v. Rich*, 339 N.E.2d 630, 197 (Ohio 1975); *State v. Won*, 528 P.2d

47

594, 595-96 (Ore. App. 1974); *Ex parte Halsted*, 182 S.W.2d 479, 485 (Tex. Crim. App. 1944).

The Medical Practice Act excludes chiropractors from its scope and requirements, but only to the extent chiropractors are engaged ***strictly*** in the practice of chiropractic. *See* TEX. OCC. CODE §§ 151.002(13), 151.052; *Tex. Orthopaedic Ass'n*, 254 S.W.3d at 717. "When engaged strictly in the practice of chiropractic as defined by law, a licensed chiropractor is not engaging in the unlicensed practice of medicine. But to the extent that a chiropractor exceeds the statutory scope of chiropractic, she would subject herself to the Medical Practice Act—and practice medicine unlawfully." *Brooks*, 2015 WL 3827327, at \*2.

This Court has refused to allow an occupational board to adopt rules that have the effect of allowing non-physician healthcare professionals to engage in the unauthorized practice of medicine. For example, in *Texas Orthopaedic Association*, the Court concluded that a rule adopted by the Texas State Board of Podiatric Medical Examiners exceeded the statutory scope of podiatry because it allowed podiatrists to treat parts of the body above the foot that were outside the scope of podiatry training. *Id.* at 721. Consequently, the Court held that the rule authorized podiatrists to engage in the unauthorized practice of medicine because they were treating parts of the body "outside the traditional scope of podiatry without satisfying the requirements of the Medical Practice Act." *Id.* The rule

48

exceeded the limited exemption from the Medical Practice Act by allowing podiatrists to engage in acts that were not *strictly* the practice of podiatry. *Id.*

Similarly, the Court has concluded that chiropractors were engaged in the unauthorized practice of medicine by performing needle EMG, *see Tex. Med. Ass'n*, 375 S.W.3d at 497, and by claiming to treat medical conditions like autism that are not limited to the biomechanical condition of the spine or musculoskeletal system, *Brooks*, 2015 WL 3827327, at *1, 5. The rules challenged in this lawsuit likewise authorize chiropractors to engage in a practice that is not strictly the practice of chiropractic and therefore are beyond the limited exception granted to them by the Medical Practice Act.

*For all of these reasons*, the Chiropractic Board's rules authorizing chiropractors to practice acupuncture are invalid. The Court should reverse and render judgment for the Association.

## II.

**Alternatively, the statutory scheme purportedly authorizing chiropractors to practice acupuncture violates the Texas Constitution because the Legislature may not favor one school of medicine over another nor enact legislation containing more than one subject.**

In the alternative, the Association requests that the Court reverse and render judgment for the Association and declare that (1) the statutory scheme purportedly authorizing chiropractors to practice acupuncture with significantly less education

or training in acupuncture than acupuncturists is invalid in violation of Texas Constitution, Article XVI, Section 31; and (2) Senate Bill 361 violated the one-subject rule in Texas Constitution, Article III, Section 35(a). *See* TEX. CIV. PRAC. & REM. CODE §§ 37.004, 37.006; *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622 (Tex. 2011) (per curiam).

## A. The statutory scheme purportedly authorizing chiropractors to practice acupuncture with significantly less education and training in acupuncture than licensed acupuncturists violates Texas Constitution, Article XVI, Section 31.

The Texas Constitution broadly states: "The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice, but *no preference shall ever be given by law to any schools of medicine*." *See* TEX. CONST. art. XVI, § 31 (emphasis added). Texas courts have interpreted this provision to prohibit the Legislature from unfairly and arbitrarily "preferring" one branch of medicine over another by allowing one category of healthcare professionals to obtain licenses with less burdensome conditions. *See, e.g.*, *Schlichting v. Tex. State Bd. of Medical Exam.*, 310 S.W.2d 557, 564 (Tex. 1958); *Wilson v. State Bd. of Naturopathic Examiners*, 298 S.W.2d 946, 948-50 (Tex. Civ. App.—Austin 1957, writ ref'd n.r.e.).

In *Schlichting*, the Texas Supreme Court held that to allow one school of medicine to be licensed on easier terms than those required for a similar practice of medicine would violate article XVI, section 31. *Id.* at 564. And the violation is

50

even more obvious when one group is allowed to practice without any license at all, while practitioners of a similar form of medicine must be licensed on onerous conditions. *Id.*; *see also Wilson*, 298 S.W.2d at 949-50.

Indeed, the Court of Criminal Appeals has held that a broad interpretation of the scope of chiropractic would violate this provision of the Constitution. The Court considered the chiropractic statute in effect at that time and concluded:

> Assuming, then, that under the Act before us, the Legislature has set up, recognized, and defined chiropractic as a system, means, and method for the treatment of diseases and disorders of the human body, and that practitioners thereof are authorized to treat, by chiropractic, patients for diseases and disorders, *it is evident that the Legislature has preferred such science and such practitioners over all others engaged in doing the same thing*, that is, in treating the human body for diseases and disorders, *because the chiropractor is not required to have the same educational qualifications*, nor is he required, as a condition precedent to his right to so treat patients, to pass a satisfactory examination upon the same subjects that are required of all others similarly situated.

*Ex parte Halsted*, 182 SW.2d at 487 (emphasis added).

Of course, as the Chiropractic Board argued at the trial court, this constitutional provision is not applicable when chiropractors are strictly practicing chiropractic because they are then not "practicing medicine." Tex. Occ. Code §§ 151.002(13), 151.052; George D. Braden et al., *The Constitution of the State of Texas: An Annotated and Comparative Analysis*, at 768 (1977). But if a chiropractor does not practice in this strict manner, she is not only engaged in the

51

practice of medicine, but the unauthorized practice of medicine. *See, e.g.*, *Tex. Orthopaedic Ass'n*, 254 S.W.3d at 717, 721.[52]

Here, the Acupuncture Chapter requires acupuncturists to complete significant education and training in acupuncture in order to practice the procedure. *See* TEX. OCC. CODE §§ 205.203, .206, .255. In contrast, if the Legislature has allowed chiropractors to practice acupuncture, it has done so without requiring them to complete *any* education or training in acupuncture. Under this statutory scheme, the Legislature unconstitutionally prefers chiropractic over acupuncture.

**B.**   **The legislation that purportedly authorized chiropractors to practice acupuncture violates the one-subject rule in Texas Constitution, Article III, Section 35(a).**

The Texas Constitution prohibits the Legislature from enacting a bill that contains more than one subject. TEX. CONST. art. III, § 35(a). For a bill to pass muster, its provisions must relate, directly or indirectly, to the same subject and have a mutual connection. *LeCroy v. Hanlon*, 713 S.W.2d 335, 337 (Tex. 1986); *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593, 601 (Tex. 1976); *C. Hayman Constr. Co. v. Am. Indem. Co.*, 471 S.W.2d 564, 566 (Tex. 1971). In other words, to be valid, a provision must be germane to the subject of the bill. *Jessen Assocs.*,

---

[52] As explained previously, acupuncture treats any condition in the entire body and is not expressly severed from the Medical Practice Act as a practice of medicine, and the Acupuncture Board operates under the supervision of the Texas Medical Board. *See, e.g.*, TEX. OCC. CODE §§ 151.052, 205.001(2), .101; *Andrews*, 498 F. Supp. at 1039-40.

531 S.W.2d at 601. As specific to amendments to a bill, to be germane, the subject matter of an amendment must be reasonably related to the content of the original act. *Sommermeyer v. State*, 713 S.W.2d 183, 184-85 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd). The policy reason behind the one-subject rule is:

> [I]f the provisions of the law or section to be amended involve a subject different from that actually dealt with in the body of the amending act, a reading of the former will not disclose to the reader the true subject of the amending act but, on the contrary, will mislead him as to the latter.

*Bd. of Water Eng'gs v. City of San Antonio*, 283 S.W.2d 722, 727 (Tex. 1955).

Senate Bill 361 was the Acupuncture Board's sunset bill. It related to the Acupuncture Board's continuation and functions, as plainly indicated from the bill's caption and its content. If the bill additionally expanded the scope of the practice of chiropractic, it violated the one-subject rule because it embraced two subjects: the continuation and function of the Acupuncture Board and the statutory scope of the practice of chiropractic.

During Senate Bill 361's journey through the Legislature, the bill amended the Chiropractic Chapter's scope of practice provision to authorize chiropractors to practice acupuncture. *See* Part I.C.2.b, *supra*. But on the House floor, those provisions were challenged and ultimately struck from the bill on germaneness grounds because the ***chiropractic*** scope of practice has no relationship or connection to the functions of the ***Acupuncture Board***. The Legislature could not

53

have expressly authorized chiropractors to practice acupuncture without violating the one-subject rule—and it cannot do indirectly what it could not do directly. *West Orange-Cove*, 107 S.W.3d at 600. Thus, if the amendment to the Acupuncture Chapter authorizes chiropractors to practice acupuncture, it rendered that portion of the bill unconstitutional.

## III.

### The Chiropractic Board's statute of limitations defense fails as a matter of law.

In its summary judgment motion, the Chiropractic Board urged that the Association's challenge is time-barred under the residual statute of limitations found in the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 16.051. But as the Chiropractic Board acknowledged, no court has applied the residual statute of limitations to a declaratory judgment action challenging the validity of agency rules. Adopting the Chiropractic Board's novel argument would be a sea change in how Texas courts resolve allegations that an agency is overstepping its statutory authority. And it would thwart the very purpose of the statutory scheme the Chiropractic Board seeks to continue to violate.

The Chiropractic Board urges that because it has for more than four years illegally authorized chiropractors to practice acupuncture, it can continue to exceed its statutory authority and violate Texas law, daily and with impunity. This is not the law in Texas. In 2012, in *Texas Medical Association,* this Court invalidated the

Chiropractic Board's rules allowing chiropractors to perform needle EMG and MUA—despite that the Chiropractic Board had been authorizing chiropractors to practice needle EMG and MUA since at least the 1980s.[53] 375 S.W.3d at 469, 481, 488. Likewise, in *Texas Association of Psychological Associates v. Texas State Board for Examiners of Psychologists*, the Court reviewed whether the Psychology Board's rules exceeded its statutory authority—despite that the challenged rules had been adopted more than four years earlier. 439 S.W.3d 597, 600-02 (Tex. App.—Austin 2014, no pet.). And in *Texas State Board of Examiners of Marriage & Family Therapists v. Texas Medical Association*, the Court reviewed and affirmed a trial court judgment invalidating a rule that had been adopted in 1994. 458 S.W.3d 552, 554 (Tex. App.—Austin 2014, pet. filed).

The residual statute of limitations should not be applied as urged by the Chiropractic Board because limitations cannot be used to defeat the legislative intent of a statute. *See Heine v. Tex. Dept. of Pub. Safety*, 92 S.W.3d 642, 648-49 (Tex. App.—Austin 2002, pet. denied). The Legislature enacted the statutes regulating the various healthcare professions, including acupuncture and chiropractic, to protect the public. To ensure practitioners possess the "requisite

---

[53] As the Sunset Commission observed in making recommendations regarding the Chiropractic Board, the Chiropractic Board evaded rule challenges and obtaining stakeholder input by issuing "opinions" that operated as de facto rules rather than adopting rules through the statutorily required process. *See* CR 574-80. These opinions authorized MUA, needle EMG, and acupuncture. *Id.*

degree of skill in learning in [these] professions which affect the public," the Legislature mandates that individuals complete specified training, obtain a license, and be overseen by the governing board for each specific healthcare profession. *See Tex. State Bd. of Public Accountancy*, 515 S.W.2d at 954. This is essential for healthcare professions because, absent adequate training, the very life and safety of the public are at stake. *See, e.g., Tex. State Bd. of Barber Exam'rs*, 454 S.W.2d at 731.

The Chiropractic Board's limitations argument seeks to erase the protections afforded by the Acupuncture Chapter. The Chiropractic Board argues that because it has, for years, illegally allowed chiropractors to practice acupuncture with little to none of the training hours required for acupuncturists, without a license from the Acupuncture Board, and without oversight from any board, it should be allowed to continue to do so into perpetuity—putting countless additional patients at risk of being deceived about the qualifications of their practitioners, subject to incompetent and ineffective treatment or, worse, harmed. The protective intent of the Legislature in enacting the Acupuncture Chapter "should not be thwarted" by applying Section 16.051 so as to give the Chiropractic Board a free pass to continue violating Texas law. *Heine*, 92 S.W.3d at 649.

Moreover, even if the Court concludes that the four-year residual statute of limitations in Section 16.051 does govern challenges to an agency's authority to

adopt and enforce administrative rules, there are at least three reasons why this Court should hold that the Association's claims for declaratory and injunctive relief are not time-barred. First, the Chiropractic Board is incorrect that the "most recent action of the Chiropractic Board relevant to the lawsuit became four years old on July 2, 2013." To the contrary, in 2013, the Board adopted amended versions of both of the challenged rules as specifically related to needle use and the practice of acupuncture by chiropractors (then Rules 75.17 and 75.21); in January 2015, during this lawsuit, the Chiropractic Board again amended the Rules, renumbering them as Rules 78.13 and 78.14. When an agency promulgates a new version of a rule, any limitations period begins anew and a court has authority to review the entire amended rule (not just specifically amended subparts of the rule). *See State Office of Pub. Util. Counsel*, 131 S.W.3d at 321.[54] Thus, the Association's challenge to the amended rules would not be time-barred until 2019.

Second, equally important is what the Chiropractic Board failed to amend in 2013 and 2015. In 2012, in *Texas Medical Association*, the Court upheld the trial court's decision invalidating the entirety of Rule 75.17(a)(3). *See* 375 S.W.3d at 481. But when the Chiropractic Board thereafter amended that rule, it did not amend the portion of the rule that continues to allow needle-use by chiropractors.

---

[54] This case concerned a limitation provision in the Public Utility Regulatory Act, not the residual limitations statute. *See id.* But the same reasoning is applicable here.

And the Chiropractic Board did not amend the related Rules 75.17(b)(4), 75.17(e)(2)(C), and 75.21 (now Rules 78.13(a)(4), (b)(2), (e)(2)(C), 78.14, and 78.15(a)(1), (b)(1)(A), (b)(2)(A)), even though the court invalidated rules permitting chiropractors to use needles. "A cause of action accrues and the applicable limitations period begins to run when a wrongful act causes some legal injury." *Nw. Austin Municipal Util. Dist. No. 1 v. City of Austin*, 274 S.W.3d 820, 836-37 (Tex. App.—Austin 2008, pet. denied). The Chiropractic Board's failure in 2013 and 2015 to bring its rules within this Court's precedent constituted an additional wrongful act that created a new controversy between the Chiropractic Board and the Association. Thus, for this additional reason, the Association's claims would not be time-barred until 2019.

Third, the residual statute of limitations in section 16.051 does not bar the Association's challenge that the Chiropractic Board's rules are a continuing and ongoing violation of state law. *Id.* at 836. The Board did not just authorize chiropractors to practice acupuncture (without adequate training, a license from the Acupuncture Board, or oversight) at some distant time in the past—it continues to do so every day. Until the Chiropractic Board's rules are amended or repealed, the Board violates state law every day, "caus[ing] the accrual of the cause of action to occur each day." *Dvorken v. Lone Star Indus., Inc.*, 740 S.W.2d 565, 567 (Tex. App.—Fort Worth 1987, no writ). While Section 16.051 may bar the Association

from seeking damages that accrued more than four years ago, it does not bar this suit to determine if the challenged rules are currently in violation of Texas law. *Nw. Austin Municipal Util. Dist. No. 1*, 274 S.W.3d at 837. Thus, the Association's challenge to the continuing violation is not time-barred.

*For each of these reasons*, the Court should conclude that, if the trial court granted summary judgment on the Chiropractic Board's affirmative defense of limitations, it erred.

## PRAYER

The Texas Association of Acupuncture and Oriental Medicine prays that the Court:

(1)  reverse the trial court's judgment, render judgment for the Association, and declare invalid and enjoin 22 Texas Administrative Code §§ 78.13(a)(4), (b)(2), (e)(2)(C), and 78.14 (previously §§ 75.17(a)(3), (b)(4), (e)(2)(C), and 75.21));

(2)  alternatively, reverse the trial court's judgment, render judgment for the Association, and declare that the statutory scheme created by Senate Bill 361's amendment to the Acupuncture Chapter is unconstitutional because the Legislature may not favor one school of medicine over another nor enact legislation containing more than one subject; or

(3)  in the further alternative, if the Court believes any fact issue precludes rendition of judgment, reverse the trial court's judgment and remand for a new trial.

The Association further prays for any other relief to which it may be entitled.

59

Respectfully submitted,


By: */s/ Craig T. Enoch*

    Craig T. Enoch
      Texas Bar No. 00000026
      cenoch@enochkever.com
    Melissa A. Lorber
      Texas Bar No. 24032969
      mlorber@enochkever.com
    Shelby O'Brien
      Texas Bar No. 24037203
      sobrien@enochkever.com
    ENOCH KEVER PLLC
    600 Congress Avenue
    Suite 2800
    Austin, Texas 78701
    512.615.1200 Telephone
    512.615.1198 Fax

***Attorneys for Texas Association of Acupuncture and Oriental Medicine***

## CERTIFICATE OF COMPLIANCE

Appellant certifies that this Brief of Appellant (when excluding the caption, identity of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certificate of compliance, and appendix) contains 13,517 words.

/s/ *Craig T. Enoch*
Craig T. Enoch

## CERTIFICATE OF SERVICE

I hereby certify that, on August 10, 2015, the foregoing Brief of Appellant Texas Association of Acupuncture and Oriental Medicine was served via electronic service on the following:

Joe H. Thrash
Assistant Attorney General
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711
Joe.Thrash@texasattorneygeneral.gov

/s/ *Craig T. Enoch*
Craig T. Enoch

61

# No. 3-15-00262-CV

*In the Court of Appeals*
*Third District of Texas — Austin*

**TEXAS ASSOCIATION OF ACUPUNCTURE**
**AND ORIENTAL MEDICINE,**

*Appellant,*

**v.**

**TEXAS BOARD OF CHIROPRACTIC EXAMINERS AND YVETTE**
**YARBROUGH, EXECUTIVE DIRECTOR IN HER OFFICIAL CAPACITY,**

*Appellees.*

*On Appeal from 201st District Court, Travis County, Texas*
*Cause No. D-1-GN-14-000355*

# APPENDIX

A. **Trial Court's Judgment**

B. **22 Texas Administrative Code §§ 78.13-78.15**

C. **Texas Occupations Code, Chapter 201**

D. **Texas Occupations Code, Chapter 205**

E. **22 Texas Administrative Code §§ 183.2, 183.4, 183.20**

F. *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Bd.*, 375 S.W.3d 464 (Tex. App.—Austin 2012, pet. denied)

# APPENDIX A

CAUSE NO. D-1-GN-14-000355

| | | |
|---|---|---|
| TEXAS ASSOCIATION OF ACUPUNCTURE AND ORIENTAL MEDICINE | § § § | IN THE DISTRICT COURT IN |
| Plaintiff, | § § § | |
| v. | § § | 201st JUDICIAL DISTRICT |
| TEXAS BOARD OF CHIROPRACTIC EXAMINERS and YVETTE YARBROUGH, EXECUTIVE DIRECTOR, IN HER OFFICIAL CAPACITY | § § § § § § § | |
| Defendants. | § § | TRAVIS COUNTY, TEXAS |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

On January 7, 2015, Plaintiff Texas Association of Acupuncture and Oriental Medicine's (hereafter "Plaintiff") Motion for Summary Judgment came on to be heard. After reading the pleadings, hearing the arguments presented by counsel, reviewing the evidence and case law, and considering the same, the Court finds that Plaintiff's Motion for Summary Judgment is DENIED.

Therefore, IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion for Summary Judgment is DENIED.

All relief not expressly granted is DENIED.

SIGNED on this the _____4_____ day of February, 2015.

JUDGE ORLINDA L. NARANJO
419TH DISTRICT COURT

Filed In The District Court
of Travis County, Texas

FEB -4 2015

At 2:33 P.M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-000355

| | | |
|---|---|---|
| TEXAS ASSOCIATION OF ACUPUNCTURE AND ORIENTAL MEDICINE | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | 201ˢᵗ JUDICIAL DISTRICT |
| TEXAS BOARD OF CHIROPRACTIC EXAMINERS and YVETTE YARBROUGH, EXECUTIVE DIRECTOR, IN HER OFFICIAL CAPACITY | § § § § § § § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING DEFENDANTS' TRADITIONAL MOTION FOR SUMMARY JUDGMENT

On January 7, 2015, Defendants Texas Board of Chiropractic Examiners, and Yvette Yarbrough's (hereafter "Defendants") Traditional Motion for Summary Judgment came on to be heard. After reading the pleadings, hearing the arguments presented by counsel, reviewing the evidence and case law, and considering the same, the Court finds that Defendants' Traditional Motion Summary Judgment is GRANTED in all respects except as to attorney's fees.

Therefore, IT IS ORDERED, ADJUDGED, AND DECREED that Defendants' Traditional Motion for Summary Judgment is GRANTED, and that Defendants' request for attorney's fees is DENIED.

All relief not expressly granted is DENIED.

SIGNED on this the ___4___ day of February, 2015.

JUDGE ORLINDA L. NARANJO
419ᵀᴴ DISTRICT COURT

P.04          512 854 2224          419TH DISTRICT COURT          16:07 FEB-04-2015

# APPENDIX B

# Texas Administrative Code

|  |  |
|---|---|
| TITLE 22 | EXAMINING BOARDS |
| PART 3 | TEXAS BOARD OF CHIROPRACTIC EXAMINERS |
| CHAPTER 78 | RULES OF PRACTICE |
| RULE §78.13 | Scope of Practice |

(a) Definitions. The following words and terms, when used in this section, shall have the following meanings, unless the context clearly indicates otherwise:

  (1) Board--The Texas Board of Chiropractic Examiners.

  (2) CPT Codebook--The American Medical Association's annual Current Procedural Terminology Codebook (2004). The CPT Codebook has been adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services as Level I of the common procedure coding system.

  (3) Cosmetic treatment--A treatment that is primarily intended by the licensee to address the outward appearance of a patient.

  (4) Incision--A cut or a surgical wound; also, a division of the soft parts made with a knife or hot laser.

  (5) Musculoskeletal system--The system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form.

  (6) On-site--The presence of a licensed chiropractor in the clinic, but not necessarily in the room, while a patient is undergoing an examination or treatment procedure or service.

  (7) Practice of chiropractic--The description and terms set forth under Texas Occupations Code §201.002, relating to the practice of chiropractic.

  (8) Subluxation--A lesion or dysfunction in a joint or motion segment in which alignment, movement integrity and/or physiological function are altered, although contact between joint surfaces remains intact. It is essentially a functional entity, which may influence biomechanical and neural integrity.

  (9) Subluxation complex--A neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them.

(b) Aspects of Practice.

  (1) A person practices chiropractic if they:

    (A) use objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body; or

(B) perform nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system.

(2) Needles may be used in the practice of chiropractic under standards set forth by the Board but may not be used for procedures that are incisive or surgical.

(3) This section does not apply to:

(A) a health care professional licensed under another statute of this state and acting within the scope of their license; or

(B) any other activity not regulated by state or federal law.

(c) Examination and Evaluation.

(1) In the practice of Chiropractic, licensees of this board provide necessary examination and evaluation services to:

(A) Determine the bio-mechanical condition of the spine and musculoskeletal system of the human body including, but not limited to, the following:

(i) the health and integrity of the structures of the system;

(ii) the coordination, balance, efficiency, strength, conditioning and functional health and integrity of the system;

(iii) the existence of the structural pathology, functional pathology or other abnormality of the system;

(iv) the nature, severity, complicating factors and effects of said structural pathology, functional pathology or other abnormality of the system;

(v) the etiology of said structural pathology, functional pathology or other abnormality of the system; and

(vi) the effect of said structural pathology, functional pathology or other abnormality of the system on the health of an individual patient or population of patients;

(B) Determine the existence of subluxation complexes of the spine and musculoskeletal system of the human body and to evaluate their condition including, but not limited to:

(i) The nature, severity, complicating factors and effects of said subluxation complexes;

(ii) the etiology of said subluxation complexes; and

(iii) The effect of said subluxation complexes on the health of an individual patient or population of patients;

(C) Determine the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(D) Determine the treatment procedures that are contra-indicated in the therapeutic care of a patient or condition; and

(E) Differentiate a patient or condition for which chiropractic treatment is appropriate from a patient or condition that is in need of care from a medical or other class of provider.

(2) To evaluate and examine individual patients or patient populations, licensees of this board are authorized to use:

(A) physical examinations;

(B) diagnostic imaging;

(C) laboratory examination;

(D) electro-diagnostic testing, other than an incisive procedure;

(E) sonography; and

(F) other forms of testing and measurement.

(3) Examination and evaluation services which require a license holder to obtain additional training or certification, in addition to the requirements of a basic chiropractic license, include:

(A) Performance of radiologic procedures, which are authorized under the Texas Chiropractic Act, Texas Occupations Code, Chapter 201, may be delegated to an assistant who meets the training requirements set forth under §78.1 of this title (relating to Registration of Chiropractic Radiologic Technologists).

(B) Technological Instrumented Vestibular-Ocular-Nystagmus Testing may be performed by a licensee with a diplomate in chiropractic neurology and that has successfully completed 150 hours of clinical and didactic training in the technical and professional components of the procedures as part of coursework in vestibular rehabilitation including the successful completion of a written and performance examination for vestibular specialty or certification. The professional component of these procedures may not be delegated to a technician and must be directly performed by a qualified licensee.

(d) Analysis, Diagnosis, and Other Opinions.

(1) In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:

(A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following:

(i) the health and integrity of the structures of the system;

(ii) the coordination, balance, efficiency, strength, conditioning and functional health and integrity of the system;

(iii) the existence of structural pathology, functional pathology or other abnormality of the system;

(iv) the nature, severity, complicating factors and effects of said structural pathology, functional pathology, or other abnormality of the system;

(v) the etiology of said structural pathology, functional pathology or other abnormality of the system; and

(vi) the effect of said structural pathology, functional pathology or other abnormality of the system on the health of an individual patient or population of patients;

(B) An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following:

(i) the nature, severity, complicating factors and effects of said subluxation complex;

(ii) the etiology of said subluxation complex; and

(iii) the effect of said subluxation complex on the health of an individual patient or population of patients;

(C) An opinion regarding the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(D) An opinion regarding the likelihood of recovery of a patient or condition under an indicated course of treatment;

(E) An opinion regarding the risks associated with the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(F) An opinion regarding the risks associated with not receiving the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(G) An opinion regarding the treatment procedures that are contraindicated in the therapeutic care of a patient or condition;

(H) An opinion that a patient or condition is in need of care from a medical or other class of provider;

(I) An opinion regarding an individual's ability to perform normal job functions and activities of daily living, and the assessment of any disability or impairment;

(J) An opinion regarding the biomechanical risks to a patient, or patient population from various occupations, job duties or functions, activities of daily living, sports or athletics, or from the ergonomics of a given environment; and

(K) Other necessary or appropriate opinions consistent with the practice of chiropractic.

(e) Treatment Procedures and Services.

(1) In the practice of chiropractic, licensees recommend, perform or oversee the performance of the treatment procedures that are indicated in the therapeutic care of a patient or patient population in order to:

(A) Improve, correct, or optimize the biomechanical condition of the spine or musculoskeletal system of the human body including, but not limited to, the following:

(i) the health and integrity of the structures of the musculoskeletal system; and

(ii) the coordination, balance, efficiency, strength, conditioning, and functional health and integrity of the musculoskeletal system;

(B) Promote the healing of, recovery from, or prevent the development or deterioration of abnormalities of the biomechanical condition of the spine or musculoskeletal system of the human body including, but not limited to, the following:

(i) the structural pathology, functional pathology, or other abnormality of the musculoskeletal system;

(ii) the effects and complicating factors of any structural pathology, functional pathology, or other abnormality of the musculoskeletal system;

(iii) the etiology of any structural pathology, functional pathology, or other abnormality of the musculoskeletal system; and

(iv) the effect of any structural pathology, functional pathology, or other abnormality of the musculoskeletal system on the health of an individual patient or population of patients; and

(C) Promote the healing of, recovery from, or prevent the development or deterioration of a subluxation complex of the spine or musculoskeletal system, including, but not limited to, the following:

(i) the structural pathology, functional pathology, or other abnormality of a subluxation complex;

(ii) the effects and complicating factors of any structural pathology, functional pathology, or other abnormality of a subluxation complex;

(iii) the etiology of any structural pathology, functional pathology, or other abnormality of a subluxation complex; and

(iv) the effect of any structural pathology, functional pathology, or other abnormality of a subluxation complex on the health of an individual patient or population of patients.

(2) In order to provide therapeutic care for a patient or patient population, licensees are authorized to use:

(A) osseous and soft tissue adjustment and manipulative techniques;

(B) physical and rehabilitative procedures and modalities;

(C) acupuncture and other reflex techniques;

(D) exercise therapy;

(E) patient education;

(F) advice and counsel;

(G) diet and weight control;

(H) immobilization;

(I) splinting;

(J) bracing;

(K) therapeutic lasers (non-invasive, nonincisive), with adequate training and the use of appropriate safety devices and procedures for the patient, the licensee and all other persons present during the use of the laser;

(L) durable medical goods and devices;

(M) homeopathic and botanical medicines, including vitamins, minerals; phytonutrients, antioxidants, enzymes, nutraceuticals, and glandular extracts;

(N) non-prescription drugs;

(O) referral of patients to appropriate health care providers; and

(P) other treatment procedures and services consistent with the practice of chiropractic.

---

**Source Note:** The provisions of this §78.13 adopted to be effective January 29, 2015, 40 TexReg 379

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

**<<Prev Rule**                                                                    **Next Rule>>**

# Texas Administrative Code

|  |  |
|---|---|
| **TITLE 22** | EXAMINING BOARDS |
| **PART 3** | TEXAS BOARD OF CHIROPRACTIC EXAMINERS |
| **CHAPTER 78** | RULES OF PRACTICE |
| RULE §78.14 | Acupuncture |

(a) Acupuncture, and the related practices of acupressure and meridian therapy, includes methods for diagnosing and treating a patient by stimulating specific points on or within the musculoskeletal system by various means, including, but not limited to, manipulation, heat, cold, pressure, vibration, ultrasound, light electrocurrent, and short-needle insertion for the purpose of obtaining a biopositive reflex response by nerve stimulation. All therapeutic modalities provided by Doctors of Chiropractic in Texas must comply with the chiropractic scope of practice as defined by the Texas Occupations Code §201.002.

(b) In order to practice acupuncture, a licensee shall either:

  (1) successfully complete at least one-hundred (100) hours training in undergraduate or post-graduate classes in the use and administration of acupuncture provided by a bona fide reputable chiropractic school or by an acupuncture school approved by the Texas State Board of Acupuncture Examiners;

  (2) successfully complete either:

    (A) the national standardized certification examination in acupuncture offered by the National Board of Chiropractic Examiners; or

    (B) the examination offered by the National Certification Commission for Acupuncture and Oriental Medicine; or

  (3) successfully complete at least one-hundred (100) hours training in the use and administration of acupuncture in a course of study approved by the board.

(c) Existing licensees that have been trained in acupuncture, that have been practicing acupuncture, and that are in good standing with the Texas Board of Chiropractic Examiners and other jurisdictions where they are licensed, may meet the requirements of subsection (b) of this section by counting each year of practice as ten hours of training in the use and administration of acupuncture.

(d) Beginning on January 1, 2010, an applicant for licensure must successfully complete either the national standardized certification examination in acupuncture offered by the National Board of Chiropractic Examiners or the examination offered by the National Certification Commission for Acupuncture and Oriental Medicine in order to practice acupuncture. This requirement will supersede the provisions of subsection (b) of this section.

---

**Source Note:** The provisions of this §78.14 adopted to be effective January 29, 2015, 40 TexReg 379

[<<Prev Rule](#)         [Next Rule>>](#)

# Texas Administrative Code

|  |  |
|---|---|
| TITLE 22 | EXAMINING BOARDS |
| PART 3 | TEXAS BOARD OF CHIROPRACTIC EXAMINERS |
| CHAPTER 78 | RULES OF PRACTICE |
| RULE §78.15 | Scope of Prohibitions |

(a) The practice of chiropractic does not include:

  (1) incisive or surgical procedures;

  (2) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription; or

  (3) the use of x-ray therapy or therapy that exposes the body to radioactive materials.

(b) Aspects of Prohibition.

  (1) Examination and evaluation services, and the equipment used for such services, which are outside the scope of chiropractic practice include:

    (A) incisive or surgical procedures;

    (B) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

    (C) the use of x-ray therapy or therapy that exposes the body to radioactive materials; or

    (D) other examination and evaluation services that are inconsistent with the practice of chiropractic and with the examination and evaluation services described under this subsection.

  (2) Analysis, diagnosis, and other opinions regarding the findings of examinations and evaluations which are outside the scope of chiropractic include:

    (A) incisive or surgical procedures;

    (B) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

    (C) the use of x-ray therapy or therapy that exposes the body to radioactive materials; or

    (D) other analysis, diagnosis, and other opinions that are inconsistent with the practice of chiropractic and with the analysis, diagnosis, and other opinions described under this subsection.

  (3) The treatment procedures and services provided by a licensee which are outside of the scope of practice include:

    (A) incisive or surgical procedures;

Appendix B to Brief of Appellant         Page 8 of 9

(B) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

(C) the use of x-ray therapy or therapy that exposes the body to radioactive materials;

(D) cosmetic treatments; or

(E) other treatment procedures and services that are inconsistent with the practice of chiropractic and with the treatment procedures and services described under this subsection.

(c) Questions Regarding Scope of Practice. Further questions regarding whether a service or procedure is within the scope of practice and this rule may be submitted in writing to the Board and should contain the following information:

(1) a detailed description of the service or procedure that will provide the Board with sufficient background information and detail to make an informed decision;

(2) information on the use of the service or procedure by chiropractors in Texas or in other jurisdictions; and

(3) an explanation of how the service or procedure is consistent with either:

(A) using subjective or objective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body; or

(B) performing nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system.

---

**Source Note:** The provisions of this §78.15 adopted to be effective January 29, 2015, 40 TexReg 379

# APPENDIX C

OCCUPATIONS CODE

TITLE 3. HEALTH PROFESSIONS

SUBTITLE C. OTHER PROFESSIONS PERFORMING MEDICAL PROCEDURES

CHAPTER 201. CHIROPRACTORS

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 201.001.  DEFINITIONS.  In this chapter:
(1)  "Board" means the Texas Board of Chiropractic Examiners.
(2)  "Chiropractor" means a person licensed to practice chiropractic by the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.002.  PRACTICE OF CHIROPRACTIC.  (a)  In this section:
(1)  "Controlled substance" has the meaning assigned to that term by Section 481.002, Health and Safety Code.
(2)  "Dangerous drug" has the meaning assigned to that term by Section 483.001, Health and Safety Code.
(3)  "Incisive or surgical procedure" includes making an incision into any tissue, cavity, or organ by any person or implement.  The term does not include the use of a needle for the purpose of drawing blood for diagnostic testing.
(4)  "Surgical procedure" includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.
(b)  A person practices chiropractic under this chapter if the person:
(1)  uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;

(2)   performs nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system;

(3)   represents to the public that the person is a chiropractor;  or

(4)   uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms or initials in connection with the person's name.

(c)   The practice of chiropractic does not include:

(1)   incisive or surgical procedures;

(2)   the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;  or

(3)   the use of x-ray therapy or therapy that exposes the body to radioactive materials.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 1, eff. September 1, 2005.


Sec. 201.003.  APPLICATIONS AND EXEMPTIONS.  (a)  This chapter does not apply to a registered nurse licensed under Chapter 301, a vocational nurse licensed under Chapter 301, a person who provides spinal screening services as authorized by Chapter 37, Health and Safety Code, a physical therapist licensed under Chapter 453, or a massage therapist or a massage therapy instructor qualified and registered under Chapter 455 if:

(1)   the person does not represent to the public that the person is a chiropractor or use the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms or initials in connection with the person's name or practice;  and

(2)   the person practices strictly within the scope of the license or registration held in compliance with all laws relating to the license and registration.

(b)   This chapter does not limit or affect the rights and powers of a physician licensed in this state to practice medicine.

(c)  This section does not affect or prevent a student enrolled in a college of chiropractic in this state from engaging in all phases of clinical practice if the practice is:

(1)  part of the curriculum;  and

(2)  conducted under the supervision of a licensed chiropractor or a licensed physician.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 553, Sec. 2.014, eff. Feb. 1, 2004.


Sec. 201.004.  APPLICATION OF SUNSET ACT.  The Texas Board of Chiropractic Examiners is subject to Chapter 325, Government Code (Texas Sunset Act).  Unless continued in existence as provided by that chapter, the board is abolished and this chapter expires September 1, 2017.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 2, eff. September 1, 2005.


SUBCHAPTER B. TEXAS BOARD OF CHIROPRACTIC EXAMINERS

Sec. 201.051.  BOARD;  MEMBERSHIP.  (a)  The Texas Board of Chiropractic Examiners consists of nine members appointed by the governor with the advice and consent of the senate as follows:

(1)  six chiropractors who are reputable practicing chiropractors and who have resided in this state for at least five years preceding appointment;  and

(2)  three members who represent the public.

(b)  Appointments to the board shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointee.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 201.052.  MEMBERSHIP ELIGIBILITY.  (a)  A person is not eligible to serve as a member of the board if the person:

       (1)  is a member of the faculty or board of trustees of a chiropractic school or a doctor of chiropractic degree program;

       (2)  is a stockholder in a chiropractic school or college; or

       (3)  has a financial interest in a chiropractic school or college.

    (b)  A person is not eligible for appointment as a public member of the board if the person or the person's spouse:

       (1)  is registered, certified, or licensed by an occupational regulatory agency in the field of health care;

       (2)  is employed by or participates in the management of a business entity or other organization regulated by or receiving funds from the board;

       (3)  owns or controls, directly or indirectly, more than a 10 percent interest in a business entity or other organization regulated by or receiving funds from the board;  or

       (4)  uses or receives a substantial amount of tangible goods, services, or funds from the board, other than compensation or reimbursement authorized by law for board membership, attendance, or expenses.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 802 (S.B. 776), Sec. 1, eff. June 15, 2007.


Sec. 201.053.  MEMBERSHIP AND EMPLOYEE RESTRICTIONS.  (a)  In this section, "Texas trade association" means a cooperative and voluntarily joined statewide association of business or professional competitors in this state designed to assist its members and its industry or profession in dealing with mutual business or professional problems and in promoting their common interest.

    (b)  A person may not be a member of the board and may not be a board employee employed in a "bona fide executive, administrative, or professional capacity," as that phrase is used for purposes of

establishing an exemption to the overtime provisions of the federal Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.), if:

      (1)  the person is an officer, employee, or paid consultant of a Texas trade association in the field of health care; or

      (2)  the person's spouse is an officer, manager, or paid consultant of a Texas trade association in the field of health care.

    (c)  Repealed by Acts 2005, 79th Leg., Ch. 1020, Sec. 36, eff. September 1, 2005.

    (d)  A person may not be a member of the board or act as the general counsel to the board if the person is required to register as a lobbyist under Chapter 305, Government Code, because of the person's activities for compensation on behalf of a profession related to the operation of the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 3, eff. September 1, 2005.

    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 36, eff. September 1, 2005.


    Sec. 201.054.  TERMS; VACANCY.  (a)  Members of the board are appointed for staggered six-year terms.  The terms of one-third of the members expire on February 1 of each odd-numbered year.

    (b)  A person may not be appointed to serve more than two terms.

    (c)  If a vacancy occurs because of the death or resignation of a board member, the governor shall appoint a replacement to fill the unexpired term.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.055.  OFFICERS.  (a)  The governor shall designate a chiropractic member of the board as the board's president.  The president serves in that capacity at the will of the governor.

    (b)  The board shall elect one of its members as vice president and one of its members as secretary-treasurer at the first board meeting after the biennial appointment of board members.

    (c)  Repealed by Acts 2003, 78th Leg., ch. 285, Sec. 31(31).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 285, Sec. 31(31), eff. Sept. 1, 2003.


Sec. 201.056.  GROUNDS FOR REMOVAL.  (a)  It is a ground for removal from the board that a member:

(1)  does not have at the time of taking office the qualifications required by Sections 201.051 and 201.052(b);

(2)  does not maintain during service on the board the qualifications required by Sections 201.051 and 201.052(b);

(3)  is ineligible for membership under Section 201.052 or 201.053;

(4)  cannot, because of illness or disability, discharge the member's duties for a substantial part of the member's term; or

(5)  is absent from more than half of the regularly scheduled board meetings that the member is eligible to attend during a calendar year without an excuse approved by a majority vote of the board.

(b)  The validity of an action of the board is not affected by the fact that it is taken when a ground for removal of a board member exists.

(c)  If the executive director has knowledge that a potential ground for removal exists, the executive director shall notify the president of the board of the potential ground.  The president shall then notify the governor and the attorney general that a potential ground for removal exists.  If the potential ground for removal involves the president, the executive director shall notify the next highest ranking officer of the board, who shall then notify the governor and the attorney general that a potential ground for removal exists.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 4, eff. September 1, 2005.

Sec. 201.057.  PER DIEM; REIMBURSEMENT.  (a)  A board member is entitled to a per diem as set by the General Appropriations Act for each day the member engages in the business of the board.

(b)  A member may not receive reimbursement for travel expenses, including expenses for meals and lodging, other than transportation expenses as provided by the General Appropriations Act.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.058.  MEETINGS.  (a)  The board shall hold regular meetings to examine applicants and transact business at least twice each year at the times and places determined by the board.

(b)  A special meeting may be held at the call of three board members.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.060.  BOARD SEAL.  The seal of the board consists of a five-point star with the words, "The State of Texas," and the words, "Texas Board of Chiropractic Examiners," around the margin.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.061.  TRAINING.  (a)  A person who is appointed to and qualifies for office as a member of the board may not vote, deliberate, or be counted as a member in attendance at a meeting of the board until the person completes a training program that complies with this section.

(b)  The training program must provide the person with information regarding:

(1)  this chapter and the board's programs, functions, rules, and budget;

(2)  the results of the most recent formal audit of the board;

(3)  the requirements of laws relating to open meetings, public information, administrative procedure, and conflicts of interest; and

(4)   any applicable ethics policies adopted by the board or the Texas Ethics Commission.

(c)   A person appointed to the board is entitled to reimbursement, as provided by the General Appropriations Act, for the travel expenses incurred in attending the training program regardless of whether the attendance at the program occurs before or after the person qualifies for office.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 5, eff. September 1, 2005.


SUBCHAPTER C. BOARD PERSONNEL

Sec. 201.101.   DIVISION OF RESPONSIBILITIES.   The board shall develop and implement policies that clearly separate the policymaking responsibilities of the board and the management responsibilities of the executive director and the staff of the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:
Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 6, eff. September 1, 2005.


Sec. 201.102.   QUALIFICATIONS AND STANDARDS OF CONDUCT INFORMATION.   The board shall provide as often as necessary to its members and employees information regarding their:
(1)   qualifications for office or employment under this chapter;   and
(2)   responsibilities under applicable laws relating to standards of conduct for state officers or employees.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.103.   CAREER LADDER PROGRAM;   PERFORMANCE EVALUATIONS. (a)   The executive director or the executive director's designee shall develop an intra-agency career ladder program.   The program

must require intra-agency postings of all nonentry level positions concurrently with any public posting.

(b)  The executive director or the executive director's designee shall develop a system of annual performance evaluations.  All merit pay for board employees must be based on the system established under this subsection.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.104.  EQUAL EMPLOYMENT OPPORTUNITY;  REPORT. (a)  The executive director or the executive director's designee shall prepare and maintain a written policy statement to ensure implementation of an equal employment opportunity program under which all personnel transactions are made without regard to race, color, disability, sex, religion, age, or national origin.  The policy statement must include:

(1)  personnel policies, including policies relating to recruitment, evaluation, selection, application, training, and promotion of personnel, that are in compliance with Chapter 21, Labor Code;

(2)  a comprehensive analysis of the board workforce that meets federal and state guidelines;

(3)  procedures by which a determination can be made of the significant underuse in the board workforce of all persons for whom federal or state guidelines encourage a more equitable balance;  and

(4)  reasonable methods to appropriately address those areas of significant underuse.

(b)  A policy statement prepared under Subsection (a) must be:

(1)  prepared to cover an annual period;

(2)  updated annually;

(3)  reviewed by the Commission on Human Rights for compliance with Subsection (a)(1);  and

(4)  filed with the governor.

(c)  The governor shall deliver a biennial report to the legislature based on the information received under Subsection (b). The report may be made separately or as part of other biennial reports made to the legislature.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER D. BOARD POWERS AND DUTIES

Sec. 201.151.  GENERAL POWERS AND DUTIES.  The board shall administer the purposes of and enforce this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.152.  RULES.  (a)  The board may adopt rules and bylaws:
          (1)  necessary to:
               (A)  perform the board's duties;  and
               (B)  regulate the practice of chiropractic;  and
          (2)  relating to the board's proceedings and the board's examination of an applicant for a license to practice chiropractic.
     (b)  The board shall adopt rules for the enforcement of this chapter.  The board shall issue all rules based on a vote of a majority of the board at a regular or special meeting.  The issuance of a disciplinary action or disciplinary order of the board is not limited by this subsection.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
     Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 7, eff. September 1, 2005.


Sec. 201.1525.  RULES CLARIFYING SCOPE OF PRACTICE OF CHIROPRACTIC.  The board shall adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope.  The rules:
          (1)  must clearly specify the procedures that chiropractors may perform;
          (2)  must clearly specify any equipment and the use of that equipment that is prohibited; and

(3)  may require a license holder to obtain additional training or certification to perform certain procedures or use certain equipment.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 8, eff. September 1, 2005.


Sec. 201.1526.  DEVELOPMENT OF PROPOSED RULES REGARDING SCOPE OF PRACTICE OF CHIROPRACTIC.  (a)  This section applies to the process by which the board develops proposed rules under Section 201.1525 before the proposed rules are published in the Texas Register and before the board complies with the rulemaking requirements of Chapter 2001, Government Code.  This section does not affect the duty of the board to comply with the rulemaking requirements of that law.

(b)  The board shall establish methods under which the board, to the extent appropriate, will seek input early in the rule development process from the public and from persons who will be most affected by a proposed rule.  Methods must include identifying persons who will be most affected and soliciting, at a minimum, the advice and opinions of those persons.  Methods may include negotiated rulemaking, informal conferences, advisory committees, and any other appropriate method.

(c)  A rule adopted by the board under Section 201.1525 may not be challenged on the grounds that the board did not comply with this section.  If the board was unable to solicit a significant amount of advice and opinion from the public or from affected persons early in the rule development process, the board shall state in writing the reasons why the board was unable to do so.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 8, eff. September 1, 2005.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see H.B. 7, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 201.153.  FEES.  (a)  The board by rule shall set fees in amounts reasonable and necessary to cover the costs of administering

this chapter.  The board may not set a fee in an amount that is less than the amount of that fee on September 1, 1993.

(b)  Each of the following fees imposed under Subsection (a) is increased by $200:

(1)  the fee for an annual renewal of a license;

(2)  the fee for issuance of a license to an out-of-state applicant;

(3)  the fee for an examination;  and

(4)  the fee for a reexamination.

(c)  For each $200 fee increase collected under Subsection (b), $50 shall be deposited in the foundation school fund and $150 shall be deposited in the general revenue fund.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 899, Sec. 2.


Sec. 201.154.  CERTIFICATION FOR MANIPULATION UNDER ANESTHESIA PROHIBITED.  Notwithstanding any other provision of this chapter, the board may not adopt a process to certify chiropractors to perform manipulation under anesthesia.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.155.  RULES RESTRICTING ADVERTISING OR COMPETITIVE BIDDING.  (a)  The board may not adopt rules restricting advertising or competitive bidding by a person regulated by the board except to prohibit false, misleading, or deceptive practices by that person.

(b)  The board may not include in rules to prohibit false, misleading, or deceptive practices by a person regulated by the board a rule that:

(1)  restricts the use of any advertising medium;

(2)  restricts the person's personal appearance or use of the person's voice in an advertisement;

(3)  relates to the size or duration of an advertisement by the person;  or

(4)  restricts the use of a trade name in advertising by the person.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 201.1555.  FRAUD.  (a)  The board shall strictly and
vigorously enforce the provisions of this chapter prohibiting fraud.
     (b)  The board shall adopt rules to prevent fraud in the
practice of chiropractic, including rules relating to:
          (1)  the filing of workers' compensation and insurance
claims; and
          (2)  records required to be maintained in connection with
the practice of chiropractic.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 9, eff.
September 1, 2005.


     Sec. 201.156.  BOARD DUTIES REGARDING COMPLAINTS.  (a)  The
board by rule shall:
          (1)  adopt a form to standardize information concerning
complaints made to the board;  and
          (2)  prescribe information to be provided to a person when
the person files a complaint with the board.
     (b)  The board shall provide reasonable assistance to a person
who wishes to file a complaint with the board.
     (c)  The board by rule shall adopt procedures concerning:
          (1)  the retention of information files on license holders;
and
          (2)  the expunction of files on license holders, including
complaints, adverse reports, and other investigative information on
license holders.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 201.157.  IMMUNITY.  In the absence of fraud, conspiracy,
or malice, a member or employee of the board, a witness called to
testify by the board, or a consultant or hearing officer is not
liable in a civil action for any alleged injury, wrong, loss, or
damage for any investigation, report, recommendation, statement,

evaluation, finding, order, or award made in the course of performing the person's official duties.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.158.  BOARD COMMITTEES.  (a)  The board may appoint committees from its own members.
(b)  A committee appointed from the members of the board shall:
(1)  consider matters referred to the committee relating to the enforcement of this chapter and the rules adopted by the board; and
(2)  make recommendations to the board.
(c)  The board may delegate to a committee of the board an authority granted to the board under Section 201.505(c).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.159.  RECORDS.  (a)  The board shall preserve a record of its proceedings in a register that contains:
(1)  the name, age, place, and duration of residence of each applicant for a license;
(2)  the amount of time spent by the applicant in the study of chiropractic in respective doctor of chiropractic degree programs; and
(3)  other information the board desires to record.
(b)  The register shall show whether an applicant was rejected or licensed.
(c)  The information recorded in the register is prima facie evidence of the matters contained in the register.  A certified copy of the register with the seal of the board is admissible as evidence in any court of this state.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.051(a), eff. Sept. 1, 2001.
Amended by:
Acts 2007, 80th Leg., R.S., Ch. 802 (S.B. 776), Sec. 2, eff. June 15, 2007.

Sec. 201.160.  PAYMENT OF OTHER EXPENSES.  The board shall pay the necessary expenses of an employee of the board incurred in the performance of the employee's duties.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 285, Sec. 24, eff. Sept. 1, 2003.


Sec. 201.161.  APPROPRIATION FROM STATE TREASURY PROHIBITED. The legislature may not appropriate money, other than fees, from the state treasury for an expenditure made necessary by this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.163.  POLICY ON TECHNOLOGICAL SOLUTIONS.  The board shall implement a policy requiring the board to use appropriate technological solutions to improve the board's ability to perform its functions.  The policy must ensure that the public is able to interact with the board on the Internet.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 10, eff. September 1, 2005.


Sec. 201.164.  NEGOTIATED RULEMAKING AND ALTERNATIVE DISPUTE RESOLUTION POLICY.  (a)  The board shall develop and implement a policy to encourage the use of:
        (1)  negotiated rulemaking procedures under Chapter 2008, Government Code, for the adoption of board rules; and
        (2)  appropriate alternative dispute resolution procedures under Chapter 2009, Government Code, to assist in the resolution of internal and external disputes under the board's jurisdiction.
    (b)  The board's procedures relating to alternative dispute resolution must conform, to the extent possible, to any model guidelines issued by the State Office of Administrative Hearings for the use of alternative dispute resolution by state agencies.
    (c)  The board shall designate a trained person to:

(1)   coordinate the implementation of the policy adopted under Subsection (a);

(2)   serve as a resource for any training needed to implement the procedures for negotiated rulemaking or alternative dispute resolution; and

(3)   collect data concerning the effectiveness of those procedures, as implemented by the board.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 10, eff. September 1, 2005.


SUBCHAPTER E. PUBLIC INTEREST INFORMATION AND COMPLAINT PROCEDURES

Sec. 201.201.   PUBLIC INTEREST INFORMATION.   (a)   The board shall prepare information of public interest describing the functions of the board and the procedures by which complaints are filed with and resolved by the board.

(b)   The board shall make the information available to the public and appropriate state agencies.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.202.   PUBLIC PARTICIPATION.   (a)   The board shall develop and implement policies that provide the public with a reasonable opportunity to appear before the board and to speak on any issue under the board's jurisdiction.

(b)   The board shall prepare and maintain a written plan that describes how a person who does not speak English may be provided reasonable access to the board's programs.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.203.   COMPLAINTS.   (a)   The board by rule shall establish methods by which consumers and service recipients are notified of the name, mailing address, and telephone number of the board for the purpose of directing complaints to the board.   The board may provide for that notice:

(1)   on each registration form, application, or written contract for services of a person regulated by the board;  or

(2)   on a sign prominently displayed in the place of business of each person regulated by the board.

(b)   The board shall list with its regular telephone number any toll-free telephone number established under other state law that may be called to present a complaint about a health professional.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.204.   RECORDS OF COMPLAINTS.   (a)   The board shall keep an information file about each complaint filed with the board.   The board's information file must be kept current and contain a record for each complaint of:

(1)   each person contacted in relation to the complaint;

(2)   a summary of findings made at each step of the complaint process;

(3)   an explanation of the legal basis and reason for a complaint that is dismissed;

(4)   the schedule required under Section 201.205 and a notification of any change in the schedule;  and

(5)   other relevant information.

(b)   Except as provided by Subsection (c), if a written complaint is filed with the board that the board has authority to resolve, the board, at least quarterly and until final disposition of the complaint, shall notify the parties to the complaint of the status of the complaint unless the notice would jeopardize an undercover investigation.

(c)   If a written complaint that the board has authority to resolve is referred to the enforcement committee, the board at least semiannually and until final disposition of the complaint, shall notify the parties to the complaint of the status of the complaint unless the notice would jeopardize an undercover investigation.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.205.   GENERAL RULES REGARDING COMPLAINT INVESTIGATION AND DISPOSITION.   (a)   The board shall adopt rules concerning the

investigation of a complaint filed with the board.  The rules adopted under this section must:

        (1)  distinguish between categories of complaints;

        (2)  require the board to prioritize complaints for purposes of determining the order in which they are investigated, taking into account the seriousness of the allegations made in a complaint and the length of time a complaint has been pending;

        (3)  ensure that a complaint is not dismissed without appropriate consideration;

        (4)  require that the board be advised of a complaint that is dismissed and that a letter be sent to the person who filed the complaint explaining the action taken on the complaint;

        (5)  ensure that the person who filed the complaint has the opportunity to explain the allegations made in the complaint; and

        (6)  prescribe guidelines concerning the categories of complaints that require the use of a private investigator and the procedures for the board to obtain the services of a private investigator.

    (b)  The board shall:

        (1)  dispose of a complaint in a timely manner;  and

        (2)  establish a schedule for conducting each phase of the complaint process that is under the control of the board not later than the 30th day after the date the board receives the complaint.

    (c)  The board shall notify the parties to the complaint of the projected time requirements for pursuing the complaint.

    (d)  The board shall notify the parties to the complaint of any change in the schedule not later than the seventh day after the date the change is made.

    (e)  The executive director shall notify the board of a complaint that is unresolved after the time prescribed by the board for resolving the complaint so that the board may take necessary action on the complaint.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 11, eff. September 1, 2005.

Sec. 201.206.  CONFIDENTIALITY OF INVESTIGATION FILES.  (a)  The board's investigation files are confidential, privileged, and not subject to discovery, subpoena, or any other means of legal compulsion for release other than to the board or an employee or agent of the board.

(b)  The board shall share information in investigation files, on request, with another state or federal regulatory agency or with a local, state, or federal law enforcement agency regardless of whether the investigation has been completed.  The board is not required to disclose under this subsection information that is an attorney-client communication, an attorney work product, or other information protected by a privilege recognized by the Texas Rules of Civil Procedure or the Texas Rules of Evidence.

(c)  On the completion of the investigation and before a hearing under Section 201.505, the board shall provide to the license holder, subject to any other privilege or restriction set forth by rule, statute, or legal precedent, access to all information in the board's possession that the board intends to offer into evidence in presenting its case in chief at the contested case hearing on the complaint.  The board is not required to provide:

(1)  a board investigative report or memorandum;

(2)  the identity of a nontestifying complainant;  or

(3)  attorney-client communications, attorney work product, or other materials covered by a privilege recognized by the Texas Rules of Civil Procedure or the Texas Rules of Evidence.

(d)  Notwithstanding Subsection (a), the board may:

(1)  disclose a complaint to the affected license holder; and

(2)  provide to a complainant the license holder's response to the complaint, if providing the response is considered by the board to be necessary to investigate the complaint.

(e)  This section does not prohibit the board or another party in a disciplinary action from offering into evidence in a contested case under Chapter 2001, Government Code, a record, document, or other information obtained or created during an investigation.

Added by Acts 2003, 78th Leg., ch. 329, Sec. 1, eff. Sept. 1, 2003.

Sec. 201.207.  INSPECTIONS.  (a)  The board, during reasonable business hours, may:

(1)  conduct an on-site inspection of a chiropractic facility to investigate a complaint filed with the board; and

(2)  examine and copy records of the chiropractic facility pertinent to the inspection or investigation.

(b)  The board is not required to provide notice before conducting an inspection under this section.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 12, eff. September 1, 2005.


Sec. 201.208.  COOPERATION WITH TEXAS DEPARTMENT OF INSURANCE. (a)  In this section, "department" means the Texas Department of Insurance.

(b)  This section applies only to information held by or for the department or the board that relates to a person who is licensed or otherwise regulated by the department or the board.

(c)  The department and the board, on request or on the department or board's own initiative, may share confidential information or information to which access is otherwise restricted by law.  The department and the board shall cooperate with and assist each other when either agency is conducting an investigation by providing information that is relevant to the investigation.  Except as provided by this section, confidential information that is shared under this section remains confidential under law, and legal restrictions on access to the information remain in effect unless the agency sharing the information approves use of the information by the receiving agency for enforcement purposes.  The provision of information by the board to the department or by the department to the board under this subsection does not constitute a waiver of privilege or confidentiality as established by law.

(d)  The department and the board shall develop and maintain a system for tracking investigations conducted by each agency with the cooperation and assistance of the other agency, including information on all disciplinary actions taken.

(e)  The department and the board shall collaborate on taking appropriate disciplinary actions to the extent practicable.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 12, eff. September 1, 2005.


Sec. 201.209.  INFORMATION ON STATUS OF CERTAIN INVESTIGATIONS. The board shall include in the annual financial report required by Section 2101.011, Government Code, information on all investigations conducted by the board with the cooperation and assistance of the Texas Department of Insurance and the Texas Workers' Compensation Commission during the preceding fiscal year.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 12, eff. September 1, 2005.


SUBCHAPTER F. PEER REVIEW COMMITTEES

Sec. 201.251.  APPOINTMENT OF PEER REVIEW COMMITTEES; TERMS. (a)  The board shall appoint local chiropractic peer review committees.  Members of a local chiropractic peer review committee serve staggered terms of three years, with as near to one-third of the members' terms as possible expiring December 31 of each year.
(b)  The board may seek input from state chiropractic associations in selecting persons to appoint to a local peer review committee.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:
Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 13, eff. September 1, 2005.


Sec. 201.252.  COMMITTEE MEMBER ELIGIBILITY.  (a)  Only a chiropractor who has completed a program of peer review training approved by the board is eligible to serve on a chiropractic peer review committee.
(b)  A member of a local peer review committee may not be a consultant to or an employee of any company or carrier of health care insurance.

(c)  The board shall establish requirements for peer review training programs that do not discriminate against any chiropractor. A peer review training program must include training in the investigation of complaints in accordance with this chapter and board rules.

(d)  The board by rule shall adopt additional requirements for eligibility to serve on a chiropractic peer review committee, including a requirement that a member have:

(1)  a clean disciplinary record; and

(2)  an acceptable record regarding utilization review performed in accordance with Article 21.58A, Insurance Code.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 14, eff. September 1, 2005.


Sec. 201.253.  EXECUTIVE PEER REVIEW COMMITTEE.  (a)  The board shall appoint an executive chiropractic peer review committee to direct the activities of the local committees.  The executive peer review committee consists of six volunteer members.  Members of the executive peer review committee serve staggered terms of three years, with one-third of the members' terms expiring December 31 of each year.  The executive peer review committee shall elect a presiding officer from its members.

(b)  The executive peer review committee shall conduct hearings relating to disputes referred by a local peer review committee and shall make its recommendations based solely on evidence presented in the hearings.

(c)  A member of an executive peer review committee may not be a consultant to or an employee of any company or carrier of health care insurance.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 15, eff. September 1, 2005.

Sec. 201.254.  DUTIES OF PEER REVIEW COMMITTEE WITH REGARD TO CERTAIN DISPUTES.  (a)  Each local chiropractic peer review committee shall:

        (1)  review and evaluate chiropractic treatment and services in disputes involving a chiropractor and a patient or a person obligated to pay a fee for chiropractic services or treatment;  and

        (2)  mediate in a dispute involving a chiropractor and a patient or person obligated to pay a fee for chiropractic services or treatment.

        (b)  Each local peer review committee shall report its findings and recommendations to the executive chiropractic peer review committee.  A local peer review committee shall refer a dispute that is not resolved at the local level to the executive peer review committee.

        (c)  Repealed by Acts 2005, 79th Leg., Ch. 1020, Sec. 36, eff. September 1, 2005.

        (d)  Repealed by Acts 2005, 79th Leg., Ch. 1020, Sec. 36, eff. September 1, 2005.

        (e)  Repealed by Acts 2005, 79th Leg., Ch. 1020, Sec. 36, eff. September 1, 2005.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
        Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 16, eff. September 1, 2005.
        Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 36, eff. September 1, 2005.

Sec. 201.2545.  COMPLAINT INVESTIGATION BY PEER REVIEW COMMITTEE.  (a)  The board may refer to a local chiropractic peer review committee for investigation a complaint regarding whether chiropractic treatment or services provided by a chiropractor were provided according to the standard of care in the practice of chiropractic.

        (b)  In conducting an investigation of a referred complaint, the committee shall review the records and other evidence obtained by the staff of the board in the course of the staff's investigation of the complaint.

(c)  The committee shall report to the board its findings regarding the complaint, including a statement of:

(1)  the standard of care in the practice of chiropractic governing the chiropractic treatment or services provided by the chiropractor;

(2)  whether the chiropractor met the standard of care in providing the treatment or services; and

(3)  the clinical basis for the committee's finding under Subdivision (2).

(d)  The board may request a member of the committee to attend an informal conference or testify at a contested case hearing.

(e)  The board, with input from the executive chiropractic peer review committee, shall adopt rules necessary to implement this section.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 17, eff. September 1, 2005.


Sec. 201.2546.  IMMUNITY; ELIGIBILITY TO PARTICIPATE IN COMMITTEE ACTIVITIES.  (a)  In the absence of fraud, conspiracy, or malice, a member of a peer review committee is not liable in a civil action for a finding, evaluation, recommendation, or other action made or taken by the member as a member of the committee or by the committee.  The immunity granted by this subsection does not limit the operation of federal or state antitrust laws as applied to the conduct of a local or executive peer review committee that involves price fixing or any other unreasonable restraint of trade.

(b)  A member of a peer review committee may not participate in committee deliberations or other activities involving chiropractic services or treatment rendered or performed by the member.

(c)  Except for the express immunity provided by Subsection (a), this section does not deprive any person of a right or remedy, legal or equitable.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 17, eff. September 1, 2005.

Sec. 201.255.  REQUEST FOR INFORMATION; REPORT TO BOARD ON DISPUTES MEDIATED.  (a)  The board may request from a chiropractic peer review committee information pertaining to actions taken by the peer review committee.

(b)  The executive chiropractic peer review committee shall file annually with the board a report on the disputes mediated by the local chiropractic peer review committees under Section 201.254 during the preceding calendar year.  The report must include:

(1)  the number of disputes referred to the committees;

(2)  a categorization of the disputes referred to the committees and the number of complaints in each category; and

(3)  the number of disputes resolved and the manner in which they were resolved.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 18, eff. September 1, 2005.


Sec. 201.256.  PUBLIC ACCESS TO INFORMATION REGARDING PEER REVIEW COMMITTEES.  The board shall maintain on the board's Internet website information regarding local chiropractic peer review committees, including:

(1)  the services committees provide; and

(2)  the types of disputes committees mediate.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 19, eff. September 1, 2005.


SUBCHAPTER G. LICENSE REQUIREMENTS

Sec. 201.301.  LICENSE REQUIRED.  A person may not practice chiropractic unless the person holds a license issued by the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 201.302.  LICENSING EXAMINATION APPLICATION.  (a)  An applicant for a license by examination must present satisfactory evidence to the board that the applicant:

(1)  is at least 18 years of age;

(2)  is of good moral character;

(3)  has completed 90 semester hours of college courses other than courses included in a doctor of chiropractic degree program; and

(4)  is either a graduate or a final semester student of a bona fide reputable doctor of chiropractic degree program.

(b)  An application for examination must be:

(1)  made in writing;

(2)  verified by affidavit;

(3)  filed with the secretary-treasurer of the board on a form prescribed by the board;  and

(4)  accompanied by a fee.

(c)  Each applicant shall be given reasonable notice of the time and place of the examination.

(d)  Notwithstanding Subsection (a)(3), if the Council on Chiropractic Education or another national chiropractic education accreditation organization recognized by the board requires a number of semester hours of college courses other than courses included in a doctor of chiropractic degree program that is greater or less than the number of hours specified by that subsection to qualify for admission to a doctor of chiropractic degree program, the board may adopt the requirement of that organization if the board determines that requirement to be appropriate.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 20, eff. September 1, 2005.

Acts 2007, 80th Leg., R.S., Ch. 802 (S.B. 776), Sec. 3, eff. June 15, 2007.


Sec. 201.303.  EDUCATIONAL REQUIREMENTS.  (a)  To comply with the requirements of Section 201.302, the applicant must submit to the board a transcript of credits that certifies that the applicant has

satisfactorily completed at least the number of semester hours of college credits required by that section at a college or university that issues credits accepted by The University of Texas at Austin for a bachelor of arts or bachelor of science degree.

(b)  Repealed by Acts 2003, 78th Leg., ch. 329, Sec. 5.

(c)  The board may charge a fee of not more than $50 for verifying that the applicant has satisfied the requirements of this section.

(d)  A bona fide reputable doctor of chiropractic degree program that satisfies Section 201.302(a)(4) is one that:

(1)  has entrance requirements and a course of instruction as high as those of a better class of doctor of chiropractic degree programs in the United States;

(2)  maintains a resident course of instruction equivalent to:

(A)  not less than four terms of eight months each; or

(B)  not less than the number of semester hours required by The University of Texas for a bachelor of arts or bachelor of science degree;

(3)  provides a course of instruction in the fundamental subjects listed in Section 201.305(b); and

(4)  has the necessary teaching staff and facilities for proper instruction in all of the fundamental subjects listed in Section 201.305(b).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 329, Sec. 5.
Amended by:
Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 21, eff. September 1, 2005.
Acts 2007, 80th Leg., R.S., Ch. 802 (S.B. 776), Sec. 4, eff. June 15, 2007.


Sec. 201.304.  EXAMINATION REQUIREMENTS.  (a)  To receive a license, an applicant for a license by examination must pass:

(1)  the required and optional parts of the examination given by the National Board of Chiropractic Examiners, as required by and under conditions established by board rule;  and

(2)   an examination prepared by the board that tests the applicant's knowledge and understanding of the laws relating to the practice of chiropractic in this state.

(b)   The board shall periodically determine whether applicants who hold National Board of Chiropractic Examiners certificates have been adequately examined.  If the board determines that those applicants have not been adequately examined, the board shall require those applicants to submit to an additional examination prepared by the board.

(c)   The board may give an examination during the applicant's last semester of college if the board receives evidence indicating the applicant has satisfactory grades.  Immediately after the applicant graduates from chiropractic college, the applicant must forward to the board evidence of satisfactory completion of the applicant's course of study.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 721, Sec. 1, eff. Sept. 1, 2001.


Sec. 201.305.   EXAMINATION PROCEDURE.   (a)  Each examination for a license to practice chiropractic shall be conducted in the English language and in a fair and impartial manner.

(b)   An examination given under Section 201.304(a)(1) shall be conducted on practical and theoretical chiropractic and in the subjects of anatomy-histology, chemistry, bacteriology, physiology, symptomatology, pathology and analysis of the human spine, and hygiene and public health.

(c)   Applicants may be known to the examiners only by numbers, without a name or another method of identification on examination papers by which members of the board could identify an applicant, until after the general averages of the applicants' numbers in the class are determined and the licenses are granted or refused.

(d)   The board by rule shall ensure that the examination is administered to applicants with disabilities in compliance with the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended
by Acts 2001, 77th Leg., ch. 721, Sec. 2, eff. Sept. 1, 2001.
Amended by:
      Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 22, eff.
September 1, 2005.


      Sec. 201.306.  EXAMINATION RESULTS.  (a)  The board shall notify
each applicant of the results of an examination given by the board
not later than the 30th day after the date the licensing examination
is administered.
      (b)  If requested by a person who fails an examination given by
the board, the board shall review with the person the circumstances
surrounding the adverse score.
      (c)  To pass the examination under Section 201.304(a)(2), an
applicant must score a grade of at least 75 percent.
      (d)  All questions and answers from an examination given by the
board, with the grades attached, authenticated by the signature of
the examiner, shall be preserved in the executive office of the board
for at least one year.
      (e)  Each license shall be attested by the seal of the board and
signed by all members of the board or a quorum of the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended
by Acts 2001, 77th Leg., ch. 721, Sec. 3, eff. Sept. 1, 2001.


      Sec. 201.307.  REEXAMINATION.  (a)  An applicant who fails to
pass a required examination may take another examination.
      (b)  The board by rule shall establish the number of times an
applicant may retake the examination required by Section 201.304(a)
(1) or (b), as applicable.  An applicant must pass the examination
required by Section 201.304(a)(2) within three attempts.  The board
by rule shall establish the conditions under which an applicant may
retake an examination.  The board may require an applicant to fulfill
additional educational requirements.
      (c)  If the applicant makes a satisfactory grade on
reexamination, the board shall grant to the applicant a license to
practice chiropractic.

(d)   The board's decision under this section is final.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 721, Sec. 4, eff. Sept. 1, 2001. Amended by:
       Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 23, eff. September 1, 2005.


       Sec. 201.308.   TEMPORARY LICENSE.   (a)  The board by rule may provide for the issuance of a temporary license.
       (b)  The board by rule shall provide a time limit for the period a temporary license is valid.
       (c)  The board may issue a temporary faculty license to practice chiropractic to a person as provided by this section.  The person:
             (1)  must hold a current chiropractic license that is unrestricted and not subject to a disciplinary order or probation in another state or a Canadian province;
             (2)  may not hold a chiropractic license in another state or a Canadian province that has any restrictions, disciplinary orders, or probation;
             (3)  must pass the examination required under Section 201.304(a)(2);
             (4)  must have been engaged in the practice of chiropractic:
                   (A)  for at least the three years preceding the date of the application under this section; or
                   (B)  as a chiropractic educator in a doctor of chiropractic degree program accredited by the Council on Chiropractic Education for at least the three years preceding the date of the application under this section; and
             (5)  must hold a salaried faculty position of at least the level of assistant professor and be working full-time at:
                   (A)  Parker College of Chiropractic; or
                   (B)  Texas Chiropractic College.
       (d)  A person is eligible for a temporary license under Subsection (c) if the person holds a faculty position of at least the level of assistant professor, the person works at least part-time at an institution listed in Subsection (c)(5), and:

(1)   the person is on active duty in the United States armed forces; and

(2)   the person's practice under the temporary license will fulfill critical needs of the citizens of this state.

(e)   A chiropractor who is issued a temporary license under Subsection (c) must sign an oath on a form prescribed by the board swearing that the person:

(1)   has read and is familiar with this chapter and board rules;

(2)   will abide by the requirements of this chapter and board rules while practicing under the chiropractor's temporary license; and

(3)   will be subject to the disciplinary procedures of the board.

(f)   A chiropractor holding a temporary license under Subsection (c) and the chiropractor's chiropractic school must file affidavits with the board affirming acceptance of the terms and limits imposed by the board on the chiropractic activities of the chiropractor.

(g)   A temporary license issued under Subsection (c) is valid for one year.

(h)   The holder of a temporary license issued under Subsection (c) is limited to the teaching confines of the applying chiropractic school as a part of the chiropractor's duties and responsibilities assigned by the program and may not practice chiropractic outside of the setting of the chiropractic school or an affiliate of the chiropractic school.

(i)   The application for a temporary license under Subsection (c) must be made by the chiropractic school in which the chiropractor teaches and must contain the information and documentation requested by the board.  The application must be endorsed by the dean of the chiropractic school or the president of the institution.

(j)   A chiropractor who holds a temporary license issued under Subsection (c) and who wishes to receive a permanent unrestricted license must meet the requirements for issuance of a permanent unrestricted license, including any examination requirements.

(k)   The board shall adopt:

(1)   rules governing the issuance of a renewal temporary faculty license, including a rule that permits a person licensed

under Subsection (c) to continue teaching while an application for a renewal temporary license is pending;

        (2)  fees for the issuance of a temporary license and a renewal temporary license; and

        (3)  an application form for temporary licenses and renewal temporary licenses to be issued under this section.

    (l)  The fee for a renewal temporary license issued under Subsection (k)(1) must be less than the amount of the fee for a temporary license issued under Subsection (c).

    (m)  A chiropractic school shall notify the board not later than 72 hours after the time:

        (1)  except as provided by Subdivision (2), a chiropractor licensed under Subsection (c) ceases to hold a full-time salaried position of at least the level of assistant professor at the school; and

        (2)  a chiropractor described by Subsection (d) ceases to hold a part-time salaried position of at least the level of assistant professor at the school.

    (n)  The board shall revoke a license issued under this section if the license holder no longer satisfies the requirements of this section.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2009, 81st Leg., R.S., Ch. 957 (H.B. 3450), Sec. 1, eff. September 1, 2009.


    Sec. 201.309.  LICENSE ISSUANCE TO CERTAIN OUT-OF-STATE APPLICANTS.  The board shall issue a license to practice chiropractic to an out-of-state applicant who:

        (1)  submits a written application to the board on a form prescribed by the board, accompanied by the application fee set by the board and any other information requested by the board;

        (2)  is licensed in good standing to practice chiropractic in another state or foreign country that has licensing requirements substantially equivalent to the requirements of this chapter;

(3)   has not been the subject of a disciplinary action and is not the subject of a pending investigation in any jurisdiction in which the applicant is or has been licensed;

(4)   has graduated from a doctor of chiropractic degree program accredited by the Council on Chiropractic Education and approved by rule by the board;

(5)   has passed a national or other examination recognized by the board relating to the practice of chiropractic;

(6)   has passed the board's jurisprudence examination;

(7)   has practiced chiropractic:

(A)   for at least the three years immediately preceding the date of the application under this section; or

(B)   as a chiropractic educator in a doctor of chiropractic degree program accredited by the Council on Chiropractic Education for at least the three years immediately preceding the date of the application under this section; and

(8)   meets any other requirements adopted by rule by the board under this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 899, Sec. 1.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 802 (S.B. 776), Sec. 5, eff. June 15, 2007.


    Sec. 201.311.  INACTIVE STATUS.  (a)  The board by rule shall adopt a system by which a license holder may place the license on inactive status.  A license holder must apply for inactive status, on a form prescribed by the board, before the expiration date of the license.

(b)  A license holder whose license is on inactive status:

(1)  is not required to pay license renewal fees;  and

(2)  may not perform an activity regulated under this chapter.

(c)  A license holder whose license is on inactive status may return to active practice by notifying the board in writing.  The board shall remove the license holder's license from inactive status

after the holder pays an administrative fee and complies with any educational or other requirements established by board rules.

(d)  The board by rule shall establish a rule setting a limit on the time a license holder's license may remain on inactive status.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.312.  REGISTRATION OF FACILITIES.  (a)  The board by rule shall adopt requirements for registering chiropractic facilities as necessary to protect the public health, safety, and welfare.

(b)  The rules adopted under this section must:

(1)  specify the registration requirements for a chiropractic facility;

(2)  prescribe the standards for the chiropractic facility registration program;

(3)  provide for the issuance of a separate certificate of registration to an owner of a chiropractic facility for each chiropractic facility owned by the owner;  and

(4)  provide for the board to send notice to an owner of a chiropractic facility and to each chiropractor practicing in the facility of the impending expiration of the facility's certificate of registration before the expiration of the certificate.

(c)  The standards adopted under Subsection (b)(2) must be consistent with industry standards for the practice of chiropractic.

(d)  To register a chiropractic facility, the owner of the facility must:

(1)  file with the board a written application for registration;  and

(2)  pay, with the application, a registration fee in an amount set by the board not to exceed $75.

(e)  The board may issue a certificate of registration only to a chiropractic facility that complies with the requirements of this section.

(f)  A certificate of registration under this section must be renewed annually.  To renew the certificate, the certificate holder shall apply to the board and pay an annual fee equal to the amount of the registration fee under Subsection (d)(2).

(g)  A person licensed to practice chiropractic in this state is subject to disciplinary action under this chapter if the person practices chiropractic in a chiropractic facility that the person knows is not registered under this section.

(h)  An owner of a chiropractic facility who violates this section or a rule adopted under this section is subject to disciplinary action by the board in the same manner as a license holder who violates this chapter or a rule adopted under this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 227, Sec. 1, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 329, Sec. 2.


SUBCHAPTER H. ANNUAL REGISTRATION AND LICENSE RENEWAL

Sec. 201.351.  ANNUAL REGISTRATION.  A chiropractor may not practice chiropractic in this state unless the chiropractor annually registers with the board not later than January 1 of each year.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.352.  APPLICATION FOR ANNUAL REGISTRATION.  (a)  A person required to register shall:

(1)  file annually with the board a written application for registration;  and

(2)  pay, with the application, an annual registration fee to the board.

(b)  The application must include:

(1)  the person's full name, age, post office address, and place of residence;

(2)  each place where the person is engaged in the practice of chiropractic;

(3)  the college of chiropractic from which the person graduated;  and

(4)  the number and date of the person's license.

(c)  On receipt of the application and registration fee, the board shall determine whether the applicant is licensed to practice

chiropractic in this state based on the records of the board or other sources the board considers reliable.

(d)  If the board determines that the applicant is licensed to practice chiropractic in this state, the board shall issue an annual registration receipt certifying that the applicant has filed an application and paid the registration fee.

(e)  The registration receipt is not evidence in a prosecution for the unlawful practice of chiropractic under Section 201.605 that the person is lawfully entitled to practice chiropractic.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.353.  LICENSE EXPIRATION DATE.  (a)  The board by rule may adopt a system under which licenses expire on various dates during the year.

(b)  For a year in which the license expiration date is changed, license fees payable on January 1 shall be prorated on a monthly basis so that each license holder pays only the portion of the fee that is allocable to the number of months during which the license is valid.  On renewal of the license on the new expiration date, the total license renewal fee is payable.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


This section was amended by the 84th Legislature. Pending publication of the current statutes, see H.B. 7, 84th Legislature, Regular Session, for amendments affecting this section.

Sec. 201.354.  LICENSE RENEWAL.  (a)  A person may renew an unexpired license by paying the required renewal fee to the board before the expiration date of the license.

(b)  At least 30 days before the expiration of a person's license, the board shall send written notice of the impending license expiration to the person at the person's last known address according to the board's records.

(c)  The annual renewal fee applies to each person licensed by the board, even if the person is not practicing chiropractic in this state.

(d)   A person whose license has been expired for 90 days or less may renew the license by paying to the board a renewal fee that is equal to the sum of 1-1/2 times the annual renewal fee set by the board under Section 201.153(a) and the increase in that fee required by Section 201.153(b).  If a person's license has been expired for more than 90 days but less than one year, the person may renew the license by paying to the board a renewal fee that is equal to the sum of two times the annual renewal fee set by the board under Section 201.153(a) and the increase in that fee required by Section 201.153 (b).

(e)   Except as provided by Subsection (g) and Section 201.355, a person may not renew a license that has been expired for one year or more.   The person may obtain a new license by submitting to reexamination and complying with the requirements and procedures for obtaining an original license.

(f)   A person who practices chiropractic without an annual renewal receipt for the current year practices chiropractic without a license.

(g)   A person may renew a license that has been expired for at least one year but not more than three years if:

(1)   the board determines according to criteria adopted by board rule that the person has shown good cause for the failure to renew the license; and

(2)   the person pays to the board:

(A)   the annual renewal fee set by the board under Section 201.153(a) for each year in which the license was expired;

(B)   an additional fee in an amount equal to the sum of:

(i)   the annual renewal fee set by the board under Section 201.153(a), multiplied by the number of years the license was expired, prorated for fractional years; and

(ii)   two times the annual renewal fee set by the board under Section 201.153(a); and

(C)   the increase in the annual renewal fee required by Section 201.153(b).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 230, Sec. 1, eff. Sept. 1, 2001. Amended by:

Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 24, eff. September 1, 2005.


Sec. 201.355.  RENEWAL OF EXPIRED LICENSE BY OUT-OF-STATE PRACTITIONER.  (a)  The board may renew without reexamination an expired license of a person who was licensed in this state, moved to another state or foreign country, and is currently licensed in good standing and has been in practice in the other state or foreign country for the two years preceding application.

(b)  The person must pay to the board a fee that is equal to the normally required renewal fee for the license.

(c)  For purposes of this section, a person is currently licensed if the person is licensed by another chiropractic licensing board recognized by the board.  The board shall adopt requirements for recognizing another chiropractic licensing board that:

(1)  has licensing requirements substantially equivalent to the requirements of this chapter;  and

(2)  maintains professional standards considered by the board to be equivalent to the standards under this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2003, 78th Leg., ch. 329, Sec. 3.
Amended by:
Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 25, eff. September 1, 2005.


Sec. 201.356.  CONTINUING EDUCATION.  (a)  The board by rule shall:

(1)  assess the continuing education needs of license holders;

(2)  adopt requirements for mandatory continuing education for license holders in subjects relating to the practice of chiropractic;

(3)  establish a minimum number of hours of continuing education required to renew a license;  and

(4)  develop a process to evaluate and approve continuing education courses.

(b)   The board may require license holders to attend continuing education courses specified by the board.  The board shall adopt a procedure to assess a license holder's participation and performance in continuing education programs.

(c)   The board shall identify the key factors for the competent performance by a license holder of the license holder's professional duties.

(d)   The board shall notify license holders of approved continuing education courses at least annually.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER I. PATIENT CONFIDENTIALITY

Sec. 201.401.   DEFINITION OF PATIENT.  In this subchapter, "patient" means any person who consults or is seen by a chiropractor to receive chiropractic care.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.402.   PATIENT CONFIDENTIALITY.  (a)  Communications between a chiropractor and a patient relating to or in connection with any professional services provided by a chiropractor to the patient are confidential and privileged and may not be disclosed except as provided by this subchapter.

(b)   Records of the identity, diagnosis, evaluation, or treatment of a patient by a chiropractor that are created or maintained by a chiropractor are confidential and privileged and may not be disclosed except as provided by this subchapter.

(c)   A person who receives information from the confidential communications or records, excluding a person listed in Section 201.404(a) who is acting on the patient's behalf, may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained.

(d)   The prohibitions of this section apply to confidential communications or records concerning any patient regardless of when the patient received the services of a chiropractor.

(e)  The privilege of confidentiality may be claimed by the patient or chiropractor acting on the patient's behalf.  The authority of a chiropractor to claim the privilege of confidentiality on behalf of a patient is presumed in the absence of evidence to the contrary.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.403.  EXCEPTIONS TO CONFIDENTIALITY FOR ADMINISTRATIVE PROCEDURE.  (a)  Section 201.402 does not apply in a court or administrative proceeding:
        (1)  brought by a patient against a chiropractor, including:
            (A)  a malpractice proceeding;  and
            (B)  any criminal or license revocation proceeding in which the patient is a complaining witness and disclosure is relevant to the claims or defense of the chiropractor;
        (2)  in which the patient or a person authorized to act on the patient's behalf submits a written consent to the release of confidential information, as provided by Section 201.405;
        (3)  brought to substantiate and collect on a claim for chiropractic services rendered to the patient;
        (4)  brought by the patient or a person on the patient's behalf who is attempting to recover monetary damages for any physical or mental condition, including death of the patient;
        (5)  brought in connection with a disciplinary investigation of a chiropractor under this chapter, except as provided by Subsection (b);
        (6)  brought in connection with a criminal investigation of a chiropractor if the board is participating or assisting in the investigation or proceeding by providing certain records obtained from the chiropractor, except as provided by Subsection (c);  and
        (7)  brought in connection with a criminal prosecution in which the patient is a victim, witness, or defendant except as provided by Subsection (d).
    (b)  The board shall protect the identity of any patient whose chiropractic records are examined in connection with an investigation or proceeding described by Subsection (a)(5), excluding patients described by Subsection (a)(1) and patients who have submitted

written consent to the release of their chiropractic records as provided by Section 201.405.

(c)  The board shall protect the identity of any patient whose records are provided in connection with an investigation or proceeding described by Subsection (a)(6), excluding patients described by Subsection (a)(1) and patients who have submitted written consent to the release of their chiropractic records as provided by Section 201.405.  The board does not authorize the release of any confidential information for the purpose of instigating or substantiating criminal charges against a patient.

(d)  In a proceeding described by Subsection (a)(7), records or communications are not discoverable until the court in which the prosecution is pending makes an in camera determination of relevancy. A determination of relevancy by a court under this subsection is not a determination of the admissibility of any record or communication.

(e)  Information is discoverable in a court or administrative proceeding in this state if the court or administrative body has jurisdiction over the subject matter of the proceeding.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.404.  EXCEPTIONS TO CONFIDENTIALITY FOR OTHER CIRCUMSTANCES.  (a)  In circumstances other than court or administrative proceedings, exceptions to Section 201.402 exist only for:

(1)  a governmental agency, if the disclosure is required or permitted by law except as provided by Subsection (b);

(2)  medical or law enforcement personnel, if the chiropractor determines that a probability of imminent physical injury to the patient, the chiropractor, or others exists or a probability of immediate mental or emotional injury to the patient exists;

(3)  qualified personnel for the purpose of management audits, financial audits, program evaluations, or research, under the conditions provided by Subsection (c);

(4)  those parts of the records reflecting charges and specific services performed, if necessary to collect fees for

services provided by a chiropractor, a professional association, or another entity qualified to render or arrange for services;

       (5)  any person who possesses a written consent described by Section 201.405;

       (6)  an individual, corporation, or governmental agency involved in paying or collecting fees for services performed by a chiropractor;

       (7)  another chiropractor or personnel under the direction of the chiropractor who participate in the diagnosis, evaluation, or treatment of the patient;  or

       (8)  an official legislative inquiry of state hospitals or state schools under the conditions provided under Subsection (d).

   (b)  A governmental agency shall protect the identity of any patient whose chiropractic records are examined under Subsection (a)(1).

   (c)  Personnel described by Subsection (a)(3) may not directly or indirectly identify a patient in any report of research, audit, or evaluation or otherwise disclose a patient's identity in any manner.

   (d)  Information released under Subsection (a)(8) may not include:

       (1)  information or records that identify a patient or client for any purpose without proper consent given by the patient; and

       (2)  records that were not created by the state hospital or school or its employees.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


   Sec. 201.405.  CONSENT FOR RELEASE.  (a)  In this section, "chiropractic records" means any record relating to the history, diagnosis, treatment, or prognosis of a patient.

   (b)  Consent for the release of confidential information must be in writing and signed by:

       (1)  the patient;

       (2)  a parent or legal guardian if the patient is a minor;

       (3)  a legal guardian if the patient has been adjudicated incompetent to manage the patient's personal affairs;

(4)   an attorney ad litem appointed for the patient, as authorized by:

        (A)   Subtitle B, Title 6, Health and Safety Code;

        (B)   Subtitle C, D, or E, Title 7, Health and Safety Code;

        (C)   Chapter XIII, Texas Probate Code;

        (D)   Chapter 107, Family Code;  or

        (E)   another applicable provision;  or

(5)   a personal representative if the patient is deceased.

(c)   The written consent must specify:

(1)   the information records covered by the release;

(2)   the reason or purpose for the release;  and

(3)   the person to whom the information is to be released.

(d)   The patient or the person authorized to consent to disclosure under this section may withdraw consent to the release of any information.  Withdrawal of consent does not affect any information disclosed before written notice of the withdrawal.

(e)   A person who receives information made confidential by this chapter may disclose the information to another only to the extent that disclosure is consistent with the authorized purposes for which consent to release the information was obtained.

(f)   A chiropractor shall furnish copies of chiropractic records or a summary or narrative of the records requested under a written consent for release of the information.  The chiropractor shall furnish the information within a reasonable time.  The patient or a person acting on the patient's behalf shall pay a reasonable fee for the information provided by the chiropractor.  The chiropractor may delete confidential information about another person who has not consented to the release.

(g)   A chiropractor who determines that access to information requested under Subsection (f) would be harmful to the physical, mental, or emotional health of the patient may refuse to release the information requested under this section.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER J.   PRACTICE BY LICENSE HOLDER

Sec. 201.451.  DELEGATION TO ASSISTANTS.  (a)  The board by rule shall establish guidelines relating to the tasks and procedures that a chiropractor may delegate to an assistant.

(b)  A chiropractor who delegates a task or procedure under this section retains full responsibility for the task or procedure.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.452.  USE OF X-RAY.  (a)  The board may require evidence of proper training and safety in the use of analytical and diagnostic x-ray in conformity with:

(1)  Chapter 401, Health and Safety Code;  and

(2)  rules of the Texas Radiation Control Agency and the Texas Department of Health.

(b)  This section does not modify or amend:

(1)  Section 201.002 by enlarging the scope of the practice of chiropractic or the acts that a chiropractor is authorized to perform;  or

(2)  Chapter 151.

(c)  The board shall implement any federal and state requirements relating to radiologic training of the employees of a chiropractor.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.453.  MALPRACTICE SETTLEMENT INFORMATION AND EXPERT REPORTS.  (a)  The Texas Department of Insurance shall provide to the board any information received by the department regarding a settlement of a malpractice claim against a chiropractor.

(b)  An insurer who delivers or issues for delivery in this state professional liability insurance coverage to a chiropractor who practices in this state shall provide to the board a copy of any expert report served under Section 74.351, Civil Practice and Remedies Code, in a malpractice action against the chiropractor.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 27, eff. September 1, 2005.

## SUBCHAPTER K. DISCIPLINARY PROCEDURES

Sec. 201.501.  DISCIPLINARY POWERS OF BOARD.  (a)  On a determination that a person has violated this chapter or a rule adopted by the board under this chapter, the board:

(1)  shall revoke or suspend the person's license, place on probation a person whose license has been suspended, or reprimand a license holder;  or

(2)  may impose an administrative penalty.

(b)  If a license suspension is probated, the board may require the license holder to:

(1)  report regularly to the board on matters that are the basis of the probation;

(2)  limit practice to the areas prescribed by the board;  or

(3)  continue or review continuing professional education until the license holder attains a degree of skill satisfactory to the board in those areas that are the basis of the probation.

(c)  In addition to other disciplinary actions authorized by this chapter, the board may require a license holder who violates this chapter to participate in a continuing education program.  The board shall specify the continuing education programs that the license holder may attend and the number of hours that the license holder must complete.

(d)  Disciplinary proceedings of the board are governed by Chapter 2001, Government Code.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.502.  GROUNDS FOR REFUSAL, REVOCATION, OR SUSPENSION OF LICENSE.  (a)  The board may refuse to admit a person to examinations and may revoke or suspend a license or place a license holder on probation for a period determined by the board for:

(1)  violating this chapter or a rule adopted under this chapter, including committing an act prohibited under Section 201.5025;

(2)  engaging in deception or fraud in the practice of chiropractic;

(3)  presenting to the board or using a license, certificate, or diploma or a transcript of a license, certificate, or diploma that was illegally or fraudulently obtained, counterfeited, or materially altered;

(4)  presenting to the board an untrue statement or a document or testimony that was illegally used to pass the examination;

(5)  being convicted of a crime involving moral turpitude or a felony;

(6)  procuring or assisting in the procuring of an abortion;

(7)  engaging in grossly unprofessional conduct or dishonorable conduct of a character likely to deceive or defraud the public;

(8)  having a habit of intemperance or drug addiction or another habit that, in the opinion of the board, endangers the life of a patient;

(9)  using an advertising statement that is false or that tends to mislead or deceive the public;

(10)  directly or indirectly employing or associating with a person who, in the course of the person's employment, commits an act constituting the practice of chiropractic when the person is not licensed to practice chiropractic;

(11)  advertising professional superiority, or advertising the performance of professional services in a superior manner, if that advertising is not readily subject to verification;

(12)  purchasing, selling, bartering, using, or offering to purchase, sell, barter, or use a chiropractic degree, license, certificate, or diploma or transcript of a license, certificate, or diploma in or relating to an application to the board for a license to practice chiropractic;

(13)  altering with fraudulent intent a chiropractic license, certificate, or diploma or transcript of a chiropractic license, certificate, or diploma;

(14)  impersonating or acting as proxy for another in an examination required by this chapter for a chiropractic license;

(15)  impersonating a licensed chiropractor;

(16)  allowing one's chiropractic license to be used by another person to practice chiropractic;

(17)  being proved insane by a person having authority to make that determination;

(18)  failing to use proper diligence in the practice of chiropractic or using gross inefficiency in the practice of chiropractic;

(19)  failing to clearly differentiate a chiropractic office or clinic from another business or enterprise;

(20)  personally soliciting a patient or causing a patient to be solicited by the use of a case history of another patient of another chiropractor;

(21)  using for the purpose of soliciting patients an accident report prepared by a peace officer in a manner prohibited by Section 38.12, Penal Code; or

(22)  advertising using the term "physician" or "chiropractic physician" or any combination or derivation of the term "physician."

(b)  Notwithstanding Subsection (a)(22), the term "chiropractic physician" may be used for the express purpose of filing a claim for necessary services within the definition of chiropractic under this chapter if the billing for the services has universally applied, predetermined coding or description requirements that are a prerequisite to appropriate reimbursement.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 28, eff. September 1, 2005.


Sec. 201.5025.  PROHIBITED PRACTICES BY CHIROPRACTOR OR LICENSE APPLICANT.  (a)  A chiropractor or an applicant for a license to practice chiropractic commits a prohibited practice if that person:

(1)  submits to the board a false or misleading statement, document, or certificate in an application for a license;

(2)  commits fraud or deception in taking or passing an examination;

(3)  commits unprofessional or dishonorable conduct that is likely to deceive or defraud the public, as provided by Section 201.5026, or injure the public;

(4)  engages in conduct that subverts or attempts to subvert an examination process required by this chapter for a chiropractic license;

(5)  directly or indirectly employs a person whose license to practice chiropractic has been suspended, canceled, or revoked;

(6)  associates in the practice of chiropractic with a person:

(A)  whose license to practice chiropractic has been suspended, canceled, or revoked; or

(B)  who has been convicted of the unlawful practice of chiropractic in this state or elsewhere; or

(7)  directly or indirectly aids or abets the practice of chiropractic by a person that is not licensed to practice chiropractic by the board.

(b)  For purposes of Subsection (a)(4), conduct that subverts or attempts to subvert the chiropractic licensing examination process includes, as prescribed by board rule, conduct that violates:

(1)  the security of the examination materials;

(2)  the standard of test administration; or

(3)  the accreditation process.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 29, eff. September 1, 2005.

Sec. 201.5026.  UNPROFESSIONAL OR DISHONORABLE CONDUCT.  (a) For purposes of Section 201.5025(a)(3), unprofessional or dishonorable conduct that is likely to deceive or defraud the public includes conduct in which a chiropractor:

(1)  commits an act that violates any state or federal law if the act is connected with the chiropractor's practice of chiropractic;

(2)  prescribes or administers a treatment that is nontherapeutic in nature or nontherapeutic in the manner the treatment is prescribed or administered;

(3)  violates Section 311.0025, Health and Safety Code;

(4)  fails to supervise adequately the activities of those acting under the supervision of the chiropractor; or

(5)  delegates professional chiropractic responsibility or acts to a person if the delegating chiropractor knows or has reason to know that the person is not qualified by training, experience, or licensure to perform the responsibility or acts.

(b)  A complaint, indictment, or conviction of a violation is not necessary for the enforcement of Subsection (a)(1).  Proof of the commission of the act while in the practice of chiropractic or under the guise of the practice of chiropractic is sufficient for the board's action.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 29, eff. September 1, 2005.


Sec. 201.503.  SCHEDULE OF SANCTIONS.  (a)  The board by rule shall adopt a schedule of the maximum amount of sanctions that may be assessed against a license holder for each category of violation of this chapter.  In establishing the schedule of sanctions or in imposing the amount of an administrative penalty under this chapter, the board shall consider:

(1)  the seriousness of the violation, including the nature, circumstances, extent, or gravity of any prohibited acts and the hazard or potential hazard created to the health, safety, or economic welfare of the public;

(2)  the economic harm to property or the environment caused by the violation;

(3)  the history of previous violations;

(4)  the amount necessary to deter a future violation;

(5)  efforts to correct the violation;  and

(6)  any other matter that justice may require.

(b)  The State Office of Administrative Hearings shall use the schedule of sanctions for any sanction imposed as the result of a hearing conducted by that office.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 201.504.  INFORMAL PROCEEDINGS; REFUNDS.  (a)  The board by rule shall adopt procedures governing:

(1)  informal disposition of a contested case under Section 2001.056, Government Code;  and

(2)  an informal proceeding held in compliance with Section 2001.054, Government Code.

(b)  Rules adopted under Subsection (a) must:

(1)  provide the complainant and the license holder an opportunity to be heard;  and

(2)  require the presence of a representative of the attorney general or the board's legal counsel to advise the board or the board's employees.

(c)  Subject to Subsection (d), the board may order a license holder to pay a refund to a consumer as provided in an agreement resulting from an informal settlement conference instead of or in addition to imposing an administrative penalty under this chapter.

(d)  The amount of a refund ordered as provided in an agreement resulting from an informal settlement conference may not exceed the amount the consumer paid to the license holder for a service regulated by this chapter.  The board may not require payment of other damages or estimate harm in a refund order.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 30, eff. September 1, 2005.
    Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 31, eff. September 1, 2005.


Sec. 201.505.  HEARINGS.  (a)  A person is entitled to a hearing before the board if the board proposes to:

(1)  refuse the person's application for a license;

(2)  suspend or revoke the person's license;  or

(3)  place on probation or reprimand the person.

(b)  The board is not bound by strict rules of evidence or procedure in conducting its proceedings and hearings, but the board must base its determination on sufficient legal evidence.

(c)  The board may:

        (1)   issue subpoenas and subpoenas duces tecum to compel the attendance of witnesses and the production of books, records, and other documents;

        (2)   administer oaths;  and

        (3)   take testimony concerning all matters within its jurisdiction.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.506.   ENFORCEMENT COMMITTEE.  (a)  The board shall appoint an enforcement committee to:

        (1)   oversee and conduct the investigation of complaints filed with the board under this chapter;  and

        (2)   perform other enforcement duties as directed by the board.

    (b)   The enforcement committee consists of three board members. Two members must be chiropractors, and one member must be a representative of the public.

    (c)   The attorney general shall provide legal counsel to the enforcement committee concerning enforcement matters, including the investigation and disposition of complaints.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.5065.   REQUIRED SUSPENSION OR REVOCATION OF LICENSE FOR CERTAIN OFFENSES.  (a)  The board shall suspend a chiropractor's license on proof that the chiropractor has been:

        (1)   initially convicted of:

           (A)   a felony;

           (B)   a misdemeanor under Chapter 22, Penal Code, other than a misdemeanor punishable by fine only;

           (C)   a misdemeanor on conviction of which a defendant is required to register as a sex offender under Chapter 62, Code of Criminal Procedure;

           (D)   a misdemeanor under Section 25.07, Penal Code; or

           (E)   a misdemeanor under Section 25.071, Penal Code; or

        (2)   subject to an initial finding by the trier of fact of guilt of a felony under:

          (A)   Chapter 481 or 483, Health and Safety Code;

          (B)   Section 485.033, Health and Safety Code; or

          (C)   the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. Section 801 et seq.).

     (b)  On final conviction for an offense described by Subsection (a), the board shall revoke the chiropractor's license.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 32, eff. September 1, 2005.

     Sec. 201.507.  TEMPORARY LICENSE SUSPENSION.  (a)  The enforcement committee may temporarily suspend the license of a license holder on an emergency basis if the enforcement committee determines from the evidence or information presented to the committee that the continued practice of chiropractic by the license holder constitutes a continuing or imminent threat to the public welfare.

     (b)  The board by rule shall adopt procedures for the temporary suspension of a license under this section.

     (c)  A license temporarily suspended under this section may be suspended without notice or hearing if, at the time the suspension is ordered, a hearing on whether disciplinary proceedings under this chapter should be initiated against the license holder is scheduled to be held not later than the 14th day after the date of the suspension.

     (d)  A second hearing on the suspended license shall be held not later than the 60th day after the date the suspension is ordered.  If the second hearing is not held in the time required by this subsection, the suspended license is automatically reinstated.

     (e)  A temporary suspension may also be ordered on a vote of two-thirds of the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

     Sec. 201.508.  POWERS OF DISTRICT COURTS;  DUTIES OF DISTRICT AND COUNTY ATTORNEYS.  (a)  A district court may revoke or suspend a chiropractor's license on proof of a violation of the law relating to the practice of chiropractic.

(b)   On the request of the board, a district or county attorney shall represent the state by filing and prosecuting a judicial proceeding for the revocation, cancellation, or suspension of the chiropractor's license.

(c)   The district or county attorney may institute the judicial proceeding by filing a petition that:

(1)   is in writing;

(2)   states the grounds for prosecution;  and

(3)   is signed officially by the prosecuting officer.

(d)   Citation must be issued in the name of the state in the manner and form as in other cases and shall be served on the defendant, who is required to answer within the time and manner provided by law in civil cases.

(e)   If a chiropractor, after proper citation, is found guilty or fails to appear and deny the charge, the court shall:

(1)   enter an order to suspend or revoke the chiropractor's license;  and

(2)   give proper judgment for costs.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.509.   REPRESENTATION BY ATTORNEY GENERAL.   (a)   The board may apply to the attorney general for representation by stating that the board previously requested the representation of a district or county attorney under Section 201.508 and the district or county attorney failed to prosecute or proceed against the person accused of violating this chapter.

(b)   The attorney general shall institute a civil or criminal proceeding against the person in the county of the person's residence.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.510.   RIGHT TO APPEAL.   (a)   A person whose license to practice chiropractic has been revoked or suspended or against whom the board has imposed an administrative penalty may appeal to a Travis County district court.

(b)   The decision of the board may not be enjoined or stayed unless the person appeals the board's decision as provided by Subsection (a) and provides notices to the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 228, Sec. 1, eff. Sept. 1, 2001.


Sec. 201.511.   REISSUANCE OF LICENSE.   (a)   On application, the board may reissue a license to practice chiropractic to a person whose license has been canceled or suspended.

(b)   An applicant whose license has been canceled or revoked:

(1)   may not apply for reissuance before the first anniversary of the date the license was canceled or revoked;   and

(2)   must apply for reissuance in the manner and form required by the board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER L. ADMINISTRATIVE PENALTY

Sec. 201.551.   IMPOSITION OF ADMINISTRATIVE PENALTY.   The board may impose an administrative penalty on a person licensed or regulated under this chapter if the person violates this chapter or a rule or order adopted under this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.552.   AMOUNT OF PENALTY.   (a)   The amount of an administrative penalty may not exceed $1,000.

(b)   Each day a violation continues or occurs is a separate violation for purposes of imposing a penalty.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.553.   ENFORCEMENT COMMITTEE RECOMMENDATIONS.   (a)   On a determination by the enforcement committee that a violation of this

chapter or a rule or order adopted under this chapter occurred, the committee may issue a report to the board stating:

        (1)  the facts on which the determination is based;  and

        (2)  the enforcement committee's recommendation on the imposition of the administrative penalty, including a recommendation on the amount of the penalty.

    (b)  Not later than the 14th day after the date the report is issued, the executive director shall give written notice of the violation by certified mail to the person on whom the penalty may be imposed.

    (c)  The notice issued under this section must:

        (1)  include a brief summary of the alleged violation;

        (2)  state the amount of the recommended penalty;  and

        (3)  inform the person of the person's right to a hearing on the occurrence of the violation, the amount of the penalty, or both.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.554.  PENALTY TO BE PAID OR HEARING REQUESTED.  (a) Not later than the 20th day after the date a person receives the notice under Section 201.553, the person may:

        (1)  accept in writing the enforcement committee's determination and recommended administrative penalty;  or

        (2)  make a written request for a hearing on the occurrence of the violation, the amount of the penalty, or both.

    (b)  If the person accepts the enforcement committee's determination and recommended penalty, the board by order shall approve the determination and impose the recommended penalty.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.0515, eff. Sept. 1, 2001.


    Sec. 201.555.  HEARING ON ENFORCEMENT COMMITTEE RECOMMENDATIONS. (a)  If the person requests a hearing or fails to respond timely to the notice, the executive director shall set a hearing and give notice of the hearing to the person.

(b)   A hearing set by the executive director under Subsection (a) shall be held by an administrative law judge of the State Office of Administrative Hearings.

(c)   The administrative law judge shall:

(1)   make findings of fact and conclusions of law;  and

(2)   promptly issue to the board a proposal for a decision as to the occurrence of the violation and the amount of a proposed administrative penalty.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.556.  DECISION BY BOARD.  (a)  Based on the findings of fact, conclusions of law, and proposal for a decision, the board by order may determine that:

(1)   a violation has occurred and impose an administrative penalty;  or

(2)   a violation did not occur.

(b)   The notice of the board's order given to the person under Chapter 2001, Government Code, must include a statement of the right of the person to judicial review of the order.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.557.  OPTIONS FOLLOWING DECISION:  PAY OR APPEAL.  (a) Not later than the 30th day after the date the board's order becomes final, the person shall:

(1)   pay the administrative penalty;

(2)   pay the penalty and file a petition for judicial review contesting the fact of the violation, the amount of the penalty, or both;  or

(3)   without paying the penalty, file a petition for judicial review contesting the fact of the violation, the amount of the penalty, or both.

(b)   Within the 30-day period, a person who acts under Subsection (a)(3) may:

(1)   stay enforcement of the penalty by:

(A)   paying the penalty to the court for placement in an escrow account;  or

           (B)   giving to the court a supersedeas bond that is approved by the court and that:

               (i)   is for the amount of the penalty;  and

               (ii)   is effective until judicial review of the board's order is final;  or

      (2)   request the court to stay enforcement of the penalty by:

           (A)   filing with the court a sworn affidavit of the person stating that the person is financially unable to pay the penalty and is financially unable to give the supersedeas bond;  and

           (B)   giving a copy of the affidavit to the executive director by certified mail.

    (c)   If the executive director receives a copy of an affidavit under Subsection (b)(2), the director may, at the direction of the enforcement committee, file with the court a contest to the affidavit not later than the fifth day after the date the copy is received.

    (d)   The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and stay the enforcement of the penalty on finding that the alleged facts are true.  The person who files the affidavit has the burden of proving that the person is financially unable to pay the penalty and to give a supersedeas bond.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.558.   COLLECTION OF PENALTY.  If the person does not pay the administrative penalty and the enforcement of the penalty is not stayed, the executive director may, at the direction of the enforcement committee, refer the matter to the attorney general for collection of the penalty.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.559.   DETERMINATION BY COURT.  (a)  If a court sustains the finding that a violation occurred after the court reviews the order of the board imposing an administrative penalty, the court may uphold or reduce the amount of the penalty and order the person to pay the full or reduced penalty.

(b)    If the court does not sustain the finding that a violation occurred, the court shall order that an administrative penalty is not owed.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.560.    REMITTANCE OF PENALTY AND INTEREST.    (a)    If after judicial review, the administrative penalty is reduced or not imposed by the court, the court shall, after the judgment becomes final:
(1)    order the appropriate amount, plus accrued interest, be remitted to the person if the person paid the penalty;  or
(2)    order the release of the bond in full if the penalty is not imposed or order the release of the bond after the person pays the penalty imposed if the person posted a supersedeas bond.
(b)    The interest paid under Subsection (a)(1) is the rate charged on loans to depository institutions by the New York Federal Reserve Bank.    The interest shall be paid for the period beginning on the date the penalty is paid and ending on the date the penalty is remitted.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.561.    ADMINISTRATIVE PROCEDURE.    All proceedings under this subchapter are subject to Chapter 2001, Government Code.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER M. OTHER PENALTIES AND ENFORCEMENT PROVISIONS

Sec. 201.601.    INJUNCTIVE RELIEF.    (a)    The board may institute in the board's name an action to restrain a violation of this chapter.    An action under this subsection is in addition to any other action authorized by law.
(b)    The state may sue for an injunction to restrain the practice of chiropractic in violation of this chapter.
(c)    The state shall be represented in suits for injunction by:

        (1)   the attorney general;

        (2)   the district attorney of the district in which the defendant resides;  or

        (3)   the county attorney of the county in which the defendant resides.

    (d)   A suit for injunction under Subsection (b) may not be filed before the final conviction for a violation of this chapter of the party sought to be enjoined.

    (e)   The state is not required to show that a person is personally injured by the defendant's unlawful practice of chiropractic.

    (f)   A court may not grant a temporary or permanent injunction until a hearing of the complaint on its merits.  A court may not issue an injunction or restraining order until the final trial and final judgment on the merits of the suit.

    (g)   If the defendant is shown to have been unlawfully practicing chiropractic or to have been about to unlawfully practice chiropractic, the court shall perpetually enjoin the defendant from practicing chiropractic in the manner that was the subject of the suit.

    (h)   A defendant who disobeys the injunction is subject to the penalties provided by law for the violation of an injunction.  The remedy by injunction is in addition to a criminal prosecution.

    (i)   A suit for injunction under this section shall be advanced for trial on the docket of the trial court and advanced and tried in the appellate courts in the same manner as other suits for injunction.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 201.6015.  CEASE AND DESIST ORDER.  (a)  If it appears to the board that a person is engaging in an act or practice that constitutes the practice of chiropractic without a license or registration under this chapter, the board, after notice and opportunity for a hearing, may issue a cease and desist order prohibiting the person from engaging in that activity.

    (b)   A violation of an order under this section constitutes grounds for imposing an administrative penalty under Subchapter L.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 33, eff. September 1, 2005.


        Sec. 201.602.  MONITORING LICENSE HOLDER.  The board by rule shall develop a system for monitoring compliance with the requirements of this chapter of a license holder who is the subject of disciplinary action.  Rules adopted under this section must include procedures to:
        (1)  monitor for compliance a license holder who is ordered by the board to perform certain acts;  and
        (2)  identify and monitor each license holder who is the subject of disciplinary action and who presents a continuing threat to the public welfare through the practice of chiropractic.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


        Sec. 201.603.  CIVIL PENALTY.  (a)  A person who violates this chapter or a rule adopted by the board under this chapter is liable to the state for a civil penalty of $1,000 for each day of violation.
        (b)  At the request of the board, the attorney general shall bring an action to recover a civil penalty authorized by this section.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


        Sec. 201.604.  GENERAL CRIMINAL PENALTY.  A person commits an offense if the person violates this chapter.  An offense under this section is a misdemeanor punishable by a fine of not less than $50 or more than $500 or by confinement in the county jail for not more than 30 days.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
        Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 34, eff. September 1, 2005.

Sec. 201.605.  CRIMINAL PENALTY:  PRACTICE WITHOUT LICENSE.  (a) A person commits an offense if the person violates Section 201.301.

(b)  Except as provided by Subsection (c), an offense under this section is a Class A misdemeanor.

(c)  If it is shown on the trial of the offense that the defendant has been previously convicted under Subsection (a), the offense is a felony of the third degree.

(d)  Each day of violation constitutes a separate offense.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 201.606.  CRIMINAL PENALTY: PROVIDING CHIROPRACTIC TREATMENT OR SERVICES WHILE INTOXICATED.  (a)  In this section, "intoxicated" has the meaning assigned by Section 49.01, Penal Code.

(b)  A person commits an offense if the person is licensed or regulated under this chapter, provides chiropractic treatment or services to a patient while intoxicated, and, by reason of that conduct, places the patient at a substantial and unjustifiable risk of harm.

(c)  An offense under this section is a state jail felony.

Added by Acts 2005, 79th Leg., Ch. 1020 (H.B. 972), Sec. 35, eff. September 1, 2005.

# APPENDIX D

OCCUPATIONS CODE

TITLE 3. HEALTH PROFESSIONS

SUBTITLE C. OTHER PROFESSIONS PERFORMING MEDICAL PROCEDURES

CHAPTER 205. ACUPUNCTURE

SUBCHAPTER A. GENERAL PROVISIONS

Sec. 205.001.  DEFINITIONS.  In this chapter:

(1)  "Acudetox specialist" means a person certified under Section 205.303.

(2)  "Acupuncture" means:

(A)  the nonsurgical, nonincisive insertion of an acupuncture needle and the application of moxibustion to specific areas of the human body as a primary mode of therapy to treat and mitigate a human condition, including evaluation and assessment of the condition;  and

(B)  the administration of thermal or electrical treatments or the recommendation of dietary guidelines, energy flow exercise, or dietary or herbal supplements in conjunction with the treatment described by Paragraph (A).

(3)  "Acupuncture board" means the Texas State Board of Acupuncture Examiners.

(4)  "Acupuncturist" means a person who:

(A)  practices acupuncture;  and

(B)  directly or indirectly charges a fee for the performance of acupuncture services.

(5)  "Chiropractor" means a person licensed to practice chiropractic by the Texas Board of Chiropractic Examiners.

(6)  "Executive director" means the executive director of the Texas Medical Board.

(7)  "Medical board" means the Texas Medical Board.

(8)  "Physician" means a person licensed to practice medicine by the Texas Medical Board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 719, Sec. 1, eff. Sept. 1, 2001. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.01, eff. September 1, 2005.


Sec. 205.003.  EXEMPTION;  LIMITATION.  (a)  This chapter does not apply to a health care professional licensed under another statute of this state and acting within the scope of the license.

(b)  This chapter does not:

(1)  limit the practice of medicine by a physician;

(2)  permit the unauthorized practice of medicine;  or

(3)  permit a person to dispense, administer, or supply a controlled substance, narcotic, or dangerous drug unless the person is authorized by other law to do so.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER B. TEXAS STATE BOARD OF ACUPUNCTURE EXAMINERS

Sec. 205.051.  BOARD;  MEMBERSHIP.  (a)  The Texas State Board of Acupuncture Examiners consists of nine members appointed by the governor with the advice and consent of the senate as follows:

(1)  four acupuncturist members who have at least five years of experience in the practice of acupuncture in this state and who are not physicians;

(2)  two physician members experienced in the practice of acupuncture; and

(3)  three members of the general public who are not licensed or trained in a health care profession.

(b)  Appointments to the acupuncture board shall be made without regard to the race, color, disability, sex, religion, age, or national origin of the appointee.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.02, eff. September 1, 2005.


Sec. 205.052.  PUBLIC MEMBER ELIGIBILITY.  A person is not eligible for appointment as a public member of the acupuncture board if the person or the person's spouse:

(1)  is registered, certified, or licensed by an occupational regulatory agency in the field of health care;

(2)  is employed by or participates in the management of a business entity or other organization regulated by the medical board or receiving funds from the medical board or acupuncture board;

(3)  owns or controls, directly or indirectly, more than a 10 percent interest in a business entity or other organization regulated by the medical board or acupuncture board or receiving funds from the medical board;

(4)  uses or receives a substantial amount of tangible goods, services, or funds from the medical board or acupuncture board, other than compensation or reimbursement authorized by law for acupuncture board membership, attendance, or expenses;  or

(5)  owns, operates, or has a financial interest in a school of acupuncture.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.056(a), eff. Sept. 1, 2001.


Sec. 205.053.  MEMBERSHIP AND EMPLOYEE RESTRICTIONS.  (a)  In this section, "Texas trade association" means a cooperative and voluntarily joined statewide association of business or professional competitors in this state designed to assist its members and its industry or profession in dealing with mutual business or professional problems and in promoting their common interest.

(b)  An officer, board member, employee, or paid consultant of a Texas trade association in the field of health care may not be a member of the acupuncture board or an employee of the medical board who is exempt from the state's position classification plan or is compensated at or above the amount prescribed by the General

Appropriations Act for step 1, salary group A17, of the position classification salary schedule.

(c)   A person may not be a member of the acupuncture board and may not be a medical board employee in a "bona fide executive, administrative, or professional capacity," as that phrase is used for purposes of establishing an exemption to the overtime provisions of the federal Fair Labor Standards Act of 1938 (29 U.S.C. Section 201 et seq.), if:

(1)   the person is an officer, employee, or paid consultant of a Texas trade association in the field of health care; or

(2)   the person's spouse is an officer, manager, or paid consultant of a Texas trade association in the field of health care.

(d)   A person may not be a member of the acupuncture board or act as general counsel to the acupuncture board or the medical board if the person is required to register as a lobbyist under Chapter 305, Government Code, because of the person's activities for compensation on behalf of a profession related to the operation of the medical board or acupuncture board.

(e)   A person may not serve on the acupuncture board if the person owns, operates, or has a financial interest in a school of acupuncture.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.056(b), eff. Sept. 1, 2001.
Amended by:
Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.03, eff. September 1, 2005.


Sec. 205.054.  TERMS;  VACANCIES.  (a)  Members of the acupuncture board serve staggered six-year terms.  The terms of three members expire on January 31 of each odd-numbered year.

(b)   A vacancy on the acupuncture board shall be filled by appointment of the governor.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 205.055.  PRESIDING OFFICER.  The governor shall designate an acupuncturist member of the acupuncture board as presiding officer.  The presiding officer serves in that capacity at the will of the governor.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:
     Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.04, eff. September 1, 2005.


Sec. 205.056.  GROUNDS FOR REMOVAL.  (a)  It is a ground for removal from the acupuncture board that a member:
        (1)  does not have at the time of appointment the qualifications required by Sections 205.051 and 205.052;
        (2)  does not maintain during service on the acupuncture board the qualifications required by Sections 205.051 and 205.052;
        (3)  violates a prohibition established by Section 205.053;
        (4)  cannot, because of illness or disability, discharge the member's duties for a substantial part of the member's term;  or
        (5)  is absent from more than half of the regularly scheduled acupuncture board meetings that the member is eligible to attend during a calendar year.
     (b)  The validity of an action of the acupuncture board is not affected by the fact that it is taken when a ground for removal of an acupuncture board member exists.
     (c)  If the executive director has knowledge that a potential ground for removal of an acupuncture board member exists, the executive director shall notify the presiding officer of the acupuncture board of the potential ground.  The presiding officer shall then notify the governor and the attorney general that a potential ground for removal exists.  If the potential ground for removal involves the presiding officer, the executive director shall notify the next highest officer of the acupuncture board, who shall notify the governor and the attorney general that a potential ground for removal exists.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 205.057.  TRAINING.  (a)  A person who is appointed to and qualifies for office as a member of the acupuncture board may not vote, deliberate, or be counted as a member in attendance at a meeting of the acupuncture board until the person completes a training program that complies with this section.

(b)  The training program must provide the person with information regarding:

(1)   this chapter;

(2)   the programs operated by the acupuncture board;

(3)   the role and functions of the acupuncture board;

(4)   the rules of the acupuncture board;

(5)   the current budget for the acupuncture board;

(6)   the results of the most recent formal audit of the acupuncture board;

(7)   the requirements of laws relating to open meetings, public information, administrative procedure, and conflicts of interest; and

(8)   any applicable ethics policies adopted by the acupuncture board or the Texas Ethics Commission.

(c)  A person appointed to the acupuncture board is entitled to reimbursement, as provided by the General Appropriations Act, for the travel expenses incurred in attending the training program regardless of whether the attendance at the program occurs before or after the person qualifies for office.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.05, eff. September 1, 2005.


Sec. 205.058.  QUALIFICATIONS AND STANDARDS OF CONDUCT INFORMATION.  The executive director or the executive director's designee shall provide, as often as necessary, to members of the acupuncture board information regarding their:

(1)   qualifications for office under this chapter;  and

        (2)  responsibilities under applicable laws relating to
standards of conduct for state officers.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


        Sec. 205.059.  COMPENSATION;  PER DIEM.  An acupuncture board
member may not receive compensation for service on the acupuncture
board but is entitled to receive a per diem as set by legislative
appropriation for transportation and related expenses incurred for
each day that the member engages in the acupuncture board's business.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


        Sec. 205.060.  APPLICATION OF OPEN MEETINGS, OPEN RECORDS, AND
ADMINISTRATIVE PROCEDURE LAWS.  Except as provided by this chapter,
the acupuncture board is subject to Chapters 551, 552, and 2001,
Government Code.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    SUBCHAPTER C. POWERS AND DUTIES OF ACUPUNCTURE BOARD AND MEDICAL
                              BOARD

        Sec. 205.101.  GENERAL POWERS AND DUTIES OF ACUPUNCTURE BOARD.
(a)  Subject to the advice and approval of the medical board, the
acupuncture board shall:
        (1)  establish qualifications for an acupuncturist to
practice in this state;
        (2)  establish minimum education and training requirements
necessary for the acupuncture board to recommend that the medical
board issue a license to practice acupuncture;
        (3)  administer an examination that is validated by
independent testing professionals for a license to practice
acupuncture;
        (4)  develop requirements for licensure by endorsement of
other states;

(5) prescribe the application form for a license to practice acupuncture;

(6) recommend rules to establish licensing and other fees;

(7) establish the requirements for a tutorial program for acupuncture students who have completed at least 48 semester hours of college; and

(8) recommend additional rules as are necessary to administer and enforce this chapter.

(b) The acupuncture board does not have independent rulemaking authority. A rule adopted by the acupuncture board is subject to medical board approval.

(c) The acupuncture board shall:

(1) review and approve or reject each application for the issuance or renewal of a license;

(2) issue each license; and

(3) deny, suspend, or revoke a license or otherwise discipline a license holder.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.06, eff. September 1, 2005.


Sec. 205.102. ASSISTANCE BY MEDICAL BOARD. (a) The medical board shall provide administrative and clerical employees as necessary to enable the acupuncture board to administer this chapter.

(b) Subject to the advice and approval of the medical board, the acupuncture board shall develop and implement policies that clearly separate the policy-making responsibilities of the acupuncture board and the management responsibilities of the executive director and the staff of the medical board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.103. FEES. The medical board shall set and collect fees in amounts that are reasonable and necessary to cover the costs

of administering and enforcing this chapter without the use of any other funds generated by the medical board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 205.104.  RULES RESTRICTING ADVERTISING OR COMPETITIVE BIDDING.  (a)  The medical board may not adopt rules under this chapter restricting advertising or competitive bidding by a license holder except to prohibit false, misleading, or deceptive practices.
     (b)  In its rules to prohibit false, misleading, or deceptive practices, the medical board may not include a rule that:
          (1)  restricts the use of any medium for advertising;
          (2)  restricts the use of a license holder's personal appearance or voice in an advertisement;
          (3)  relates to the size or duration of an advertisement by the license holder;  or
          (4)  restricts the license holder's advertisement under a trade name.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


     Sec. 205.1041.  GUIDELINES FOR EARLY INVOLVEMENT IN RULEMAKING PROCESS.  (a)  The acupuncture board shall develop guidelines to establish procedures for receiving input during the rulemaking process from individuals and groups that have an interest in matters under the acupuncture board's jurisdiction.  The guidelines must provide an opportunity for those individuals and groups to provide input before the acupuncture board submits the rule to the medical board for approval.
     (b)  A rule adopted by the acupuncture board may not be challenged on the grounds that the board did not comply with this section.  If the acupuncture board was unable to solicit a significant amount of input from the public or affected persons early in the rulemaking process, the board shall state in writing the reasons why the board was unable to do so.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.07, eff. September 1, 2005.


Sec. 205.1045.   RULES ON CONSEQUENCES OF CRIMINAL CONVICTION. The acupuncture board shall adopt rules and guidelines as necessary to comply with Chapter 53, except to the extent the requirements of this chapter are stricter than the requirements of Chapter 53.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.08, eff. September 1, 2005.


Sec. 205.106.   USE OF TECHNOLOGY.   Subject to the advice and approval of the medical board, the acupuncture board shall implement a policy requiring the acupuncture board to use appropriate technological solutions to improve the acupuncture board's ability to perform its functions.   The policy must ensure that the public is able to interact with the acupuncture board on the Internet.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.09, eff. September 1, 2005.


Sec. 205.107.   NEGOTIATED RULEMAKING AND ALTERNATIVE DISPUTE RESOLUTION POLICY.   (a)   Subject to the advice and approval of the medical board, the acupuncture board shall develop and implement a policy to encourage the use of:
        (1)   negotiated rulemaking procedures under Chapter 2008, Government Code, for the adoption of acupuncture board rules; and
        (2)   appropriate alternative dispute resolution procedures under Chapter 2009, Government Code, to assist in the resolution of internal and external disputes under the acupuncture board's jurisdiction.
     (b)   The acupuncture board procedures relating to alternative dispute resolution must conform, to the extent possible, to any model guidelines issued by the State Office of Administrative Hearings for the use of alternative dispute resolution by state agencies.
     (c)   The acupuncture board shall designate a trained person to:

(1)   coordinate the implementation of the policy adopted under Subsection (a);

(2)   serve as a resource for any training needed to implement the procedures for negotiated rulemaking or alternative dispute resolution; and

(3)   collect data concerning the effectiveness of those procedures, as implemented by the acupuncture board.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.10, eff. September 1, 2005.


SUBCHAPTER D. PUBLIC ACCESS AND INFORMATION AND COMPLAINT PROCEDURES

Sec. 205.151.   PUBLIC INTEREST INFORMATION.   (a)   The acupuncture board shall prepare information of public interest describing the functions of the acupuncture board and the procedures by which complaints are filed with and resolved by the acupuncture board.

(b)   The acupuncture board shall make the information available to the public and appropriate state agencies.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.152.   COMPLAINTS.   (a)   The acupuncture board by rule shall establish methods by which consumers and service recipients are notified of the name, mailing address, and telephone number of the acupuncture board for the purpose of directing a complaint to the acupuncture board.   The acupuncture board may provide for that notification:

(1)   on each registration form, application, or written contract for services of a person regulated under this chapter;

(2)   on a sign prominently displayed in the place of business of each person regulated under this chapter;   or

(3)   in a bill for service provided by a person regulated under this chapter.

(b)  The acupuncture board shall keep information about each complaint filed with the acupuncture board.  The information shall include:

(1)  the date the complaint is received;

(2)  the name of the complainant;

(3)  the subject matter of the complaint;

(4)  a record of all persons contacted in relation to the complaint;

(5)  a summary of the results of the review or investigation of the complaint;  and

(6)  for a complaint for which the acupuncture board took no action, an explanation of the reason the complaint was closed without action.

(c)  The acupuncture board shall keep a file about each written complaint filed with the acupuncture board that the acupuncture board has authority to resolve.  The acupuncture board shall provide to the person filing the complaint and each person who is the subject of the complaint the acupuncture board's policies and procedures pertaining to complaint investigation and resolution.

(d)  The acupuncture board, at least quarterly and until final disposition of the complaint, shall notify the person filing the complaint and each person who is the subject of the complaint of the status of the complaint unless the notice would jeopardize an investigation.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.1521.  CONDUCT OF INVESTIGATION.  The acupuncture board shall complete a preliminary investigation of a complaint received by the acupuncture board not later than the 30th day after the date of receiving the complaint.  The acupuncture board shall first determine whether the acupuncturist constitutes a continuing threat to the public welfare.  On completion of the preliminary investigation, the acupuncture board shall determine whether to officially proceed on the complaint.  If the acupuncture board fails to complete the preliminary investigation in the time required by this section, the acupuncture board's official investigation of the complaint is considered to commence on that date.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.11, eff. September 1, 2005.


Sec. 205.153.  PUBLIC PARTICIPATION.  (a)  Subject to the advice and approval of the medical board, the acupuncture board shall develop and implement policies that provide the public with a reasonable opportunity to appear before the acupuncture board and to speak on any issue under the acupuncture board's jurisdiction.

(b)  The executive director shall prepare and maintain a written plan that describes how a person who does not speak English may be provided reasonable access to the acupuncture board's programs and services.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER E.  LICENSE REQUIREMENTS

Sec. 205.201.  LICENSE REQUIRED.  Except as provided by Section 205.303, a person may not practice acupuncture in this state unless the person holds a license to practice acupuncture issued by the acupuncture board under this chapter.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:
Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.12, eff. September 1, 2005.


Sec. 205.202.  ISSUANCE OF LICENSE.  (a)  The acupuncture board shall issue a license to practice acupuncture in this state to a person who meets the requirements of this chapter and the rules adopted under this chapter.

(b)  The acupuncture board may delegate authority to medical board employees to issue licenses under this chapter to applicants who clearly meet all licensing requirements.  If the medical board employees determine that the applicant does not clearly meet all licensing requirements, the application shall be returned to the

acupuncture board.  A license issued under this subsection does not require formal acupuncture board approval.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.13, eff. September 1, 2005.


Sec. 205.203.  LICENSE EXAMINATION.  (a)  An applicant for a license to practice acupuncture must pass an acupuncture examination and a jurisprudence examination approved by the acupuncture board as provided by this section.

(b)  To be eligible for the examination, an applicant must:

(1)  be at least 21 years of age;

(2)  have completed at least 60 semester hours of college courses, including basic science courses as determined by the acupuncture board;  and

(3)  be a graduate of an acupuncture school with entrance requirements and a course of instruction that meet standards set under Section 205.206.

(c)  The acupuncture examination shall be conducted on practical and theoretical acupuncture and other subjects required by the acupuncture board.

(c-1)  The jurisprudence examination shall be conducted on the licensing requirements and other laws, rules, or regulations applicable to the professional practice of acupuncture in this state.

(d)  The examination may be in writing, by a practical demonstration of the applicant's skill, or both, as required by the acupuncture board.

(e)  The medical board shall notify each applicant of the time and place of the examination.

(f)  The acupuncture board shall adopt rules for the jurisprudence examination under Subsection (c-1) regarding:

(1)  the development of the examination;

(2)  applicable fees;

(3)  administration of the examination;

(4)  reexamination procedures;

(5)  grading procedures; and

(6)   notice of results.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 1420, Sec. 14.057(a), eff. Sept. 1, 2001.
Amended by:
    Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.14, eff. September 1, 2005.


    Sec. 205.204.   APPLICATION FOR EXAMINATION.  An application for examination must be:
        (1)   in writing on a form prescribed by the acupuncture board;
        (2)   verified by affidavit;
        (3)   filed with the executive director;  and
        (4)   accompanied by a fee in an amount set by the medical board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


    Sec. 205.2045.   APPEARANCE OF APPLICANT BEFORE ACUPUNCTURE BOARD.  An applicant for a license to practice acupuncture may not be required to appear before the acupuncture board or a committee of the acupuncture board unless the application raises questions concerning:
        (1)   a physical or mental impairment of the applicant;
        (2)   a criminal conviction of the applicant;  or
        (3)   revocation of a professional license held by the applicant.

Added by Acts 2001, 77th Leg., ch. 1420, Sec. 14.057(b), eff. Sept. 1, 2001.


    Sec. 205.205.   EXAMINATION RESULTS.  (a)  Not later than the 30th day after the date a licensing examination is administered under this chapter, the acupuncture board shall notify each examinee of the results of the examination.  If an examination is graded or reviewed by a national testing service, the acupuncture board shall notify

examinees of the results of the examination not later than the 14th day after the date the acupuncture board receives the results from the testing service.

(b)  If the notice of examination results graded or reviewed by a national testing service will be delayed for longer than 90 days after the examination date, the acupuncture board shall notify the examinee of the reason for the delay before the 90th day.  The acupuncture board may require a testing service to notify examinees of the results of an examination.

(c)  If requested in writing by a person who fails a licensing examination administered under this chapter, the acupuncture board shall furnish the person with an analysis of the person's performance on the examination if an analysis is available from the national testing service.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.206.  ACUPUNCTURE SCHOOLS.  (a)  A reputable acupuncture school, in addition to meeting standards set by the acupuncture board, must:

(1)  maintain a resident course of instruction equivalent to not less than six terms of four months each for a total of not less than 1,800 instructional hours;

(2)  provide supervised patient treatment for at least two terms of the resident course of instruction;

(3)  maintain a course of instruction in anatomy-histology, bacteriology, physiology, symptomatology, pathology, meridian and point locations, hygiene, and public health;  and

(4)  have the necessary teaching force and facilities for proper instruction in required subjects.

(b)  In establishing standards for the entrance requirements and course of instruction of an acupuncture school, the acupuncture board may consider the standards set by the National Accreditation Commission for Schools and Colleges of Acupuncture and Oriental Medicine.

(c)  In addition to the other requirements of this section, an acupuncture school or degree program is subject to approval by the Texas Higher Education Coordinating Board unless the school or

program qualifies for an exemption under Section 61.303, Education Code.

(d)  In reviewing an acupuncture school or degree program as required by Subsection (c), the Texas Higher Education Coordinating Board shall seek input from the acupuncture board regarding the standards to be used for assessing whether a school or degree program adequately prepares an individual for the practice of acupuncture.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.15, eff. September 1, 2005.


Sec. 205.207.  RECIPROCAL LICENSE.  The medical board may waive any license requirement for an applicant after reviewing the applicant's credentials and determining that the applicant holds a license from another state that has license requirements substantially equivalent to those of this state.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.208.  TEMPORARY LICENSE.  (a)  The acupuncture board may, through the executive director, issue a temporary license to practice acupuncture to an applicant who:

(1)  submits an application on a form prescribed by the acupuncture board;

(2)  has passed a national or other examination recognized by the acupuncture board relating to the practice of acupuncture;

(3)  pays the appropriate fee;

(4)  if licensed in another state, is in good standing as an acupuncturist;  and

(5)  meets all the qualifications for a license under this chapter but is waiting for the next scheduled meeting of the medical board for the license to be issued.

(b)  A temporary license is valid for 100 days after the date issued and may be extended only for another 30 days after the date the initial temporary license expires.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER F. LICENSE RENEWAL

Sec. 205.251.  ANNUAL RENEWAL REQUIRED.  (a)  The medical board by rule shall provide for the annual renewal of a license to practice acupuncture.

(b)  The medical board by rule may adopt a system under which licenses expire on various dates during the year.  For the year in which the license expiration date is changed, license fees shall be prorated on a monthly basis so that each license holder pays only that portion of the license fee that is allocable to the number of months during which the license is valid.  On renewal of the license on the new expiration date, the total license renewal fee is payable.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.252.  NOTICE OF LICENSE EXPIRATION.  Not later than the 30th day before the expiration date of a person's license, the medical board shall send written notice of the impending license expiration to the person at the person's last known address according to the records of the medical board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.253.  PROCEDURE FOR RENEWAL.  (a)  A person who is otherwise eligible to renew a license may renew an unexpired license by paying the required renewal fee to the medical board before the expiration date of the license.  A person whose license has expired may not engage in activities that require a license until the license has been renewed under this section or Section 205.254.

(b)  If the person's license has been expired for 90 days or less, the person may renew the license by paying to the medical board a fee in an amount equal to one and one-half times the required renewal fee.

(c)  If the person's license has been expired for longer than 90 days but less than one year, the person may renew the license by paying to the medical board a fee in an amount equal to two times the required renewal fee.

(d)  If the person's license has been expired for one year or longer, the person may not renew the license.  The person may obtain a new license by submitting to reexamination and complying with the requirements and procedures for obtaining an original license.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.254.  RENEWAL OF EXPIRED LICENSE BY OUT-OF-STATE PRACTITIONER.  (a)  The medical board may renew without reexamination the license of a person who was licensed to practice acupuncture in this state, moved to another state, and is currently licensed and has been in practice in the other state for the two years preceding application.

(b)  The person must pay to the medical board a fee in an amount equal to two times the required renewal fee for the license.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.255.  CONTINUING EDUCATION.  (a)  The acupuncture board by rule may require a license holder to complete a certain number of hours of continuing education courses approved by the acupuncture board to renew a license.

(a-1)  The acupuncture board shall establish written guidelines for granting continuing education credit that specify:

(1)  procedural requirements;

(2)  the qualifications needed to be considered a preferred provider of continuing education; and

(3)  course content requirements.

(b)  The acupuncture board shall consider the approval of a course conducted by:

(1)  a knowledgeable health care provider;  or

(2)  a reputable school, state, or professional organization.

(c)  After guidelines are established under Subsection (a-1), the acupuncture board shall delegate to medical board employees the authority to approve course applications for courses that clearly meet the guidelines.  Medical board employees shall refer any courses that are not clearly within the guidelines to the acupuncture board for review and approval.

Added by Acts 2001, 77th Leg., ch. 1420, Sec. 14.058(a), eff. Sept. 1, 2001.
Amended by:
     Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.16, eff. September 1, 2005.


SUBCHAPTER G. PRACTICE BY LICENSE HOLDER

     Sec. 205.301.  REFERRAL BY OTHER HEALTH CARE PRACTITIONER REQUIRED.  (a)  A license holder may perform acupuncture on a person only if the person was:
          (1)  evaluated by a physician or dentist, as appropriate, for the condition being treated within six months before the date acupuncture is performed;  or
          (2)  referred by a chiropractor within 30 days before the date acupuncture is performed.
     (b)  A license holder acting under Subsection (a)(1) must obtain reasonable documentation that the required evaluation has taken place.  If the license holder is unable to determine that an evaluation has taken place, the license holder must obtain a written statement signed by the person on a form prescribed by the acupuncture board that states the person has been evaluated by a physician or dentist within the prescribed time.  The form must contain a clear statement that the person should be evaluated by a physician or dentist for the condition being treated by the license holder.
     (c)  A license holder acting under Subsection (a)(2) shall refer the person to a physician after performing acupuncture 20 times or for 30 days, whichever occurs first, if substantial improvement does not occur in the person's condition for which the referral was made.

(d)  The medical board, with advice from the acupuncture board, by rule may modify:

      (1)  the scope of the evaluation under Subsection (a)(1);

      (2)  the period during which treatment must begin under Subsection (a)(1) or (2);  or

      (3)  the number of treatments or days before referral to a physician is required under Subsection (c).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.302.  AUTHORIZED PRACTICE WITHOUT REFERRAL.  (a)  After notice and public hearing, the medical board shall determine by rule whether an acupuncturist may treat a patient for alcoholism or chronic pain without a referral from a physician, dentist, or chiropractor.  The medical board shall make the determination based on clinical evidence and what the medical board determines to be in the best interest of affected patients.

(b)  Notwithstanding Section 205.301, a license holder may, without a referral from a physician, dentist, or chiropractor, perform acupuncture on a person for:

      (1)  smoking addiction;

      (2)  weight loss;  or

      (3)  substance abuse, to the extent permitted by medical board rule adopted with advice from the acupuncture board.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended by Acts 2001, 77th Leg., ch. 719, Sec. 2, eff. Sept. 1, 2001.


Sec. 205.303.  ACUDETOX SPECIALIST.  (a)  The medical board may certify a person as an acudetox specialist under this section if the person:

      (1)  provides to the medical board documentation that the person:

         (A)  is a licensed social worker, licensed professional counselor, licensed psychologist, licensed chemical dependency counselor, licensed vocational nurse, or licensed registered nurse; and

(B)  has successfully completed a training program in acupuncture detoxification that meets guidelines approved by the medical board;  and

(2)  pays a certification fee in an amount set by the medical board.

(b)  An acudetox specialist may practice acupuncture only:

(1)  to the extent allowed by rules adopted by the medical board for the treatment of alcoholism, substance abuse, or chemical dependency;  and

(2)  under the supervision of a licensed acupuncturist or physician.

(c)  A program that includes the services of an acudetox specialist shall:

(1)  notify each participant in the program of the qualifications of the acudetox specialist and of the procedure for registering a complaint regarding the acudetox specialist with the medical board;  and

(2)  keep a record of each client's name, the date the client received the acudetox specialist's services, and the name, signature, and certification number of the acudetox specialist.

(d)  The medical board may annually renew the certification of an acudetox specialist under this section if the person:

(1)  provides to the medical board documentation that:

(A)  the certification or license required under Subsection (a)(1)(A) is in effect;  and

(B)  the person has successfully met continuing education requirements established by the medical board under Subsection (e);  and

(2)  pays a certification renewal fee in an amount set by the medical board.

(e)  The medical board shall establish continuing education requirements for an acudetox specialist that, at a minimum, include six hours of education in the practice of acupuncture and a course in either clean needle technique or universal infection control precaution procedures.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended
by Acts 2001, 77th Leg., ch. 1420, Sec. 14.059(a), eff. Sept. 1,
2001;  Acts 2003, 78th Leg., ch. 892, Sec. 33, eff. Sept. 1, 2003.


Sec. 205.304.  PROFESSIONAL REVIEW ACTION.  Sections 160.002,
160.003, 160.006, 160.007(d), 160.013, 160.014, and 160.015 apply to
professional review actions relating to the practice of acupuncture
by an acupuncturist or acupuncturist student.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.  Amended
by Acts 2001, 77th Leg., ch. 1420, Sec. 14.060, eff. Sept. 1, 2001.


Sec. 205.305.  LICENSE HOLDER INFORMATION.  (a)  Each license
holder shall file with the acupuncture board:
        (1)  the license holder's mailing address;
        (2)  the address of the license holder's residence;
        (3)  the mailing address of each office of the license
holder;  and
        (4)  the address for the location of each office of the
license holder that has an address different from the office's
mailing address.
    (b)  A license holder shall:
        (1)  notify the acupuncture board of a change of the
license holder's residence or business address;  and
        (2)  provide the acupuncture board with the license
holder's new address not later than the 30th day after the date the
address change occurs.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


SUBCHAPTER H. DISCIPLINARY PROCEDURES

Sec. 205.351.  GROUNDS FOR LICENSE DENIAL OR DISCIPLINARY
ACTION.  (a)  A license to practice acupuncture may be denied or,
after notice and hearing, a license holder may be subject to
disciplinary action under Section 205.352 if the license applicant or
license holder:

(1)   intemperately uses drugs or intoxicating liquors to an extent that, in the opinion of the board, could endanger the lives of patients;

(2)   obtains or attempts to obtain a license by fraud or deception;

(3)   has been adjudged mentally incompetent by a court;

(4)   has a mental or physical condition that renders the person unable to perform safely as an acupuncturist;

(5)   fails to practice acupuncture in an acceptable manner consistent with public health and welfare;

(6)   violates this chapter or a rule adopted under this chapter;

(7)   has been convicted of a crime involving moral turpitude or a felony or is the subject of deferred adjudication or pretrial diversion for such an offense;

(8)   holds the person out as a physician or surgeon or any combination or derivative of those terms unless the person is also licensed by the medical board as a physician or surgeon;

(9)   fraudulently or deceptively uses a license;

(10)   engages in unprofessional or dishonorable conduct that is likely to deceive, defraud, or injure a member of the public;

(11)   commits an act in violation of state law if the act is connected with the person's practice as an acupuncturist;

(12)   fails to adequately supervise the activities of a person acting under the supervision of the license holder;

(13)   directly or indirectly aids or abets the practice of acupuncture by any person not licensed to practice acupuncture by the acupuncture board;

(14)   is unable to practice acupuncture with reasonable skill and with safety to patients because of illness, drunkenness, or excessive use of drugs, narcotics, chemicals, or any other type of material or because of any mental or physical condition;

(15)   is the subject of repeated or recurring meritorious health-care liability claims that in the opinion of the acupuncture board evidence professional incompetence likely to injure the public;

(16)   has had a license to practice acupuncture suspended, revoked, or restricted by another state or has been subject to other

disciplinary action by another state or by the uniformed services of the United States regarding practice as an acupuncturist;  or

      (17)  sexually abuses or exploits another person through the license holder's practice as an acupuncturist.

    (b)  If the acupuncture board proposes to suspend, revoke, or refuse to renew a person's license, the person is entitled to a hearing conducted by the State Office of Administrative Hearings.

    (c)  A complaint, indictment, or conviction of a violation of law is not necessary for an action under Subsection (a)(11).  Proof of the commission of the act while in the practice of acupuncture or under the guise of the practice of acupuncture is sufficient for action by the acupuncture board.

    (d)  A certified copy of the record of the state or uniformed services of the United States taking an action is conclusive evidence of the action for purposes of Subsection (a)(16).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

    Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.17, eff. September 1, 2005.

    Sec. 205.352.  DISCIPLINARY POWERS OF ACUPUNCTURE BOARD.  (a) On finding that grounds exist to deny a license or take disciplinary action against a license holder, the acupuncture board by order may:

      (1)  deny the person's application for a license, license renewal, or certificate to practice acupuncture or revoke the person's license or certificate to practice acupuncture;

      (2)  require the person to submit to the care, counseling, or treatment of a health care practitioner designated by the acupuncture board as a condition for the issuance, continuance, or renewal of a license or certificate to practice acupuncture;

      (3)  require the person to participate in a program of education or counseling prescribed by the acupuncture board;

      (4)  suspend, limit, or restrict the person's license or certificate to practice acupuncture, including limiting the practice of the person to, or excluding from the practice, one or more specified activities of acupuncture or stipulating periodic review by the acupuncture board;

(5)   require the person to practice under the direction of an acupuncturist designated by the acupuncture board for a specified period of time;

(6)   assess an administrative penalty against the person as provided by Subchapter J;

(7)   require the person to perform public service considered appropriate by the acupuncture board;

(8)   stay enforcement of an order and place the person on probation with the acupuncture board retaining the right to vacate the probationary stay and enforce the original order for noncompliance with the terms of probation or impose any other remedial measure or sanction authorized by this section;

(9)   require the person to continue or review professional education until the person attains a degree of skill satisfactory to the acupuncture board in those areas that are the basis of the probation under Subdivision (8);

(10)   require the person to report regularly to the acupuncture board on matters that are the basis of the probation under Subdivision (8); or

(11)   administer a public reprimand.

(b)   The acupuncture board may reinstate or reissue a license or remove any disciplinary or corrective measure that the acupuncture board has imposed under this section.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.18, eff. September 1, 2005.


Sec. 205.3522.   SURRENDER OF LICENSE.   (a)   The acupuncture board may accept the voluntary surrender of a license.

(b)   A surrendered license may not be returned to the license holder unless the acupuncture board determines, under acupuncture board rules, that the former holder of the license is competent to resume practice.

(c)   The acupuncture board shall recommend rules to the medical board for determining the competency of a former license holder to return to practice.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.19, eff. September 1, 2005.


Sec. 205.3523.  PHYSICAL OR MENTAL EXAMINATION.  (a)  The acupuncture board shall adopt guidelines, in conjunction with persons interested in or affected by this section, to enable the board to evaluate circumstances in which an acupuncturist or applicant may be required to submit to an examination for mental or physical health conditions, alcohol and substance abuse, or professional behavior problems.

(b)  The acupuncture board shall refer an acupuncturist or applicant with a physical or mental health condition to the most appropriate medical specialist.  The acupuncture board may not require an acupuncturist or applicant to submit to an examination by a physician having a specialty specified by the board unless medically indicated.  The acupuncture board may not require an acupuncturist or applicant to submit to an examination to be conducted an unreasonable distance from the person's home or place of business unless the acupuncturist or applicant resides and works in an area in which there are a limited number of physicians able to perform an appropriate examination.

(c)  The guidelines adopted under this section do not impair or remove the acupuncture board's power to make an independent licensing decision.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.20, eff. September 1, 2005.


Sec. 205.354.  RULES FOR DISCIPLINARY PROCEEDINGS.  Rules of practice adopted by the medical board under Section 2001.004, Government Code, applicable to the proceedings for a disciplinary action may not conflict with rules adopted by the State Office of Administrative Hearings.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 205.3541.  INFORMAL PROCEEDINGS.  (a)  The acupuncture board by rule shall adopt procedures governing:

(1)  informal disposition of a contested case under Section 2001.056, Government Code; and

(2)  informal proceedings held in compliance with Section 2001.054, Government Code.

(b)  Rules adopted under this section must require that:

(1)  an informal meeting in compliance with Section 2001.054, Government Code, be scheduled not later than the 180th day after the date the complaint is filed with the acupuncture board, unless good cause is shown by the acupuncture board for scheduling the informal meeting after that date;

(2)  the acupuncture board give notice to the license holder of the time and place of the meeting not later than the 30th day before the date the meeting is held;

(3)  the complainant and the license holder be provided an opportunity to be heard;

(4)  at least one of the acupuncture board members participating in the informal meeting as a panelist be a member who represents the public;

(5)  the acupuncture board's legal counsel or a representative of the attorney general be present to advise the acupuncture board or the medical board's staff; and

(6)  an employee of the medical board be at the meeting to present to the acupuncture board's representative the facts the medical board staff reasonably believes it could prove by competent evidence or qualified witnesses at a hearing.

(c)  An affected acupuncturist is entitled, orally or in writing, to:

(1)  reply to the staff's presentation; and

(2)  present the facts the acupuncturist reasonably believes the acupuncturist could prove by competent evidence or qualified witnesses at a hearing.

(d)  After ample time is given for the presentations, the acupuncture board panel shall recommend that the investigation be closed or shall attempt to mediate the disputed matters and make a recommendation regarding the disposition of the case in the absence of a hearing under applicable law concerning contested cases.

(e)  If the license holder has previously been the subject of disciplinary action by the acupuncture board, the acupuncture board shall schedule the informal meeting as soon as practicable but not later than the deadline prescribed by Subsection (b)(1).

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.21, eff. September 1, 2005.


Sec. 205.3542.  ACUPUNCTURE BOARD REPRESENTATION IN INFORMAL PROCEEDINGS.  (a)  In an informal proceeding under Section 205.3541, at least two panelists shall be appointed to determine whether an informal disposition is appropriate.

(b)  Notwithstanding Subsection (a) and Section 205.3541(b)(4), an informal proceeding may be conducted by one panelist if the affected acupuncturist waives the requirement that at least two panelists conduct the informal proceeding.  If the acupuncturist waives that requirement, the panelist may be any member of the acupuncture board.

(c)  The panel requirements described by Subsection (a) apply to an informal proceeding conducted by the acupuncture board under Section 205.3541, including a proceeding to:

(1)  consider a disciplinary case to determine if a violation has occurred; or

(2)  request modification or termination of an order.

(d)  The panel requirements described by Subsection (a) do not apply to an informal proceeding conducted by the acupuncture board under Section 205.3541 to show compliance with an order of the acupuncture board.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.22, eff. September 1, 2005.


Sec. 205.3543.  ROLES AND RESPONSIBILITIES OF PARTICIPANTS IN INFORMAL PROCEEDINGS.  (a)  An acupuncture board member that serves as a panelist at an informal meeting under Section 205.3541 shall make recommendations for the disposition of a complaint or

allegation.  The member may request the assistance of a medical board employee at any time.

(b)  Medical board employees shall present a summary of the allegations against the affected acupuncturist and of the facts pertaining to the allegation that the employees reasonably believe may be proven by competent evidence at a formal hearing.

(c)  An acupuncture board or medical board attorney shall act as counsel to the panel and, notwithstanding Subsection (e), shall be present during the informal meeting and the panel's deliberations to advise the panel on legal issues that arise during the proceeding. The attorney may ask questions of participants in the informal meeting to clarify any statement made by the participant.  The attorney shall provide to the panel a historical perspective on comparable cases that have appeared before the acupuncture board or medical board, keep the proceedings focused on the case being discussed, and ensure that the medical board's employees and the affected acupuncturist have an opportunity to present information related to the case.  During the panel's deliberation, the attorney may be present only to advise the panel on legal issues and to provide information on comparable cases that have appeared before the acupuncture board or medical board.

(d)  The panel and medical board employees shall provide an opportunity for the affected acupuncturist and the acupuncturist's authorized representative to reply to the board employees' presentation and to present oral and written statements and facts that the acupuncturist and representative reasonably believe could be proven by competent evidence at a formal hearing.

(e)  An employee of the medical board who participated in the presentation of the allegation or information gathered in the investigation of the complaint, the affected acupuncturist, the acupuncturist's authorized representative, the complainant, the witnesses, and members of the public may not be present during the deliberations of the panel.  Only the members of the panel and the attorney serving as counsel to the panel may be present during the deliberations.

(f)  The panel shall recommend the dismissal of the complaint or allegations or, if the panel determines that the affected acupuncturist has violated a statute or acupuncture board rule, the

panel may recommend board action and terms for an informal settlement of the case.

(g)  The panel's recommendations under Subsection (f) must be made in a written order and presented to the affected acupuncturist and the acupuncturist's authorized representative.  The acupuncturist may accept the proposed settlement within the time established by the panel at the informal meeting.  If the acupuncturist rejects the proposed settlement or does not act within the required time, the acupuncture board may proceed with the filing of a formal complaint with the State Office of Administrative Hearings.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.23, eff. September 1, 2005.


Sec. 205.3544.  LIMIT ON ACCESS TO INVESTIGATION FILES.  The acupuncture board shall prohibit or limit access to an investigation file relating to a license holder in an informal proceeding in the manner provided by Section 164.007(c).

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.24, eff. September 1, 2005.


Sec. 205.355.  REQUIRED DISCIPLINARY ACTION FOR FAILURE TO OBTAIN REFERRAL.  Except as provided by Section 205.301(a)(2), a license to practice acupuncture shall be denied or, after notice and hearing, revoked if the applicant or license holder violates Section 205.301(a)(1).

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.356.  REHABILITATION ORDER.  (a)  The acupuncture board, through an agreed order or after a contested proceeding, may impose a nondisciplinary rehabilitation order on an applicant, as a prerequisite for issuing a license, or on a license holder based on:

(1)  the person's intemperate use of drugs or alcohol directly resulting from habituation or addiction caused by medical care or treatment provided by a physician;

(2)  the person's intemperate use of drugs or alcohol during the five years preceding the date of the report that could adversely affect the person's ability to safely practice as an acupuncturist, if the person:

(A)  reported the use;

(B)  has not previously been the subject of a substance abuse related order of the acupuncture board; and

(C)  did not violate the standard of care as a result of the impairment;

(3)  a judgment by a court that the person is of unsound mind; or

(4)  the results of a mental or physical examination, or an admission by the person, indicating that the person suffers from a potentially dangerous limitation or an inability to practice as an acupuncturist with reasonable skill and safety by reason of illness or as a result of any physical or mental condition.

(b)  The acupuncture board may not issue an order under this section if, before the individual signs the proposed order, the board receives a valid complaint with regard to the individual based on the individual's intemperate use of drugs or alcohol in a manner affecting the standard of care.

(c)  The acupuncture board must determine whether an individual has committed a standard of care violation described by Subsection (a)(2) before imposing an order under this section.

(d)  The acupuncture board may disclose a rehabilitation order to a local or statewide private acupuncture association only as provided by Section 205.3562.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.25, eff. September 1, 2005.


    Sec. 205.3561.  EXPERT IMMUNITY.  An expert who assists the acupuncture board is immune from suit and judgment and may not be subjected to a suit for damages for any investigation, report, recommendation, statement, evaluation, finding, or other action taken without fraud or malice in the course of assisting the board in a

disciplinary proceeding.  The attorney general shall represent the expert in any suit resulting from a service provided by the expert in good faith to the acupuncture board.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.26, eff. September 1, 2005.


     Sec. 205.3562.  RESPONSIBILITIES OF PRIVATE ASSOCIATIONS.  (a) If a rehabilitation order imposed under Section 205.356 requires a license holder to participate in activities or programs provided by a local or statewide private acupuncture association, the acupuncture board shall inform the association of the license holder's duties under the order.  The information provided under this section must include specific guidance to enable the association to comply with any requirements necessary to assist in the acupuncturist's rehabilitation.
     (b)  The acupuncture board may provide to the association any information that the board determines to be necessary, including a copy of the rehabilitation order.  Any information received by the association remains confidential, is not subject to discovery, subpoena, or other means of legal compulsion, and may be disclosed only to the acupuncture board.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.26, eff. September 1, 2005.


     Sec. 205.357.  EFFECT OF REHABILITATION ORDER.  (a)  A rehabilitation order imposed under Section 205.356 is a nondisciplinary private order.  If entered by agreement, the order is an agreed disposition or settlement agreement for purposes of civil litigation and is exempt from the open records law.
     (b)  A rehabilitation order imposed under Section 205.356 must contain findings of fact and conclusions of law.  The order may impose a revocation, cancellation, suspension, period of probation or restriction, or any other term authorized by this chapter or agreed to by the acupuncture board and the person subject to the order.

(c)  A violation of a rehabilitation order may result in disciplinary action under the provisions of this chapter for contested matters or the terms of the agreed order.

(d)  A violation of a rehabilitation order is grounds for disciplinary action based on:

(1)  unprofessional or dishonorable conduct;  or

(2)  any provision of this chapter that applies to the conduct resulting in the violation.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.358.  AUDIT OF REHABILITATION ORDER.  (a)  The acupuncture board shall keep rehabilitation orders imposed under Section 205.356 in a confidential file.  The file is subject to an independent audit to ensure that only qualified license holders are subject to rehabilitation orders.  The audit shall be conducted by a state auditor or private auditor with whom the acupuncture board contracts to perform the audit.

(b)  An audit may be performed at any time at the direction of the acupuncture board.  The acupuncture board shall ensure that an audit is performed at least once in each three-year period.

(c)  The audit results are a matter of public record and shall be reported in a manner that maintains the confidentiality of each license holder who is subject to a rehabilitation order.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.359.  SUBPOENA.  (a)  On behalf of the acupuncture board, the executive director of the medical board or the presiding officer of the acupuncture board may issue a subpoena or subpoena duces tecum:

(1)  for purposes of an investigation or contested proceeding related to:

(A)  alleged misconduct by an acupuncturist;  or

(B)  an alleged violation of this chapter or other law related to practice as an acupuncturist or to the provision of health care under the authority of this chapter;  and

(2)  to determine whether to:

(A)  issue, suspend, restrict, revoke, or cancel a license authorized by this chapter;  or

(B)  deny or grant an application for a license under this chapter.

(b)  Failure to timely comply with a subpoena issued under this section is a ground for:

(1)  disciplinary action by the acupuncture board or any other licensing or regulatory agency with jurisdiction over the individual or entity subject to the subpoena;  and

(2)  denial of a license application.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.


Sec. 205.360.  DELEGATION OF CERTAIN COMPLAINT DISPOSITIONS. (a)  The acupuncture board may delegate to a committee of medical board employees the authority to dismiss or enter into an agreed settlement of a complaint that does not relate directly to patient care or that involves only administrative violations.  The disposition determined by the committee must be approved by the acupuncture board at a public meeting.

(b)  A complaint delegated under this section shall be referred for informal proceedings under Section 205.3541 if:

(1)  the committee of employees determines that the complaint should not be dismissed or settled;

(2)  the committee is unable to reach an agreed settlement; or

(3)  the affected acupuncturist requests that the complaint be referred for informal proceedings.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.27, eff. September 1, 2005.


Sec. 205.361.  TEMPORARY SUSPENSION.  (a)  The presiding officer of the acupuncture board, with that board's approval, shall appoint a three-member disciplinary panel consisting of acupuncture board

members to determine whether a person's license to practice as an acupuncturist should be temporarily suspended.

(b)  If the disciplinary panel determines from the information presented to the panel that a person licensed to practice as an acupuncturist would, by the person's continuation in practice, constitute a continuing threat to the public welfare, the disciplinary panel shall temporarily suspend the license of that person.

(c)  A license may be suspended under this section without notice or hearing on the complaint if:

(1)  institution of proceedings for a hearing before the acupuncture board is initiated simultaneously with the temporary suspension; and

(2)  a hearing is held under Chapter 2001, Government Code, and this chapter as soon as possible.

(d)  Notwithstanding Chapter 551, Government Code, the disciplinary panel may hold a meeting by telephone conference call if immediate action is required and convening of the panel at one location is inconvenient for any member of the disciplinary panel.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.28, eff. September 1, 2005.


Sec. 205.362.  CEASE AND DESIST ORDER.  (a)  If it appears to the acupuncture board that a person who is not licensed under this chapter is violating this chapter, a rule adopted under this chapter, or another state statute or rule relating to the practice of acupuncture, the board, after notice and opportunity for a hearing, may issue a cease and desist order prohibiting the person from engaging in the activity.

(b)  A violation of an order under this section constitutes grounds for imposing an administrative penalty under Section 205.352.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.29, eff. September 1, 2005.

Sec. 205.363.  REFUND.  (a)  Subject to Subsection (b), the acupuncture board may order a license holder to pay a refund to a consumer as provided in an agreement resulting from an informal settlement conference instead of or in addition to imposing an administrative penalty under this subchapter.

(b)  The amount of a refund ordered under Subsection (a) may not exceed the amount the consumer paid to the license holder for a service regulated by this chapter.  The acupuncture board may not require payment of other damages or estimate harm in a refund order.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.30, eff. September 1, 2005.

Sec. 205.364.  MODIFICATION OF FINDINGS OR RULINGS BY ADMINISTRATIVE LAW JUDGE.  The acupuncture board may change a finding of fact or conclusion of law or vacate or modify an order of an administrative law judge only if the acupuncture board makes a determination required by Section 2001.058(e), Government Code.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.31, eff. September 1, 2005.

SUBCHAPTER I.  CRIMINAL PENALTIES AND OTHER ENFORCEMENT PROVISIONS

Sec. 205.401.  CRIMINAL PENALTY.  (a)  Except as provided by Section 205.303, a person commits an offense if the person practices acupuncture in this state without a license issued under this chapter.

(b)  Each day a person practices acupuncture in violation of Subsection (a) constitutes a separate offense.

(c)  An offense under Subsection (a) is a felony of the third degree.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999.

Sec. 205.402.  INJUNCTIVE RELIEF;  CIVIL PENALTY.  (a)  The acupuncture board, the attorney general, or a district or county

attorney may bring a civil action to compel compliance with this chapter or to enforce a rule adopted under this chapter.

(b)  In addition to injunctive relief or any other remedy provided by law, a person who violates this chapter or a rule adopted under this chapter is liable to the state for a civil penalty in an amount not to exceed $2,000 for each violation.

(c)  Each day a violation continues or occurs is a separate violation for purposes of imposing a civil penalty.

(d)  The attorney general, at the request of the acupuncture board or on the attorney general's own initiative, may bring a civil action to collect a civil penalty.

Acts 1999, 76th Leg., ch. 388, Sec. 1, eff. Sept. 1, 1999. Amended by:
    Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.32, eff. September 1, 2005.


SUBCHAPTER J.  ADMINISTRATIVE PENALTIES

Sec. 205.451.  IMPOSITION OF ADMINISTRATIVE PENALTY.  The acupuncture board by order may impose an administrative penalty against a person licensed or regulated under this chapter who violates this chapter or a rule or order adopted under this chapter.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.


Sec. 205.452.  PROCEDURE.  (a)  The acupuncture board by rule shall prescribe the procedure by which it may impose an administrative penalty.

(b)  A proceeding under this subchapter is subject to Chapter 2001, Government Code.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

Sec. 205.453.  AMOUNT OF PENALTY.  (a)  The amount of an administrative penalty may not exceed $5,000 for each violation. Each day a violation continues or occurs is a separate violation for purposes of imposing a penalty.

(b)  The amount of the penalty shall be based on:

(1)  the seriousness of the violation, including:

(A)  the nature, circumstances, extent, and gravity of any prohibited act; and

(B)  the hazard or potential hazard created to the health, safety, or economic welfare of the public;

(2)  the economic harm to property or the environment caused by the violation;

(3)  the history of previous violations;

(4)  the amount necessary to deter a future violation;

(5)  efforts to correct the violation; and

(6)  any other matter that justice may require.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

Sec. 205.454.  NOTICE OF VIOLATION AND PENALTY.  (a)  If the acupuncture board by order determines that a violation has occurred and imposes an administrative penalty, the acupuncture board shall notify the affected person of the board's order.

(b)  The notice must include a statement of the right of the person to judicial review of the order.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

Sec. 205.455.  OPTIONS FOLLOWING DECISION:  PAY OR APPEAL.  (a) Not later than the 30th day after the date the acupuncture board's order imposing the administrative penalty is final, the person shall:

(1)  pay the penalty;

(2)  pay the penalty and file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both; or

(3)   without paying the penalty, file a petition for judicial review contesting the occurrence of the violation, the amount of the penalty, or both.

(b)   Within the 30-day period, a person who acts under Subsection (a)(3) may:

(1)   stay enforcement of the penalty by:

(A)   paying the penalty to the court for placement in an escrow account; or

(B)   giving to the court a supersedeas bond approved by the court for the amount of the penalty and that is effective until all judicial review of the acupuncture board's order is final; or

(2)   request the court to stay enforcement of the penalty by:

(A)   filing with the court an affidavit of the person stating that the person is financially unable to pay the penalty and is financially unable to give the supersedeas bond; and

(B)   giving a copy of the affidavit to the presiding officer of the acupuncture board by certified mail.

(c)   If the presiding officer of the acupuncture board receives a copy of an affidavit under Subsection (b)(2), the presiding officer may file with the court a contest to the affidavit not later than the fifth day after the date the copy is received.

(d)   The court shall hold a hearing on the facts alleged in the affidavit as soon as practicable and shall stay the enforcement of the penalty on finding that the alleged facts are true.  The person who files an affidavit has the burden of proving that the person is financially unable to pay the penalty and to give a supersedeas bond.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.


Sec. 205.456.   COLLECTION OF PENALTY.  If the person does not pay the administrative penalty and the enforcement of the penalty is not stayed, the presiding officer of the acupuncture board may refer the matter to the attorney general for collection of the penalty.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

Sec. 205.457.  DETERMINATION BY COURT.  (a)  If on appeal the court sustains the determination that a violation occurred, the court may uphold or reduce the amount of the administrative penalty and order the person to pay the full or reduced penalty.

(b)  If the court does not sustain the determination that a violation occurred, the court shall order that a penalty is not owed.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

Sec. 205.458.  REMITTANCE OF PENALTY AND INTEREST.  (a)  If after judicial review the administrative penalty is reduced or not imposed by the court, the court shall, after the judgment becomes final:

(1)  order that the appropriate amount, plus accrued interest, be remitted to the person if the person paid the penalty; or

(2)  order the release of the bond in full if the penalty is not imposed or order the release of the bond after the person pays the penalty imposed if the person posted a supersedeas bond.

(b)  The interest paid under Subsection (a)(1) is the rate charged on loans to depository institutions by the New York Federal Reserve Bank.  The interest is paid for the period beginning on the date the penalty is paid and ending on the date the penalty is remitted.

Added by Acts 2005, 79th Leg., Ch. 269 (S.B. 419), Sec. 3.34, eff. September 1, 2005.

# APPENDIX E

[<<Prev Rule](#)                                                    [Next Rule>>](#)

# Texas Administrative Code

|  |  |
|---|---|
| TITLE 22 | EXAMINING BOARDS |
| PART 9 | TEXAS MEDICAL BOARD |
| CHAPTER 183 | ACUPUNCTURE |
| RULE §183.2 | Definitions |

The following words and terms, when used in this chapter, shall have the following meanings, unless the content clearly indicates otherwise.

(1) Ability to communicate in the English language--An applicant who has met the requirements set out in §183.4(a)(8) of this title (relating to Licensure).

(2) Acceptable approved acupuncture school--Effective January 1, 1996, and in addition to and consistent with the requirements of §205.206 of the Tex. Occ. Code:

(A) a school of acupuncture located in the United States or Canada which, at the time of the applicant's graduation, was a candidate for accreditation by the Accreditation Commission for Acupuncture and Oriental Medicine (ACAOM) or another accrediting body recognized by the Texas Higher Education Coordinating Board, provides certification that the curriculum at the time of the applicant's graduation was equivalent to the curriculum upon which accreditation granted, offered a masters degree or a professional certificate or diploma upon graduation, and had a curriculum of 1,800 hours with at least 450 hours of herbal studies which at a minimum included the following:

(i) basic herbology including recognition, nomenclature, functions, temperature, taste, contraindications, and therapeutic combinations of herbs;

(ii) herbal formulas including traditional herbal formulas and their modifications or variations based on traditional methods of herbal therapy;

(iii) patent herbs including the names of the more common patent herbal medications and their uses; and

(iv) clinical training emphasizing herbal uses; or

(B) a school of acupuncture located in the United States or Canada which, at the time of the applicant's graduation, was accredited by ACAOM or another accrediting body recognized by the Texas Higher Education Coordinating Board, offered a masters degree or a professional certificate or diploma upon graduation, and had a curriculum of 1,800 hours with at least 450 hours of herbal studies which at a minimum included the following:

(i) basic herbology including recognition, nomenclature, functions, temperature, taste, contraindications, and therapeutic combinations of herbs;

(ii) herbal formulas including traditional herbal formulas and their modifications or variations based on traditional methods of herbal therapy;

(iii) patent herbs including the names of the more common patent herbal medications and their uses; and

(iv) clinical training emphasizing herbal uses; or

(C) a school of acupuncture located outside the United States or Canada that is determined by the board to be substantially equivalent to a Texas acupuncture school or a school defined in subparagraph (B) of this paragraph. An evaluation by the American Association of Collegiate Registrars and Admissions Officers (AACRAO) or an evaluation requested by the board may be utilized when making a determination of substantial equivalence.

(3) Acupuncture Act or "the Act"--Chapter 205 of the Texas Occupations Code.

(4) Acupuncture--

(A) The insertion of an acupuncture needle and the application of moxibustion to specific areas of the human body as a primary mode of therapy to treat and mitigate a human condition, including the evaluation and assessment of the condition; and

(B) the administration of thermal or electrical treatments or the recommendation of dietary guidelines, energy flow exercise, or dietary or herbal supplements in conjunction with the treatment described by subparagraph (A) of this paragraph.

(5) Acupuncture board or "board"--The Texas State Board of Acupuncture Examiners.

(6) Acupuncturist--A licensee of the acupuncture board who directly or indirectly charges a fee for the performance of acupuncture services.

(7) Agency--The divisions, departments, and employees of the Texas Medical Board, the Texas Physician Assistant Board, and the Texas State Board of Acupuncture Examiners.

(8) APA--The Administrative Procedure Act, Government Code, §2001.001 et seq.

(9) Applicant--A party seeking a license from the board.

(10) Application--An application is all documents and information necessary to complete an applicant's request for licensure including the following:

(A) forms furnished by the board, completed by the applicant:

(i) all forms and addenda requiring a written response must be printed in ink or typed;

(ii) photographs must meet United States Government passport standards;

(B) a fingerprint card, furnished by the acupuncture board, completed by the applicant, that must be readable by the Texas Department of Public Safety;

(C) all documents required under §183.4(c) of this title (relating to Licensure Documentation); and

(D) the required fee, payable by check through a United States bank.

(11) Assistant Presiding Officer--A member of the acupuncture board elected by the acupuncture board to

fulfill the duties of the presiding officer in the event the presiding officer is incapacitated or absent, or the presiding officer's duly qualified successor under Robert's Rules of Order Newly Revised or board rules.

(12) Board member--One of the members of the acupuncture board, appointed and qualified pursuant to §§205.051 - 205.053 of the Act.

(13) Chiropractor--A licensee of the Texas State Board of Chiropractic Examiners.

(14) Contested case--A proceeding, including but not restricted to, licensing, in which the legal rights, duties, or privileges of a party are to be determined by the board after an opportunity for adjudicative hearing.

(15) Documents--Applications, petitions, complaints, motions, protests, replies, exceptions, answers, notices, or other written instruments filed with the medical board or acupuncture board in a licensure proceeding or by a party in a contested case.

(16) Eligible for legal practice and/or licensure in country of graduation--An applicant who has completed all requirements for legal practice of acupuncture and/or licensure in the country in which the school is located except for any citizenship requirements.

(17) Executive Director--The executive director of the agency or the authorized designee of the executive director.

(18) Full force--Applicants for licensure who possess a license in another jurisdiction must have it in full force and not restricted, canceled, suspended or revoked. An acupuncturist with a license in full force may include an acupuncturist who does not have a current, active, valid annual permit in another jurisdiction because that jurisdiction requires the acupuncturist to practice in the jurisdiction before the annual permit is current.

(19) Full NCCAOM examination--The National Certification Commission for Acupuncture and Oriental Medicine examination, consisting of the following:

(A) if taken before June 1, 2004: the Comprehensive Written Exam (CWE), the Clean Needle Technique Portion (CNTP), the Practical Examination of Point Location Skills (PEPLS), and the Chinese Herbology Exam; or

(B) if taken on or after June 1, 2004: the NCCAOM Foundation of Oriental Medicine Module, Acupuncture Module, Point Location Module, the Chinese Herbology Module, and the Biomedicine Module.

(20) Good professional character--An applicant for licensure must not be in violation of or have committed any act described in the Act, §205.351.

(21) Administrative Law Judge (ALJ)--An individual appointed to preside over administrative hearings pursuant to the APA.

(22) License--Includes the whole or part of any board permit, certificate, approval, registration, or similar form of permission required by law; specifically, a license and a registration.

(23) Licensing--Includes the medical board's and acupuncture board's process respecting the granting,

denial, renewal, revocation, suspension, annulment, withdrawal, or amendment of a license.

(24) Medical board--The Texas Medical Board.

(25) Misdemeanors involving moral turpitude--Any misdemeanor of which fraud, dishonesty, or deceit is an essential element; burglary; robbery; sexual offense; theft; child molesting; substance diversion or substance abuse; an offense involving baseness, vileness, or depravity in the private social duties one owes to others or to society in general; or an offense committed with knowing disregard for justice or honesty.

(26) Party--The acupuncture board and each person named or admitted as a party in a SOAH hearing or contested case before the acupuncture board.

(27) Person--Any individual, partnership, corporation, association, governmental subdivision, or public or private organization of any character.

(28) Physician--A licensee of the medical board.

(29) Pleading--Written documents filed by parties concerning their respective claims.

(30) Presiding officer--The member of the acupuncture board appointed by the governor to preside over acupuncture board proceedings or the presiding officer's duly qualified successor in accordance with Robert's Rules of Order Newly Revised or board rules.

(31) Register--The Texas Register.

(32) Rule--Any agency statement of general applicability that implements, interprets, or prescribes law or policy, or describes the procedures or practice requirements of this board. The term includes the amendment or repeal of a prior section but does not include statements concerning only the internal management or organization of any agency and not affecting private rights or procedures. This definition includes substantive regulations.

(33) Secretary--The secretary-treasurer of the acupuncture board.

(34) Substantially equivalent to a Texas acupuncture school--A school or college of acupuncture that is an institution of higher learning designed to select and educate acupuncture students; provide students with the opportunity to acquire a sound basic acupuncture education through training; to develop programs of acupuncture education to produce practitioners, teachers, and researchers; and to afford opportunity for postgraduate and continuing medical education. The school must provide resources, including faculty and facilities, sufficient to support a curriculum offered in an intellectual and practical environment that enables the program to meet these standards. The faculty of the school shall actively contribute to the development and transmission of new knowledge. The school of acupuncture shall contribute to the advancement of knowledge and to the intellectual growth of its students and faculty through scholarly activity, including research. The school of acupuncture shall include, but not be limited to, the following characteristics:

(A) the facilities for didactic and clinical training (i.e., laboratories, hospitals, library, etc.) shall be adequate to ensure opportunity for proper education.

(B) the admissions standards shall be substantially equivalent to a Texas school of acupuncture.

(C) the basic curriculum shall include courses substantially equivalent to those delineated in the

Accreditation Commission for Acupuncture and Oriental Medicine (ACAOM) core curriculum at the time of applicant's graduation.

   (D) the curriculum shall be of at least 1800 hours in duration.

---

**Source Note:** The provisions of this §183.2 adopted to be effective May 16, 1994, 19 TexReg 3366; amended to be effective December 20, 1994, 19 TexReg 9598; amended to be effective January 12, 1996, 21 TexReg 108; amended to be effective October 22, 1996, 21 TexReg 9828; amended to be effective September 15, 1997, 22 TexReg 8998; amended to be effective May 10, 1998, 23 TexReg 4266; amended to be effective September 21, 2000, 25 TexReg 9217; amended to be effective May 6, 2001, 26 TexReg 3217; amended to be effective January 6, 2002, 26 TexReg 10866; amended to be effective March 6, 2003, 28 TexReg 1883; amended to be effective September 12, 2004, 29 TexReg 8511; amended to be effective January 9, 2005, 29TexReg12188;amendedto be effective May 1, 2006, 31 TexReg 3534; amended to be effective January 4, 2007, 31 TexReg 10799; amended to be effective May 6, 2009, 34 TexReg 2675

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

# Texas Administrative Code

|              |                       |
|--------------|-----------------------|
| TITLE 22     | EXAMINING BOARDS      |
| PART 9       | TEXAS MEDICAL BOARD   |
| CHAPTER 183  | ACUPUNCTURE           |
| RULE §183.4  | Licensure             |

(a) Qualifications. An applicant must present satisfactory proof to the acupuncture board that the applicant:

  (1) is at least 21 years of age;

  (2) is of good professional character as defined in §183.2 of this title (relating to Definitions);

  (3) has successfully completed 60 semester hours of general academic college level courses, other than in acupuncture school, that are not remedial and would be acceptable at the time they were completed for credit on an academic degree at a two or four year institution of higher education within the United States accredited by an agency recognized by the Higher Education Coordinating Board or its equivalent in other states as a regional accrediting body. Coursework completed as a part of a degree program in acupuncture or Oriental medicine may be accepted by the acupuncture board if, in the opinion of the acupuncture board, such coursework is substantially equivalent to the required hours of general academic college level coursework;

  (4) is a graduate of an acceptable approved acupuncture school;

  (5) has taken and passed, within five attempts, each component of the full National Certification Commission for Acupuncture and Oriental Medicine (NCCAOM) examination. If an applicant submits to multiple attempts on a component before and on or after June 1, 2004, the number of attempts shall be combined based on the subject matter tested;

  (6) has taken and passed the CCAOM (Council of Colleges of Acupuncture and Oriental Medicine) Clean Needle Technique (CNT) course and practical examination;

  (7) for applicants who apply for a license on or after September 1, 2007, passes a jurisprudence examination ("JP exam"), which shall be conducted on the licensing requirements and other laws, rules, or regulations applicable to the acupuncture profession in this state. The jurisprudence examination shall be developed and administered as follows:

    (A) Questions for the JP Exam shall be prepared by agency staff with input from the Acupuncture board and the agency staff shall make arrangements for a facility by which applicants can take the examination.

    (B) Applicants must pass the JP exam with a score of 75 or better within three attempts, unless the Board allows an additional attempt based upon a showing of good cause. An applicant who is unable to pass the JP exam within three attempts must appear before the Licensure Committee of the board to address the applicant's inability to pass the examination and to re-evaluate the applicant's eligibility for licensure. It is at the discretion of the committee to allow an applicant additional attempts to take the JP exam.

    (C) An examinee shall not be permitted to bring medical books, compends, notes, medical journals,

calculators or other help into the examination room, nor be allowed to communicate by word or sign with another examinee while the examination is in progress without permission of the presiding examiner, nor be allowed to leave the examination room except when so permitted by the presiding examiner.

(D) Irregularities during an examination such as giving or obtaining unauthorized information or aid as evidenced by observation or subsequent statistical analysis of answer sheets, shall be sufficient cause to terminate an applicant's participation in an examination, invalidate the applicant's examination results, or take other appropriate action.

(E) A person who has passed the JP Exam shall not be required to retake the Exam for another or similar license, except as a specific requirement of the board.

(8) is able to communicate in English as demonstrated by one of the following:

(A) passage of the NCCAOM examination taken in English;

(B) passage of the TOEFL (Test of English as a Foreign Language) with a score of at least "intermediate" on the Reading and Listening sections and a score of at least "fair" on the Speaking and Writing sections of the Internet Based Test (iBT®), or a score of 550 or higher on the paper based test (PBT);

(C) passage of the TSE (Test of Spoken English) with a score of 45 or higher;

(D) passage of the TOEIC (Test of English for International Communication) with a score of 500 or higher;

(E) graduation from an acceptable approved school of acupuncture located in the United States or Canada; or

(F) at the discretion of the acupuncture board, passage of any other similar, validated exam testing English competency given by a testing service with results reported directly to the acupuncture board or with results otherwise subject to verification by direct contact between the testing service and the acupuncture board.

(9) can demonstrate current competence through the active practice of acupuncture.

(A) All applicants for licensure shall provide sufficient documentation to the board that the applicant has, on a full-time basis, actively treated persons, been a student at an acceptable approved acupuncture school, or been on the active teaching faculty of an acceptable approved acupuncture school, within either of the last two years preceding receipt of an application for licensure.

(B) The term "full-time basis," for purposes of this section, shall mean at least 20 hours per week for 40 weeks duration during a given year.

(C) Applicants who do not meet the requirements of subparagraphs (A) and (B) of this paragraph may, in the discretion of the executive director or board, be eligible for an unrestricted license or a restricted license subject to one or more of the following conditions or restrictions:

(i) limitation of the practice of the applicant to specified components of the practice of acupuncture and/or exclusion of specified components of the practice of acupuncture;

(ii) remedial education; or

(iii) such other remedial or restrictive conditions or requirements that, in the discretion of the board are necessary to ensure protection of the public and minimal competency of the applicant to safely practice acupuncture.

(10) Alternative License Procedure for Military Spouse.

(A) An applicant who is the spouse of a member of the armed forces of the United States assigned to a military unit headquartered in Texas may be eligible for alternative demonstrations of competency for certain licensure requirements. Unless specifically allowed in this subsection, an applicant must meet the requirements for licensure as specified in this chapter.

(B) To be eligible, an applicant must be the spouse of a person serving on active duty as a member of the armed forces of the United States and meet one of the following requirements:

(i) holds an active unrestricted medical license issued by another state that has licensing requirements that are substantially equivalent to the requirements for a Texas acupuncture license; or

(ii) within the five years preceding the application date held an acupuncture license in this state that expired and was cancelled for nonpayment while the applicant lived in another state for at least six months.

(C) Applications for licensure from applicants qualifying under paragraph (9)(A) and (B) of this subsection shall be expedited by the board's licensure division.

(D) Alternative Demonstrations of Competency Allowed. Applicants qualifying under paragraph (9)(A) and (B) of this subsection:

(i) are not required to comply with subsection (c)(1) of this section; and

(ii) notwithstanding the one year expiration in subsection (b)(1)(B) of this section, are allowed an additional 6 months to complete the application prior to it becoming inactive; and

(iii) notwithstanding the 60 day deadline in subsection (b)(1)(G) of this section, may be considered for permanent licensure up to 5 days prior to the board meeting.

(b) Procedural rules for licensure applicants. The following provisions shall apply to all licensure applicants.

(1) Applicants for licensure:

(A) whose documentation indicates any name other than the name under which the applicant has applied must furnish proof of the name change;

(B) whose applications have been filed with the board in excess of one year will be considered expired. Any fee previously submitted with that application shall be forfeited unless otherwise provided by §175.5 of this title (relating to Payment of Fees or Penalties). Any further request for licensure will require submission of a new application and inclusion of the current licensure fee. An extension to an application may be granted under certain circumstances, including:

(i) Delay by board staff in processing an application;

(ii) Application requires Licensure Committee review after completion of all other processing and will

expire prior to the next scheduled meeting;

   (iii) Licensure Committee requires an applicant to meet specific additional requirements for licensure and the application will expire prior to deadline established by the Committee;

   (iv) Applicant requires a reasonable, limited additional period of time to obtain documentation after completing all other requirements and demonstrating diligence in attempting to provide the required documentation;

   (v) Applicant is delayed due to unanticipated military assignments, medical reasons, or catastrophic events;

  (C) who in any way falsify the application may be required to appear before the acupuncture board. It will be at the discretion of the acupuncture board whether or not the applicant will be issued a Texas acupuncture license;

  (D) on whom adverse information is received by the acupuncture board may be required to appear before the acupuncture board. It will be at the discretion of the acupuncture board whether or not the applicant will be issued a Texas license;

  (E) shall be required to comply with the acupuncture board's rules and regulations which are in effect at the time the completed application form and fee are filed with the board;

  (F) may be required to sit for additional oral, written, or practical examinations or demonstrations that, in the opinion of the acupuncture board, are necessary to determine competency of the applicant;

  (G) must have the application for licensure completed and legible in every detail 60 days prior to the acupuncture board meeting in which they are to be considered for licensure unless otherwise determined by the acupuncture board based on good cause.

 (2) Applicants for licensure who wish to request reasonable accommodation due to a disability must submit the request at the time of filing the application.

 (3) Applicants who have been licensed in any other state, province, or country shall complete a notarized oath or other verified sworn statement in regard to the following:

  (A) whether the license, certificate, or authority has been the subject of proceedings against the applicant for the restriction for cause, cancellation for cause, suspension for cause, or revocation of the license, certificate, or authority to practice in the state, province, or country, and if so, the status of such proceedings and any resulting action; and

  (B) whether an investigation in regard to the applicant is pending in any jurisdiction or a prosecution is pending against the applicant in any state, federal, national, local, or provincial court for any offense that under the laws of the state of Texas is a felony, and if so, the status of such prosecution or investigation.

 (4) An applicant for a license to practice acupuncture may not be required to appear before the acupuncture board or any of its committees unless the application raises questions about the applicant's:

  (A) physical or mental impairment;

(B) criminal conviction; or

(C) revocation of a professional license.

(c) Licensure documentation.

(1) Original documents/interview. Upon request, any applicant must appear for a personal interview at the board offices and present original documents to a representative of the board for inspection. Original documents may include, but are not limited to, those listed in paragraph (2) of this subsection.

(2) Required documentation. Documentation required of all applicants for licensure shall include the following:

(A) Birth certificate/proof of age. Each applicant for licensure must provide a copy of either a birth certificate and translation, if necessary, to prove that the applicant is at least 21 years of age. In instances where a birth certificate is not available, the applicant must provide copies of a passport or other suitable alternate documentation.

(B) Name change. Any applicant who submits documentation showing a name other than the name under which the applicant has applied must present copies of marriage licenses, divorce decrees, or court orders stating the name change. In cases where the applicant's name has been changed by naturalization the applicant must submit the original naturalization certificate by hand delivery or by certified mail to the board office for inspection.

(C) Examination scores. Each applicant for licensure must have a certified transcript of grades submitted directly from the appropriate testing service to the acupuncture board for all examinations used in Texas for purposes of licensure in Texas.

Cont'd...

Next Page          Previous Page



<<Prev Rule                                                     Next Rule>>

# Texas Administrative Code

| | |
|---|---|
| TITLE 22 | EXAMINING BOARDS |
| PART 9 | TEXAS MEDICAL BOARD |
| CHAPTER 183 | ACUPUNCTURE |
| RULE §183.20 | Continuing Acupuncture Education |

(a) Purpose. This section is promulgated to promote the health, safety, and welfare of the people of Texas through the establishment of minimum requirements for continuing acupuncture education (CAE) for licensed Texas acupuncturists so as to further enhance their professional skills and knowledge.

(b) Minimum Continuing Acupuncture Education. As a prerequisite to the annual registration of the license of an acupuncturist, the acupuncturist shall complete 17 hours of CAE each year.

  (1) The required hours shall be from courses that meet one of the following criteria at the time the hours are taken:

    (A) are designated or otherwise approved for credit by the Texas State Board of Acupuncture Examiners based on a review and recommendation of the course content by the Education Committee of the board as described in subsection (n) of this section;

    (B) are offered by approved providers;

    (C) have been approved for CAE credit for a minimum of three years by another state acupuncture board having first gone through a formal approval process;

    (D) approved by the NCCAOM (National Certification Commission for Acupuncture and Oriental Medicine) for professional development activity credit; or

    (E) are provided outside of the United States by a provider of continuing acupuncture education that are acceptable to the Board.

  (2) At least eight hours shall be in general acupuncture in order to ensure that a licensee's CAE is comprehensive and that the licensee's overall acupuncture knowledge, skills, and competence are enhanced.

  (3) At least one of the required hours shall be from a course in ethics.

  (4) At least two of the required hours shall be in herbology. More than two hours shall be expected of a licensee whose primary practice includes prescriptions of herbs.

  (5) Effective for licensees applying for renewal of their licensees on or after November 30, 2010, at least one hour of biomedicine.

  (6) No more than two of the required hours may be from courses that primarily relate to practice enhancement or business or office administration.

  (7) Courses may be taught through live lecture, distance learning, or the Internet.

Appendix E to Brief of Appellant                                                   

(8) No more than a total of eight hours completed under paragraph (1)(D) or (E) of this subsection may be applied to the total hours required each registration period.

(c) Reporting Continuing Acupuncture Education. An acupuncturist must report on the licensee's annual registration form whether the licensee has completed the required acupuncture education during the previous year.

(d) Grounds for Exemption from Continuing Acupuncture Education. An acupuncturist may request in writing and may be exempt from the annual minimum continuing acupuncture education requirements for one or more of the following reasons:

  (1) catastrophic illness;

  (2) military service of longer than one year in duration;

  (3) acupuncture practice and residence of longer than one year in duration outside the United States; and/or

  (4) good cause shown on written application of the licensee which gives satisfactory evidence to the board that the licensee is unable to comply with the requirements of continuing acupuncture education.

(e) Exemption Requests. Exemption requests shall be subject to the approval of the executive director of the board, and shall be submitted in writing at least 30 days prior to the expiration of the license.

(f) Exemption Duration and Renewal. An exemption granted under subsections (d) and (e) of this section may not exceed one year, but may be renewed annually upon written request submitted at least 30 days prior to the expiration of the current exemption.

(g) Verification of Credits. The board may require written verification of continuing acupuncture education hours from any licensee and the licensee shall provide the requested verification within 30 calendar days of the date of the request. Failure to timely provide the requested verification may result in disciplinary action by the board.

(h) Nonrenewal for Insufficient Continuing Acupuncture Education. Unless exempted under the terms of this section, the apparent failure of an acupuncturist to obtain and timely report the 17 hours of continuing education hours as required and provided for in this section shall result in nonrenewal of the license until such time as the acupuncturist obtains and reports the required hours; however, the executive director of the board may issue to such an acupuncturist a temporary license numbered so as to correspond to the nonrenewed license. Such a temporary license issued pursuant to this subsection may be issued to allow the board to verify the accuracy of information related to the continuing acupuncture education hours of the acupuncturist and to allow the acupuncturist who has not obtained or timely reported the required number of hours an opportunity to correct any deficiency so as not to require termination of ongoing patient care.

(i) Fee for Issuance of Temporary License. The fee for issuance of a temporary license pursuant to the provisions of this section shall be in the amount specified under §175.1 of this title (relating to Application Fees); however, the fee need not be paid prior to the issuance of the temporary license, but shall be paid prior to the renewal of a permanent license.

(j) Application of Additional Hours. Continuing acupuncture education hours that are obtained to comply with the requirements for the preceding year as a prerequisite for licensure renewal, shall first be credited to meet the requirements for that previous year. Once the requirements of the previous year are satisfied, any

additional hours obtained shall be credited to meet the continuing acupuncture education requirements of the current year. A licensee may carry forward CAE hours earned prior to an annual registration report which are in excess of the 17-hour annual requirement and such excess hours may be applied to the following years' requirements. A maximum of 34 total excess hours may be carried forward. Excess CAE hours may not be carried forward or applied to an annual report of CAE more than two years beyond the date of the annual registration following the period during which the hours were earned.

(k) False Reports/Statements. An intentionally false report or statement to the board by a licensee regarding continuing acupuncture education hours reportedly obtained shall be a basis for disciplinary action by the board pursuant to the Act, §205.351(a)(2) and (6).

(l) Monetary Penalty. Failure to obtain and timely report the continuing acupuncture education hours for renewal of a license shall subject the licensee to a monetary penalty for late registration in the amount set forth in §175.2 and §175.3 of this title (relating to Registration and Renewal Fees and Penalties).

(m) Disciplinary Action, Conditional Licensure, and Construction. This section shall be construed to allow the board to impose requirements for completion of additional continuing acupuncture education hours for purposes of disciplinary action and conditional licensure.

(n) Required Content for Continuing Acupuncture Education Courses. Continuing Acupuncture Education courses must meet the following requirements:

  (1) the content of the course, program, or activity is related to the practice of acupuncture or oriental medicine, and shall:

    (A) be related to the knowledge and/or technical skills required to practice acupuncture; or

    (B) be related to direct and/or indirect patient care;

  (2) the method of instruction is adequate to teach the content of the course, program, or activity;

  (3) the credentials of the instructor(s) indicate competency and sufficient training, education, and experience to teach the specific course, program, or activity;

  (4) the education provider maintains an accurate attendance/participation record on individuals completing the course, program, or activity;

  (5) each credit hour for the course, program, or activity is equal to no less than 50 minutes of actual instruction or training;

  (6) the course, program, or activity is provided by a knowledgeable health care provider or reputable school, state, or professional organization;

  (7) the course description provides adequate information so that each participant understands the basis for the program and the goals and objectives to be met; and

  (8) the education provider obtains written evaluations at the end of each program, collate the evaluations in a statistical summary, and makes the summary available to the board upon request.

(o) Continuing Acupuncture Education Approval Requests. All requests for approval of courses, programs,

or activities for purposes of satisfying CAE credit requirements shall be submitted in writing to the Education Committee of the board on a form approved by the board, along with any required fee, and accompanied by information, documents, and materials accurately describing the course, program, or activity, and necessary for verifying compliance with the requirements set forth in subsection (n) of this section. At the discretion of the board or the Education Committee, supplemental information, documents, and materials may be requested as needed to obtain an adequate description of the course, program, or activity and to verify compliance with the requirements set forth in subsection (n) of this section. At the discretion of the board or the Education Committee, inspection of original supporting documents may be required for a determination on an approval request. The Acupuncture Board shall have the authority to conduct random and periodic checks of courses, programs, or activities to ensure that criteria for education approval as set forth in subsection (n) of this section have been met and continue to be met by the education provider. Upon requesting approval of a course, program, or activity, the education provider shall agree to such checks by the Acupuncture Board or its designees, and shall further agree to provide supplemental information, documents, and material describing the course, program, or activity which, in the discretion of the Acupuncture Board, may be needed for approval or continued approval of the course, program, or activity. Failure of an education provider to provide the necessary information, documents, and materials to show compliance with the standards set forth in subsection (n) of this section shall be grounds for denial of CAE approval or recision of prior approval in regard to the course, program, or activity.

(p) Reconsideration of Denials of Approval Requests. Determinations to deny approval of a CAE course, program, or activity may be reconsidered by the Education Committee or the board based on additional information concerning the course, program, or activity, or upon a showing of good cause for reconsideration. A decision to reconsider a denial determination shall be a discretionary decision based on consideration of the additional information or the good cause showing. Requests for reconsideration shall be made in writing by the education provider, and may be made orally or in writing by board staff or a committee of the board.

(q) Reconsideration of Approvals. Determinations to approve a CAE course, program, or activity may be reconsidered by the Education Committee or the board based on additional information concerning the course, program, or activity, or upon a showing of good cause. A decision to reconsider an approval determination shall be a discretionary decision based on consideration of the additional information or the good cause showing. Requests for reconsideration may be made in writing by a member of the public or may be made orally or in writing by board staff or a committee of the board.

(r) Criteria for Provider Approval.

  (1) In order to be an approved provider, a provider shall submit to the board a provider application on a form approved by the board, along with any required fee. All provider applications and documentation submitted to the board shall be typewritten and in English.

  (2) To become an approved provider, a provider shall submit to the board evidence that the provider has three continuous years of previous experience providing at least one different CAE course in Texas in each of those years that were approved by the board. In addition the provider must have no history of complaints or reprimands with the board.

  (3) The approval of the provider shall expire three years after it is issued by the board and may be renewed upon the filing of the required application, along with any required fee.

  (4) Acupuncture schools and colleges which have been approved by the board, as defined under §183.2(2)

of this title (relating to Definitions), who seek to be approved providers shall be required to submit an application for an approved provider number to the board.

(s) Requirements of Approved Providers.

   (1) For the purpose of this chapter, the title "approved provider" can only be used when a person or organization has submitted a provider application form, and has been issued a provider number unless otherwise provided.

   (2) A person or organization may be issued only one provider number. When two or more approved providers co-sponsor a course, the course shall be identified by only one provider number and that provider shall assume responsibility for recordkeeping, advertising, issuance of certificates and instructor(s) qualifications.

   (3) An approved provider shall offer CAE programs that are presented or instructed by persons who meet the minimum criteria as described in subsection (t) of this section.

   (4) An approved provider shall keep the following records for a period of four years in one identified location:

      (A) Course outlines of each course given.

      (B) Record of time and places of each course given.

      (C) Course instructor curriculum vitaes or resumes.

      (D) The attendance record for each course.

      (E) Participant evaluation forms for each course given.

   (5) An approved provider shall submit to the board the following within ten days of the board's request:

      (A) A copy of the attendance record showing the name, signature and license number of any licensed acupuncturists who attended the course.

      (B) The participant evaluation forms of the course.

   (6) Approved providers shall issue, within 60 days of the conclusion of a course, to each participant who has completed the course, a certificate of completion that contains the following information:

      (A) Provider's name and number.

      (B) Course title.

      (C) Participant's name and, if applicable, his or her acupuncture license number.

      (D) Date and location of course.

      (E) Number of continuing education hours completed.

      (F) Description of hours indicating whether hours completed are in general acupuncture, ethics, herbology, biomedicine, or practice management.

(G) Statement directing the acupuncturist to retain the certificate for at least four years from the date of completion of the course.

(7) Approved providers shall notify the board within 30 days of any changes in organizational structure of a provider and/or the person(s) responsible for the provider's continuing education course, including name, address, or telephone number changes.

(8) Provider approval is non-transferable.

(9) The board may audit during reasonable business hours records, courses, instructors and related activities of an approved provider.

(t) Instructors.

(1) Minimum qualifications of an acupuncturist instructor. The instructor must:

(A) hold a current valid license to practice acupuncture in Texas or other state and be free of any disciplinary order or probation by a state licensing authority; and

(B) be knowledgeable, current and skillful in the subject matter of the course as evidenced through one of the following:

(i) hold a minimum of a master's degree from an accredited college or university or a post-secondary educational institution, with a major in the subject directly related to the content of the program to be presented;

(ii) have experience in teaching similar subject matter content within the last two years in the specialized area in which he or she is teaching;

(iii) have at least one year's experience within the last two years in the specialized area in which he or she is teaching; or

(iv) have graduated from an acceptable acupuncture school, as defined under §183.2(2) of this title, and have completed 3 years of professional experience in the licensed practice of acupuncture.

(2) Minimum qualifications of a non-acupuncturist instructor. The instructor must:

(A) be currently licensed or certified in his or her area of expertise if appropriate;

(B) show written evidence of specialized training or experience, which may include, but not be limited to, a certificate of training or an advanced degree in a given subject area; and

(C) have at least one year's teaching experience within the last two years in the specialized area in which he or she teaches.

(u) CAE Credit for Course Instruction. Instructors of board-approved CAE courses or courses taught through a program offered by an approved provider for CAE credit may receive three hours of CAE credit for each hour of lecture, not to exceed six hours of continuing education credit per year, regardless of how many hours taught. Participation as a member of a panel presentation for the approved course shall not entitle the participant to earn CAE credit as an instructor. No CAE credit shall be granted to school faculty members as credit for their regular teaching assignments.

(v) Expiration, Denial and Withdrawal of Approval.

(1) Approval of any CAE course shall expire three years after the date of approval.

(2) The board may withdraw its approval of a provider or deny an application for approval if the provider is convicted of a crime substantially related to the activities of a provider.

(3) Any material misrepresentation of fact by a provider or applicant in any information required to be submitted to the board is grounds for withdrawal of approval or denial of an application.

(4) The board may withdraw its approval of a provider after giving the provider written notice setting forth its reasons for withdrawal and after giving the provider a reasonable opportunity to be heard by the board or its designee.

(5) Should the board deny approval of a provider, the provider may appeal the action by filing a letter stating the reason(s) with the board. The letter of appeal shall be filed with the board within ten days of the mailing of the applicant's notification of the board's denial. The appeal shall be considered by the board.

---

**Source Note:** The provisions of this §183.20 adopted to be effective September 21, 2000, 25 TexReg 9217; amended to be effective January 6, 2002, 26 TexReg 10866; amended to be effective September 19, 2002, 27 TexReg 8770; amended to be effective June 29, 2003, 28 TexReg 4633; amended to be effective September 14, 2003, 28 TexReg 7704; amended to be effective March 6, 2005, 30 TexReg 1076; amended to be effective January 4, 2007, 31 TexReg 10799; amended to be effective May 6, 2009, 34 TexReg 2675; amended to be effective February 28, 2011, 36 TexReg 1278; amended to be effective June 28, 2011, 36 TexReg 3918

Next Page          Previous Page

List of Titles          Back to List

HOME | TEXAS REGISTER | TEXAS ADMINISTRATIVE CODE | OPEN MEETINGS

# APPENDIX F

H

Court of Appeals of Texas,
Austin.
TEXAS BOARD OF CHIROPRACTIC EXAMINERS,
Glenn Parker, Executive Director, and Texas Chiropractic
Association, Appellants
v.
TEXAS MEDICAL ASSOCIATION, Texas Medical
Board, and the State of Texas, Appellees.

No. 03–10–00673–CV.
July 6, 2012.

**Background:** Medical association brought action against Texas Board of Chiropractic Examiners (TBCE) seeking declarations that various provisions of the scope-of-practice rule that permitted needle electromyography (EMG) and manipulation under anesthesia (MUA) were invalid because they exceeded the statutory scope of chiropractic and constituted the unlawful practice of medicine. The District Court, Travis County, Stephen Yelenosky, J., invalidated rules. TBCE appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

(1) TBCE exceeded its authority in promulgating rules allowing chiropractors to perform needle EMG;

(2) MUA was a surgical procedure excluded from the statutory scope of chiropractic;

(3) rule allowing chiropractors to make certain diagnosis regarding the biomechanical condition of the spine or musculoskeletal system fell within the statutory scope of chiropractic; and

(4) rule allowing chiropractors to diagnose a subluxation complex of the spine or musculoskeletal system fell within the statutory scope of chiropractic.

Affirmed in part, reversed in part, and remanded; re-

hearing denied.

West Headnotes

**[1] Health 198H ⚷176**

198H Health
    198HI Regulation in General
        198HI(B) Professionals
            198Hk162 Unauthorized Practice
                198Hk176 k. Chiropractors. Most Cited Cases

**Health 198H ⚷192**

198H Health
    198HI Regulation in General
        198HI(B) Professionals
            198Hk191 Regulation of Professional Conduct; Boards and Officers
                198Hk192 k. In general. Most Cited Cases

Texas Board of Chiropractic Examiners (TBCE) exceeded its authority in promulgating rules allowing chiropractors to perform needle electromyography (EMG); some types of EMG needles had beveled, blade-like edges, which were designed to slice or cut through tissue, and thus, the use of the needles constituted an "incisive" procedure that was excluded by statute from the scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b–c); 22 TAC § 75.17(a)(3).

**[2] Health 198H ⚷176**

198H Health
    198HI Regulation in General
        198HI(B) Professionals
            198Hk162 Unauthorized Practice
                 198Hk176 k. Chiropractors. Most Cited

Cases

**Health 198H ⚷192**

198H Health
  198HI Regulation in General
    198HI(B) Professionals
      198Hk191 Regulation of Professional Conduct; Boards and Officers
        198Hk192 k. In general. Most Cited Cases

Manipulation under anesthesia (MUA) was a "surgical procedure" excluded from the statutory scope of chiropractic, and thus, rules promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to perform MUA were invalid, where the American Medical Association's annual Current Procedural Terminology (CPT) Codebook listed MUA as a medical procedure in the surgery section of the Codebook. V.T.C.A., Occupations Code §§ 201.002(a)(4), 201.154; 22 TAC § 75.17(e)(2)(O).

**[3] Constitutional Law 92 ⚷2442**

92 Constitutional Law
  92XX Separation of Powers
    92XX(B) Legislative Powers and Functions
      92XX(B)4 Delegation of Powers
        92k2442 k. To non-governmental entities. Most Cited Cases

**Health 198H ⚷105**

198H Health
  198HI Regulation in General
    198HI(A) In General
      198Hk102 Constitutional and Statutory Provisions
        198Hk105 k. Validity. Most Cited Cases

Statute regarding scope of chiropractic practice in-

corporated the 2004 version of American Medical Association's (AMA) Current Procedural Terminology (CPT) Codebook in defining "surgical procedure," rather than the CPT Codebook in whatever manner the AMA might revise or amend it in the future, and thus, the Legislature did not improperly delegate its authority in a way that violated the separation-of-powers clause of the Texas Constitution. Vernon's Ann.Texas Const. Art. 3, § 1; V.T.C.A., Occupations Code § 201.002(a)(4).

**[4] Health 198H ⚷176**

198H Health
  198HI Regulation in General
    198HI(B) Professionals
      198Hk162 Unauthorized Practice
        198Hk176 k. Chiropractors. Most Cited Cases

**Health 198H ⚷192**

198H Health
  198HI Regulation in General
    198HI(B) Professionals
      198Hk191 Regulation of Professional Conduct; Boards and Officers
        198Hk192 k. In general. Most Cited Cases

In the absence of a separate notice of appeal filed by medical association, appellate court lacked jurisdiction to consider medical association's claim that the statutory scope of chiropractic did not include "diagnosing" a condition, as opposed to analyzing, examining, or evaluating it, where claim sought relief beyond that which association was afforded in the district court's judgment, which granted motions for partial summary judgment and rendered a take-nothing judgment as to association's claims for a declaration that the use of "diagnosis" in itself rendered applicable rule invalid. Rules App.Proc., Rule 25.1(c); 22 TAC § 75.17(d).

**[5] Health 198H ⚷176**

198H Health
    198HI Regulation in General
        198HI(B) Professionals
           198Hk162 Unauthorized Practice
               198Hk176 k. Chiropractors. Most Cited Cases

## Health 198H ⌕192

198H Health
    198HI Regulation in General
        198HI(B) Professionals
           198Hk191 Regulation of Professional Conduct; Boards and Officers
               198Hk192 k. In general. Most Cited Cases

    Rule promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to make certain diagnosis restricted any such diagnosis to the biomechanical condition of the spine or musculoskeletal system, and thus, the rule fell within the statutory scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b)(1); 22 TAC § 75.17(d)(1)(A).

## [6] Health 198H ⌕176

198H Health
    198HI Regulation in General
        198HI(B) Professionals
           198Hk162 Unauthorized Practice
               198Hk176 k. Chiropractors. Most Cited Cases

## Health 198H ⌕192

198H Health
    198HI Regulation in General
        198HI(B) Professionals
           198Hk191 Regulation of Professional Conduct; Boards and Officers
               198Hk192 k. In general. Most Cited Cases

    Although the definition of subluxation complex as used in rule promulgated by the Texas Board of Chiropractic Examiners (TBCE) allowing chiropractors to make certain diagnosis indicated that its existence might have functional or pathological consequences or that it might affect essentially every part of the body, the rule itself only allowed chiropractors to render an analysis, diagnosis, or other opinion regarding a subluxation complex of the spine or musculoskeletal system, and thus, the rule fell within the statutory scope of chiropractic. V.T.C.A., Occupations Code § 201.002(b); 22 TAC § 75.17(d)(1)(B).

West Codenotes
Held Invalid22 TAC § 75.17(a)(3), (e)(2)(O). **\*465** Jason D. Ray, Jennifer S. Riggs, Riggs, Aleshire & Ray, P.C., Joe H. Thrash, Assistant Attorney General, Environmental Protection & Administrative Law Division, Matt C. Wood, Baker Botts, L.L.P., Austin, TX, for appellant.

David F. Bragg, Law Offices of David F. Bragg, P.C., Bastrop, TX, Nancy K. Juren, Angela V. Colmenero, Assistant Attorney General, General Litigation Division, Donald P. Wilcox, Andrea Schwab, C.J. Francisco, Office of General Counsel, Texas Medical Association, Austin, TX, for appellee.

**\*466** Before Chief Justice JONES, Justices PEMBERTON and HENSON.

### *OPINION*
BOB PEMBERTON, Justice.
    We withdraw our opinion and judgment dated April 5, 2012, and substitute the following in its place. The motion for rehearing filed by appellee Texas Medical Association is denied.

    The Texas Board of Chiropractic Examiners (TBCE), its executive director, and the Texas Chiropractic Association appeal a final district court judgment invalidating portions of TBCE's recently adopted administrative rule

defining the scope of practice of chiropractic. *See* 22 Tex. Admin. Code § 75.17 (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice). The rule provisions at issue purport to authorize TBCE's licensees to perform procedures known as manipulation under anesthesia and needle electromyography, and to "diagnose" certain conditions. *See id.* § 75.17(a)(3), (c)(2)(D), (c)(3)(A), (d)(1)(A)–(B), (e)(2)(O). We will affirm the judgment in part and reverse and remand in part.

## BACKGROUND

Article XVI, section 31 of the Texas Constitution authorizes the Legislature to "pass laws prescribing the qualifications of practitioners of medicine in this State," with the caveat that "no preference shall ever be given by law to any schools of medicine." Tex. Const. art. XVI, § 31. In turn, the Legislature has enacted the Medical Practice Act, in which it has delegated broad authority to the Texas Medical Board (TMB) to regulate the "practice of medicine" in this state, mandated that a person cannot lawfully "practice medicine" without a TMB-issued license, and imposed rigorous education and training requirements as a prerequisite to licensing eligibility. *See* Tex. Occ.Code Ann. §§ 151.001–.056 (West 2004 & Supp. 2011) (Medical Practice Act); *id.* §§ 151.003(2) (providing that TMB "should remain the primary means of licensing, regulating, and disciplining physicians."), 152.001(a) (West Supp. 2011) (designating TMB as agency with power to regulate the practice of medicine), 153.001(3) (West 2004) (granting TMB the authority to adopt rules to regulate the practice of medicine), 155.001 (West 2004) (requiring license to practice medicine), 155.003 (West Supp. 2011) (setting forth requirements for license to practice medicine). The Legislature has defined "practicing medicine" under the Medical Practice Act as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions" by a person who either "directly or indirectly charges money or other compensation for those services" or publicly professes to be a physician or surgeon. *See id.* § 151.002(a)(13).

However, the Legislature has carved out of this broad definition of "practicing medicine"—and, thus, exempted from the Medical Practice Act's education, training, and licensing standards and the TMB's regulatory authority—a variety of other health-related fields on which it has imposed different legal requirements and regulations. *See id.* § 151.052. Such exemptions, our Texas high courts have reasoned, do not amount to an unconstitutional "preference ... to any school[ ] of medicine" to the extent the exempted treatment or method does not extend to the "whole body." *See Schlichting v. Texas State Bd. of Med. Exam'rs,* 158 Tex. 279, 310 S.W.2d 557, 564 (1958); *Ex parte Halsted,* 147 Tex.Crim. 453, 182 S.W.2d 479, 486 (1944). Among the exemptions, the Legislature **\*467** has included "a licensed chiropractor engaged strictly in the practice of chiropractic as defined by law." *See* Tex. Occ.Code Ann. § 151.052(a)(3). Chiropractors are currently regulated under chapter 201 of the occupations code, which defines the permissible scope of chiropractic practice, imposes its own set of educational and licensing requirements, and delegates authority to TBCE to administer the regime. *See id.* §§ 201.001–.606 (West 2004 & Supp. 2011).

The net effect of the statutory interplay is that a person licensed by TBCE as a chiropractor but not by the TMB to "practice medicine" (i.e., as a physician [FN1]) can lawfully do things that would otherwise constitute "practicing medicine" as long as he remains within the statutory scope of chiropractic under chapter 201. However, to the extent he exceeds the statutory scope of chiropractic, he would subject himself to the Medical Practice Act—and practice medicine unlawfully. *See id.* §§ 151.002(a)(13), 201.002; [FN2] *see also Teem v. State,* 79 Tex.Crim. 285, 183 S.W. 1144 (1916) (involving prosecution of chiropractor for unlawfully practicing medicine prior to Texas's legislative recognition and legalization of chiropractic). Another consequence of this statutory interplay is a long history of professional, scientific, or economic antagonism between chiropractors and the medical community, and resultant disputes, spanning all three branches of government, regarding where any legal line between chiropractic and the practice of medicine is or should be. Key participants in these disputes have included the two professional associa-

tions that are parties to this appeal, the Texas Chiropractic Association (TCA) and the Texas Medical Association (TMA), which advocate on behalf of the respective interests of chiropractors and physicians and their sometimes-competing views of patient welfare.

> FN1. *See* Tex. Occ.Code Ann. § 151.002(a)(12) (West Supp. 2011) ("physician" refers to a licensee under the Medical Practice Act).

> FN2. Conversely, physicians do not subject themselves to chapter 201 if their conduct comes within the statutory scope of chiropractic. *See id.* § 201.003(b) (West 2004) (Chapter 201 "does not limit or affect the rights and powers of a physician licensed in this state to practice medicine.").

Chiropractic was historically rooted in a theory that a wide range of human health problems stem from spinal misalignment—or a broader category of spinal disorders termed "subluxations"—and can be cured through manipulation of vertebrae.[FN3] At its 1949 inception, Texas's statutory regime defining and regulating chiropractic reflected**\*468** this traditional focus on ascertaining spinal problems and manipulating vertebrae as an intended means of cure.[FN4] However, over the ensuing decades, Texas chiropractors evidently came to engage in identifying and treating a wider range of musculoskeletal problems with a wider range of procedures or methods. In 1989, the Legislature saw fit to take account of these developments through amendments to the statutory definition of chiropractic practice that expanded the focus of chiropractic beyond the spine to the more general "biomechanics" of the "musculoskeletal system," and added somewhat broader language regarding the treatments or methods chiropractors could perform. *See* Act of May 12, 1989, 71st Leg., R.S., ch. 227, §§ 1–3, 1989 Tex. Gen. Laws 1005, 1005–06. [FN5] Although procedures entailing "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material" were expressly excluded from the practice, chiropractors were now permitted to use (1) "objective or subjective means to analyze, examine, or evaluate

the biomechanical condition of the spine and musculoskeletal system of the human body" and (2) "adjustment, manipulation, or other **\*469** procedures in order to improve subluxation or the biomechanics of the musculoskeletal system." *See id.* §§ 1, 3, 1989 Tex. Gen. Laws at 1005–06.

> FN3. While different cultures throughout history have employed manipulation of human bones and tissue as an intended means of improving health, David D. Palmer is typically credited with originating the modern theory of chiropractic in 1895, when he reportedly restored a man's hearing by using spinal manipulation. *See* Walter I. Wardwell, *Chiropractic: History & Evolution of a New Profession* 2 (1992); Erland Pettman, *A History of Manipulative Therapy,* 15 The Journal of Manual & Manipulative Therapy 165, 165–66 (2007); Judith Turner, *Gale Encyclopedia of Medicine: Chiropractic* (2006). Palmer concluded that misalignment or "subluxations" in the spine created pressure on or irritation of nerves that, in turn, could lead to various health problems, disease, or disability. Wardwell at 2; Pettman at 168. Based on this theoretical premise, Palmer sought to develop a procedure for adjusting misaligned vertebrae as a means of improving health and, eventually, founded this country's first chiropractic school, the Palmer School of Cure in Davenport, Iowa, currently known as the Palmer College of Chiropractic. *See* Palmer College of Chiropractic, http:// www. palmer. edu/ History (last visited Mar. 13, 2011). While today's chiropractors typically recognize the importance of other factors in disease causation, they still manipulate spines to correct musculoskeletal problems. *See* Wardwell at 2.

> FN4. The 1949 enactment defined the practice of chiropractic as follows:

> > Any person shall be regarded as practicing chiropractic within the meaning of this Act who

shall employ objective or subjective means without the use of drugs, surgery, X-ray therapy or radium therapy, for the purpose of ascertaining the alignment of the vertebrae of the human spine, and the practice of adjusting the vertebrae to correct any subluxation or misalignment thereof, and charge therefor, directly or indirectly, money or other compensation; or who shall hold himself out to the public as a chiropractor or shall use either the term "chiropractor," "chiropractic," "doctor of chiropractic," or any derivative of any of the above in connection with his name.

*See* Act of Apr. 21, 1949, 51st Leg., R.S., ch. 94, § 1, 1949 Tex. Gen. Laws 160, 160–61. The Texas Legislature first enacted a statute recognizing chiropractic and exempting it from the laws governing the practice of medicine in 1943. *See* Act of May 5, 1943, 48th Leg., R.S., ch. 359, §§ 1–17, 1943 Tex. Gen. Laws 627. The 1943 statute authorized chiropractors to treat the "spinal column, and its connecting tissues." *Id.* § 3, 1943 Tex. Gen. Laws at 628–29. The Court of Criminal Appeals later invalidated this law as an unconstitutional "preference" to chiropractic, reasoning that "the spinal column *and its connecting tissues* embraces the entire body and all organs thereof." *See Ex parte Halsted,* 147 Tex.Crim. 453, 182 S.W.2d 479, 486 (1944) (emphasis added). The current statutory regime defining and regulating chiropractic traces back to the 1949 enactment.

FN5. The amended definition provided:

A person shall be regarded as practicing chiropractic within the meaning of this Act if the person:

(1) uses objective or subjective means to ana-

lyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body;

(2) uses adjustment, manipulation, or other procedures in order to improve subluxation or the biomechanics of the musculoskeletal system; or

(3) holds himself out to the public as a chiropractor or uses the term "chiropractor," "chiropractic," "doctor of chiropractic," "D.C.," or any derivative of those terms in connection with his name.

Act of May 12, 1989, 71st Leg., R.S., ch. 227, § 1, 1989 Tex. Gen. Laws 1005. Excluded from the scope of chiropractic practice, however, were the provision of "surgery, drugs that require a prescription to be dispensed, x-ray therapy, or therapy that exposes the body to radioactive material." *See id.* § 3, 1989 Tex. Gen. Laws at 1006. Amendment proponents evidently touted the changes as necessary to modernize the "outdated" statutory definition to "reflect the education, training, and clinical expertise of chiropractors today" and to account for a study showing that "86.8% of the conditions treated by chiropractors can be classified as musculoskeletal problems" rather than spinal misalignment. *See* Senate Comm. on Health & Human Servs., Bill Analysis, Tex. S.B. 169, 71st Leg., R.S. (1989).

In the aftermath of the 1989 amendments, a number of controversies arose concerning whether particular examination or treatment procedures exceeded the statutory scope of chiropractic and, relatedly, the extent to which TBCE, by permitting chiropractors to perform them, was abetting unlawful encroachments upon the practice of medicine. Areas of dispute included the extent to which chiropractors could perform procedures entailing the in-

sertion of needles into the human body, such as acupuncture and a procedure known as needle electromyography, or "needle EMG." Simply described, needle EMG entails the insertion of needle electrodes into a patient's muscle and transmitting a small electric current as a means of evaluating nerve conductivity. Another subject of controversy was a treatment method known as manipulation under anesthesia, or "MUA." As the term suggests, MUA entails a chiropractor's manipulation of the musculoskeletal system while the patient is under general anesthesia so as to facilitate a greater range of motion than if the patient was feeling pain or resisting.[FN6]

> FN6. The anesthesia itself is evidently administered by a qualified health-care professional other than a chiropractor, including an anesthesiologist, a physician.

Against this backdrop, in 1995 the Legislature made several important amendments to the statutory scope of chiropractic. These included specifying that the treatment methods that defined the scope of chiropractic were "nonsurgical, nonincisive procedures, including but not limited to adjustment and manipulation, in order to improve the subluxation complex or the biomechanics of the musculoskeletal system," and likewise excluding "incisive or surgical procedures" from the scope of chiropractic practice. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 965, §§ 13, 18, 1995 Tex. Gen. Laws 4789, 4802–03 (current version at Tex. Occ.Code Ann. § 201.002(b)–(c)). The Legislature defined or described "incisive or surgical procedures" as follows:

> In this act, "incisive or surgical procedure" includes but is not limited to making an incision into any tissue, cavity or organ by any person or implement. It does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

*See id.* § 18, 1995 Tex. Gen. Laws at 4803. Additionally, the Legislature prohibited TBCE from "adopt[ing] a process to certify chiropractors to perform manipulation

under anesthesia." *See id.* § 19, 1995 Tex. Gen. Laws at 4803. These provisions were later codified in sections 201.002 and 201.154 of the occupations code. *See* Tex. Occ.Code Ann. §§ 201.002(a)(3) (" 'Incisive or surgical procedure' includes making an incision into any tissue, cavity or organ by any person or implement. The term does not include the use of a needle for the purpose of drawing blood for diagnostic testing."), .002(c) ( "The practice of chiropractic does not include ... incisive or surgical procedures."), .154 ("Notwithstanding any other provision of this chapter, the [TBCE] may not adopt a process to certify chiropractors to perform manipulation under anesthesia.").[FN7]

> FN7. TMA and TMB, in particular, place great emphasis on the legislative history of these amendments. Although versions of the changes had appeared in earlier bills considered by the Seventy–Fourth Legislature, the amendments' immediate origins were a House floor amendment that Representative Tom Uher proposed to add to a bill that had theretofore focused chiefly on rural health-care issues. Although containing the same limitation of treatment methods to "nonsurgical, nonincisive procedures" and exclusion of "incisive or surgical procedures" that ultimately appeared in the final, enacted version, Uher's amendment defined "incisive procedure" to "include[ ] entry into any tissue, cavity, or organ by any person or implement," subject to some broad exceptions:
>
> > ["incisive procedure"] does not include examination of the ear, nose, and throat, drawing blood for the purposes of diagnostic testing, or acupuncture or needle EMG if the chiropractor is certified to perform acupuncture or needle EMG under ... this Act.
>
> > Floor Amendment No. 9 to Tex. S.B. 673, at 2, 74th Leg., R.S. (May 22, 1995). Additionally, as the exceptions contemplated, other provisions of Uher's proposed amendment would

have required TBCE to adopt procedures and standards for "certifying" chiropractors to perform needle EMG and acupuncture. *See id.* at 6. The amendment imposed a similar mandate requiring TBCE to adopt procedures to certify chiropractors to perform MUA. *See id.* at 5.

In response to Uher's proposed amendment, then-Representative (later Senator) Kyle Janek, a physician, proposed to amend Uher's amendment to, in relevant part, (1) delete the exceptions for needle EMG and acupuncture in Uher's definition or description of "incisive" procedures; (2) delete the mandate that TBCE adopt processes for certifying chiropractors to perform needle EMG and acupuncture; and (3) invert the mandate that TBCE "shall adopt" processes for certifying chiropractors to perform MUA into an explicit prohibition that TBCE "shall not" adopt processes to "certify" chiropractors to perform MUA. *See* Floor Amendment No. 12 to Tex. S.B. 673, 74th Leg., R.S. (May 22, 1995). During the debate on these amendments, Representative Janek expressed his opinion that "[t]his amendment would take out any ability by the chiropractors to put needles in people." Debate on S.B. 673 on the Floor of the House, 74th Leg., R.S. (May 22, 1995) (statement of Rep. Janek) (transcript available from Senate Staff Services). The House of Representatives ultimately adopted Uher's amendment with Janek's modifications and a few additional, less sweeping changes and refinements. *See* Floor Amendment Nos. 9–14 to Tex. S.B. 673 (May 22–24, 1995). These changes, in turn, were ultimately enacted into law, as described above.

**\*470** In the aftermath of these changes to the statutory scope of chiropractic, TBCE issued what it styled as informal "statements" or "memoranda" advising its licensees of its view that the 1995 amendments had not rendered needle EMG, acupuncture, or MUA beyond the scope of chiropractic practice.[FN8] Meanwhile, the Attorney General issued opinions reasoning that, to the contrary, any procedure involving the insertion of a needle into the body (other than the excepted blood draw for diagnostic use) was "incisive" and thus excluded it from the scope of chiropractic.[FN9] Applying this reasoning, for example, the Attorney General opined that acupuncture was an "incisive" procedure and thus excluded from the scope of chiropractic. [FN10] Thereafter, the Legislature amended the statutory definition of acupuncture, which had previously been stated in terms of "the insertion of an acupuncture needle," *see* Act of May 30, 1993, 73d Leg., R.S., ch. 862, § 37, 1993 Tex. Gen. Laws 3374, 3400, to refer instead to "the *nonsurgical, nonincisive* insertion of an acupuncture needle." *See* Act of May 28, 1997, 75th Leg., R.S., ch. 1170, § 1, 1997 Tex. Gen. Laws 4418 (emphasis added) (current version at Tex. Occ.Code Ann. § 205.001(2)(A) (West Supp. 2011)); *see also* Tex. Att'y Gen. Op. No. DM–471 (1998) (concluding that the **\*471** 1997 amendment served to ensure that the practice of acupuncture would be within the practice of chiropractic, thereby superseding the prior opinion). But the broader underlying disagreement concerning the use of needles in chiropractic remained,[FN11] as did the controversy regarding whether chiropractors could perform MUA. However, due in part to the advisory nature of the administrative pronouncements and related jurisdictional and procedural limitations, the controversies eluded judicial resolution for several years.[FN12]

> FN8. *See* Tex. Bd. of Chiropractic Exam'rs, *Acupuncture, MUA, and Needle EMG* (ratified September 11, 1997, amended May 7, 1998, and May 1999); Tex. Bd. Chiropractic Exam'rs, *RE: Scope of Practice Clarification regarding Nerve Conduction Studies* (Jan. 25, 2002) (memo. to all Texas chiropractic licensees).

> FN9. *See, e.g.,* Tex. Att'y Gen. Op. No. DM–472, at 3 (1998).

> FN10. *See* Tex. Att'y Gen. Op. No. DM–415, at

4–6 (1996).

FN11. *See* Tex. Att'y Gen. Op. No. DM–472, at 6 (concluding that "the use of a needle ... for any purpose other than the drawing of blood for diagnostic purposes or the practice of acupuncture is not within the scope of practice of a licensed Texas chiropractor.").

FN12. *See O'Neal v. Texas Bd. of Chiropractic Exam'rs,* No. 03–03–00270–CV, 2004 WL 2027787, at *3, 2004 Tex.App. LEXIS 8254, at *9 (Tex.App.-Austin Sept. 10, 2004, no pet.) (mem. op.) (holding that suit by chiropractor against TBCE seeking declaration that needle EMG was within the scope of chiropractic practice did not present a justiciable controversy "where the ... Board indisputably agrees with the legal interpretation ... that [the chiropractor] seeks" and there was no more than speculation that it would change that view; also observing that Attorney General opinions did not in themselves present a justiciable controversy); *Continental Cas. Co. v. Texas Bd. of Chiropractic Exam'rs,* No. 03–00–00513–CV, 2001 WL 359632, at *1, 2001 Tex.App. LEXIS 2336, at *2 (Tex.App.-Austin Apr. 12, 2001, no pet.) (mem. op., not designated for publication) (holding court lacked jurisdiction to hear insurance company's claim that TBCE improperly authorized chiropractors to perform MUA and needle EMG because there was no justiciable controversy where company was not a licensee or otherwise subject to TBCE); *see also Texas Mut. Ins. Co. v. Stelzer,* No. 03–06–00675–CV, 2010 WL 142501, at *1–3, 2010 Tex.App. LEXIS 236, *2–10 (Tex.App.-Austin 2010, no pet.) (mem. op.) (rejecting carrier's challenge to workers' compensation division order requiring reimbursement of chiropractor for needle-EMG procedure; holding that division properly deferred to TBCE interpretation of statutory scope of practice and that underlying scope-of-practice dispute was not properly before the court).

The Legislature returned to chiropractic scope-of-practice issues in 2005 when TBCE came up for sunset review. Although it did not address either needle EMG or MUA through statutory amendments expressly mentioning either procedure, the Legislature did add a new description of the "surgical procedures" that were excluded from chiropractic:

> "Surgical procedure" includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

*See* Act of May 27, 2005, 79th Leg., R.S., ch. 1020, § 1, 2005 Tex. Gen. Laws 3464, 3465 (codified at Tex. Occ.Code Ann. § 201.002(a)(4)). The Legislature also mandated that TBCE "adopt rules clarifying what activities are included within the scope of the practice of chiropractic and what activities are outside of that scope," including "clearly specify[ing] the procedures that chiropractors may perform" and "any equipment and the use of that equipment that is prohibited." *See id.* § 8, 2005 Tex. Gen. Laws at 3466 (codified at Tex. Occ.Code Ann. §§ 201.1525–.1526). Among other implications, this rule-making mandate ensured that TBCE would issue scope-of-practice directives to its licensees in a form that opponents could test in court to determine whether they exceeded the underlying statutory scope of chiropractic. *See* Tex. Gov't Code Ann. § 2001.038 (West 2008) (creating cause of action for declaratory relief regarding "the validity or applicability of a rule" where "it is alleged that the rule or its threatened **\*472** application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff"); *see also Texas Orthopaedic Ass'n v. Texas State Bd. of Podiatric Med. Exam'rs,* 254 S.W.3d 714, 718 n. 1 (Tex.App.-Austin 2008, pet. denied) (recognizing physician's standing to challenge validity of podiatric board rule that included ankle within the definition of "foot" and ultimately holding that rule exceeded board's rule-making authority).[FN13]

preceding the 2005 amendments had criticized TBCE's "practice of issuing Board opinions" to define the scope of chiropractic and recommended that the agency be required to promulgate administrative rules instead. *See* Sunset Advisory Comm'n, Sunset Comm'n Decisions: Tex. Bd. of Chiropractic Exam'rs (May 2004) at 3; Sunset Advisory Comm'n: Tex. Bd. of Chiropractic Exam'rs, Staff Report, at 5 (Feb. 2004).

In response to this rule-making mandate, TBCE promulgated a "Scope of Practice" rule authorizing chiropractors to perform both needle EMG and MUA. *See* 22 Tex. Admin. Code § 75.17.[FN14] Invoking section 2001.038 of the Administrative Procedures Act, TMA sued TBCE [FN15] seeking declarations that various provisions of the scope-of-practice rule that permitted needle EMG and MUA were invalid because they exceeded the statutory scope of chiropractic and, therefore, constituted the unlawful practice of medicine.[FN16] TMA also asserted similar claims concerning a provision of the rule permitting chiropractors to "diagnose" certain conditions. In the alternative, if any of the challenged rule provisions proved to be within TBCE's statutory authority, TMA sought declarations that the underlying statutes granted chiropractors a "preference" over physicians in practicing "medicine" in violation of article XVI, section 31 of the Texas Constitution. TMA further sought injunctive relief barring enforcement of the challenged rules or, alternatively, statutes.

FN14. When it initially promulgated the scope-of-practice rule in 2006, TBCE purported to leave MUA unaddressed pending further rule-making while also emphasizing in the rule's preamble that MUA "ha[d] been part of the practice of chiropractic in Texas for more than 25 years" and that the agency was leaving this "status quo" undisturbed. *See* 31 Tex. Reg. 4613 (2006) (proposed Dec. 16, 2005), *amended in part by* 34 Tex. Reg. 4331 (2009) (proposed Jan. 2, 2009) (former 22 Tex. Admin. Code § 75.17).

This former version of the rule was the subject of the interlocutory jurisdictional appeal we addressed in *Texas Board of Chiropractic Examiners v. Texas Medical Association,* 270 S.W.3d 777, 780–83 (Tex.App.-Austin 2008, no pet.). During the pendency of the litigation, TBCE amended the text of the rule to include an explicit authorization for chiropractors to perform MUA, discussed above. *See* 34 Tex. Reg. 4331 (2009) (codified at 22 Tex. Admin. Code § 75.17) (proposed Jan. 2, 2009).

FN15. TMA also named TBCE's executive director as a defendant, and he appears in his official capacity as a party to this appeal. Because any distinction between the two parties is not material to this appeal, for convenience we will use "TBCE" hereinafter to refer both to the agency itself and the agency and executive director collectively.

FN16. TMA also sought a declaration that TBCE had failed to provide an adequate "reasoned justification" for the challenged rules, as required by the Administrative Procedure Act. These claims are not at issue on appeal.

On petition of TMA, the TMB was joined in the suit as a plaintiff. After TBCE was unsuccessful in challenging TMA's standing, TCA intervened as a defendant and also asserted its own affirmative claims for declarations that each of the challenged rules were within the statutory scope of chiropractic. In the alternative, TCA sought a declaration that a statutory definition of "surgical" added by the Legislature in the 2005 Sunset legislation was unconstitutional on grounds that included **\*473** improper delegation of legislative authority to a private entity. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 465–75 (Tex.1997).

TMA, joined by TMB (hereafter, the "Physician Parties"), sought traditional partial summary judgment on

their claims seeking to invalidate, as beyond the statutory scope of chiropractic, TBCE's rules authorizing chiropractors to perform needle EMG and MUA. The district court granted the motion as to these claims.

In the same motion, the Physician Parties similarly sought summary judgment invalidating TBCE's rule permitting chiropractors to make "diagnoses" as beyond the statutory scope of chiropractic. TBCE and TCA (hereafter the "Chiropractor Parties") countered with a cross-motion for partial summary judgment dismissing the Physician Parties' claims challenging whether TBCE's rules permitting "diagnoses" were within the statutory scope of chiropractic.[FN17] The district court denied the Physician Parties' motion and granted the Chiropractor Parties' motion in part "as to the Chiropractic Board's use of the word 'diagnosis' in its rule." "However," the court emphasized, it "reserve[d] judgment regarding 'diagnosis' as it related to *scope of practice*." (Emphasis in original.) Following a second round of summary-judgment filings, however, the district court granted summary judgment for the Physician Parties as to a narrower portion of the "diagnosis" rule than they had challenged previously.

> FN17. The district court's final judgment also references cross-motions purportedly filed by the Chiropractor Parties concerning the needle-EMG and MUA issues. However, no such motions appear in the appellate record, nor does the docket sheet reflect that any such motions were ever filed.

In the meantime, the Attorney General had intervened on behalf of the State of Texas to defend against each side's alternative constitutional claims, *see* Tex. Civ. Prac. & Rem.Code Ann. § 37.006(b) (West 2008), and the Attorney General and various other parties had filed pleadings attacking those claims. After the district court indicated its intended disposition of the second round of partial summary-judgment motions, but before it signed an order, TCA non-suited its affirmative claims for relief.

In light of TCA's non-suit, and concluding that the Physician Parties' "constitutional challenges" had been rendered "moot" by its summary-judgment rulings, the district court rendered a final judgment incorporating its summary-judgment rulings and declaring the aforementioned rule provisions concerning needle EMG, MUA, and "diagnoses" "invalid and void." Both of the Chiropractor Parties filed notices of appeal.

## ANALYSIS

In five issues on appeal, TCA challenges the district court's judgment invalidating TBCE rules regarding needle EMG, MUA, and "diagnoses." TBCE brings three issues challenging only the portions of the judgment invalidating the needle-EMG and MUA rules.

### Standard of review

The challenged portions of the district court's judgment are predicated on its rulings granting or denying motions for partial summary judgment. We review the district court's summary judgments de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter **\*474** of law. Tex.R. Civ. P. 166a(c). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.,* 164 S.W.3d at 661; *Knott,* 128 S.W.3d at 215. When parties file cross-motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we review the summary-judgment evidence supporting both motions and determine all questions presented and preserved. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). We "should render the judgment that the trial court should have rendered." *Id.*

In this case, the parties' respective entitlements to summary judgment turn principally on whether the rules in question were within TBCE's statutory authority to adopt.

To resolve such questions, we consider whether each rule: (1) contravened specific statutory language; (2) ran counter to the general objectives of the underlying statute, chapter 201 of the occupations code; or (3) imposed additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions. *See City of Garland v. Public Util. Comm'n,* 165 S.W.3d 814, 819 (Tex.App.-Austin 2005, pet. denied).

Statutory construction presents a question of law that we review de novo. *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn,* 209 S.W.3d 83, 85 (Tex.2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009) (op. on reh'g) (citing *Shumake,* 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson,* 209 S.W.3d 644, 651–52 (Tex.2006)). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired; otherwise we construe the words according to their plain and common meaning unless a contrary intent is apparent from the context. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex.2008). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010); *Shook v. Walden,* 304 S.W.3d 910, 917 (Tex.App.-Austin 2010, no pet.). Our analysis of the statutory text may also be informed by the presumptions that "the entire statute is intended to be effective" and that "a just and reasonable result is intended," *see* Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and consideration of such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, "common law or former statutory provisions, including laws on the same or similar subjects," "consequences of a particular construction," and the enactment's

"title," *id.* § 311.023(1)-(5), (7) (West 2005). However, only when the statutory text is ambiguous—i.e., susceptible to more than one reasonable interpretation—"do we 'resort to rules of construction or extrinsic aids.' " *See Entergy Gulf States, Inc.,* 282 S.W.3d at 437 (quoting *In re Estate of Nash,* 220 S.W.3d 914, 917 (Tex.2007)).

As the Chiropractor Parties emphasize, in certain circumstances courts may be required to defer to an administrative agency's construction of its own statutory authority. *See* **\*475***Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 624–25 (Tex.2011). But these principles apply only where the statute in question is ambiguous and only to the extent that the agency's interpretation is one of those reasonable interpretations. *See id.* "Consequently, to determine whether this rule of deference applies, a reviewing court must first make a threshold determination that the statute is ambiguous and the agency's construction is reasonable—questions that turn on statutory construction and are reviewed de novo." *City of Waco v. Texas Comm'n on Envtl. Quality,* 346 S.W.3d 781, 800 (Tex.App.-Austin 2011, pet. filed) (citing *Texas Citizens,* 336 S.W.3d at 625). Additionally, this Court has recognized that these principles of deference may be subject to further qualifications where the subject matter is not within any specialized expertise of the agency, *see id.* (citing *Texas Citizens,* 336 S.W.3d at 630), and where "a nontechnical question of law" is involved, *see Rogers v. Texas Bd. of Architectural Exam'rs,* ——S.W.3d ——, ——, 2011 WL 3371543 (Tex.App.-Austin 2011, no pet. h.) (citing *Rylander v. Fisher Controls Int'l, Inc.,* 45 S.W.3d 291, 302 (Tex.App.-Austin 2001, no pet.)).

To the extent our analysis turns on administrative construction of the rules themselves, we defer to an agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent with the text of the rule or underlying statute. *See Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex.1991); *Tennessee Gas Pipeline Co. v. Rylander,* 80 S.W.3d 200, 203 (Tex.App.-Austin 2002, pet. denied). We construe administrative rules in the same manner as statutes because

they have the force and effect of statutes. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex.1999).

**Needle EMG**

TCA's second issue and TBCE's first two issues challenge the district court's summary judgment invalidating rules relating to needle EMG.

As previously noted, the statutory scope of chiropractic practice includes "using objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body," *see* Tex. Occ.Code Ann. § 201.002(b)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(A) (tracking the same language in TBCE's scope-of-practice rule), but excludes any "incisive or surgical procedure," *see* Tex. Occ.Code Ann. § 201.002(c)(1); *see also* 22 Tex. Admin. Code § 75.17(a)(2)(A), (c)(4), (d)(2), (e)(3) (tracking same exclusion in scope-of-practice rule), a term that:

includes making an incision into any tissue, cavity, or organ by any person or implement....

[but] does not include the use of a needle for the purpose of drawing blood for diagnostic testing.

Tex. Occ.Code Ann. § 201.002(a)(3) (formatting altered for emphasis).

In its scope-of-practice rule, TBCE construed and defined the term "incision"—i.e., that which characterizes an "incisive procedure"—as "[a] cut or a surgical wound; also, a division of the soft parts made with a knife or hot laser." 22 Tex. Admin. Code § 75.17(b)(3). TBCE further determined that the insertion of a needle into the human body might or might not "cut" the body or be "incisive" in the sense of the exclusion, or be "surgical," and promulgated a standard, found in subparagraph (a)(3) of the rule, for distinguishing "incisive" or "surgical" needle insertions from non-incisive and non-surgical ones:

(3) Needles may be used in the practice of chiropractic

under standards set **\*476** forth by the [TBCE] but may not be used for procedures that are incisive or surgical.

(A) The use of a needle for a procedure is incisive if the procedure results in the removal of tissue other than for the purpose of drawing blood.

(B) The use of a needle for a procedure is surgical if the procedure is listed in the surgical section of the CPT Codebook.

*Id.* § 75.17(a)(3). The "CPT Codebook" is defined elsewhere in the rule as "the American Medical Association's annual Current Procedural Terminology Codebook (2004) .... adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services as Level I of the common procedure coding system." *See id.* § 75.17(b)(2).

Applying this standard, TBCE concluded that needle EMG was neither an "incisive" nor "surgical" procedure and, thus, was not excluded from the scope of chiropractic practice. Premised on that conclusion, TBCE promulgated two additional rule provisions addressing needle EMG specifically. The first, paragraph (c)(2)(D), listed "electro-diagnostic testing" among several examples of testing and measurement procedures that chiropractic licensees were permitted to use in evaluating or examining patients. *See id.* § 75.17(c)(2)(D). In the second provision, paragraph (c)(3)(A), TBCE imposed certification and supervision requirements on any licensees who administered "electro-neuro diagnostic testing" that varied according to whether the testing was "surface (non-needle)" or involved the use of needles. *See id.* § 75.17(c)(3)(A). The import or effect of paragraphs (c)(2)(D) and (c)(3)(A), as the parties agree, was that chiropractors with specified training and certification could utilize needle EMG in evaluating or examining patients.

In their live petition and summary-judgment motions, the Physician Parties challenged the validity of the two rule provisions specifically addressing needle

EMG—75.17(c)(2)(D) and (c)(3)(A)—plus the general standard regarding use of needles—75.17(a)(3)—based on the assertions that each rule permitted chiropractors to perform needle EMG, and needle EMG was an "incisive" procedure excluded from the statutory scope of chiropractic. The district court granted the motions and rendered judgment declaring that "22 Tex. Admin. Code §§ 75.17(a)(3), 75.17(c)(2)(D) and 75.17(c)(3)(A), concerning needle electromyography, are ... invalid and void." The Physician Parties did not challenge, and the district court did not invalidate, TBCE's definition of "incision" as a "cut," "surgical wound," or "division of the soft parts." *See id.* § 75.17(b)(3).

In holding that the three rules improperly permitted chiropractors to perform an "incisive" procedure, the district court, the Chiropractor Parties assert, misconstrued unambiguous statutory language or at least erred in failing to give required deference to TBCE's reasonable construction of ambiguous language. They concede that the last sentence of occupations code section 201.002(a)(3)—"[an incisive or surgical procedure] does not include the use of a needle for the purpose of drawing blood for diagnostic testing"—negatively implies that the use of a needle to draw blood for diagnostic testing would otherwise have been considered an "incisive" procedure in the view of the Legislature, as otherwise the exception created in that sentence would have amounted to a redundant nullity. *See DeQueen,* 325 S.W.3d at 638 ("Courts 'do not lightly presume that the Legislature may have done a useless act.' " (quoting **\*477***Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex.1998)); *Sultan v. Mathew,* 178 S.W.3d 747, 751 (Tex.2005) ("We must avoid, when possible, treating statutory language as surplusage."). But the fact that this procedure involving use of a needle would be considered "incisive," the Chiropractor Parties insist, does not imply that *every* procedure involving the insertion of a needle into the human body necessarily is. They urge that any such construction or inference ignores the Legislature's 1997 amendments to the statutory definition of acupuncture. In those amendments, as previously explained, the Legislature, with evident reference to its prior exclusion of "incisive" and

"surgical" procedures from the practice of chiropractic, changed the definition of acupuncture to refer to "the nonsurgical, nonincisive insertion of an acupuncture needle ... to specific areas of the human body." *See* Act of May 28, 1997, § 1, 1997 Tex. Gen. Laws at 4418 (codified at Tex. Occ.Code Ann. § 205.001(2)(A)); Tex. Att'y Gen. Op. No. DM–471 (1998) (observing that 1997 amendment responded to prior opinion concluding that acupuncture was an "incisive" procedure outside the scope of chiropractic). By expressly contemplating, in a related statute, that the insertion of a needle into the human body may be "nonincisive" (not to mention "nonsurgical"), the Legislature, in the Chiropractor Parties' view, confirmed that needle insertions may either be "incisive" or "nonincisive" within the meaning of the statutory exclusion from chiropractic. And it follows, they add, that the mere fact a needle insertion creates some degree of hole or separation of tissue along the length of the inserted instrument, as all needle insertions will, cannot in itself be the criterion that distinguishes an "incisive" needle insertion from a "nonincisive" one within the Legislature's contemplation.

The Chiropractor Parties add that TBCE's standard for distinguishing "incisive" from "nonincisive" needle use, which focuses on whether the procedure results in the removal of tissue, *see* 22 Tex. Admin. Code § 75.17(a)(3), is consistent with this statutory framework. They reason that (1) if using needles for blood draws for diagnostic use is an "incisive" procedure (again, the negative implication of the Legislature's exception of blood draws from "incisive or surgical" procedures, *see* Tex. Occ.Code Ann. § 201.002(a)(3)), (2) but needle insertion in itself cannot be what makes the procedure "incisive" (as implied by the statutory definition of acupuncture as entailing "nonincisive" needle insertion into the body, *see* Tex. Occ.Code Ann. § 205.001(2)(A)), (3) then the "incisive" character of a needle blood draw must relate to the fact that it results in the separation and removal of the blood itself or, more generally, tissue, as blood is considered to be a form of connective tissue. That distinguishing feature, the Chiropractor Parties assert, is properly reflected in TBCE's standard for determining "incisive" needle use. In striking down that standard, they argue, the district court over-

looked the unambiguous text of the relevant statutes, or at least failed to give required deference to TBCE's reasonable construction of ambiguous text. And the same error, they add, led the district court to improperly strike down the two rules permitting needle EMG, as it is undisputed that the procedure does not entail the removal of tissue.

The Physician Parties' core contention in response, as it was in their summary-judgment motions, is that occupations code section 201.002(a)(3)'s express exception for needle blood draws for diagnostic purposes from the "incisive or surgical" procedures excluded from chiropractic reflects the Legislature's intent that all other procedures involving needle usage, including **\*478** needle EMG, be excluded from the scope of chiropractic practice. Such a construction, they reason, is necessary both to give effect to the exclusion, *see Liberty Mut. Ins. Co. v. American Emp'rs Ins. Co.,* 556 S.W.2d 242, 245 (Tex.1977) (in context of construing a contract, observing "the purpose of an exclusion is to take something out ... that would otherwise have been included in it"), and by the canon of statutory construction known as *expressio unius est exclusio alterius*—literally "the specific mention of one is the exclusion of the other"—under which we would presume that the Legislature's explicit mention or inclusion of one thing signals its intention to exclude the other or the alternative thing. *See Johnson v. Second Injury Fund,* 688 S.W.2d 107, 108–09 (Tex.1985) (citing *Bryan v. Sundberg,* 5 Tex. 418, 422–23 (Tex.1849)). They similarly rely on the more general principle that courts must assume that the Legislature chose its words carefully and deliberately, and included or excluded particular words purposefully. *See, e.g., DeQueen,* 325 S.W.3d at 635; *USA Waste Servs. of Houston, Inc. v. Strayhorn,* 150 S.W.3d 491, 494 (Tex.App.-Austin 2004, pet. denied).

In further support, the Physician Parties emphasize the legislative history of the 1995 amendments that added the exclusion and description of "incisive or surgical procedures." In their view, this history confirms the Legislature's intent to forbid chiropractors from performing needle EMG and any other procedure entailing the insertion of needles into the human body. In reply, the Chiropractor

Parties remind us that statutory construction turns not on the statements of individual legislators but on the text of the statutes the Legislature collectively enacts. *See Ojo v. Farmers Grp., Inc.,* 356 S.W.3d 421, 435 (Tex.2011) (noting that courts should apply "text-centric model" when construing statutes, using extrinsic aids such as legislative history only when text is not clear). And that statutory text, they urge, stops well short of evidencing intent to outlaw needle EMG by chiropractors, especially considering that the procedure has been performed by Texas chiropractors since the early 1990s and been a frequent concern of the medical community for much of that time. If the Legislature had truly meant to prohibit chiropractors from performing needle EMG, they suggest, it presumably would have said so more clearly and directly instead of condemning "incisive" procedures and delegating power to TBCE to promulgate scope-of-practice rules.

As for the implications of the acupuncture statute's reference to "nonsurgical, nonincisive" needle insertions, the Physician Parties first suggest that this language is simply irrelevant because chiropractors acting within the scope of their license are exempted from the acupuncture statutes. [FN18] They similarly question the premise of the Chiropractor Parties (and the Attorney General) [FN19] that the definition of acupuncture as "nonsurgical" and "nonincisive" under the statutes regulating its practice necessarily resolves whether or not it is "incisive" under the meaning of the chiropractic statutes. However, the Physician Parties have also relied on the narrower point (so to speak) that the types of needles used in needle EMG have physical**\*479** features that materially distinguish them from those used in acupuncture.

> FN18. *See* Tex. Occ.Code Ann. § 205.003 (West 2004) (government code chapter 205, the chapter regulating acupuncture, "does not apply to a health care professional licensed under another statute and acting within the scope of the license").

> FN19. *See* Tex. Att'y Gen. Op. No. DM–471 (1998); Tex. Att'y Gen. Op. No. DM–472 (1998).

In support of their summary-judgment motion, TMA presented the affidavit of Dr. Sara G. Austin, a physician, who compared the characteristics of acupuncture needles versus those used in needle EMG. Attached to her affidavit were photographs comparing what she averred were "a standard needle used in performing acupuncture" alongside "two of the types of needles I use in performing EMG." The photographs reflected that the two needle-EMG needles were longer and somewhat thicker than the acupuncture needle, with one of the needle-EMG needles appearing to extend four or five times the length of the acupuncture needle.[FN20] Austin further testified that the tips of the types of needles used in needle EMG "typically are beveled"—i.e., have an angled side or end, characteristic of a blade or cutting edge [FN21]—and, consequently, "incise tissue" (in the sense of cutting it like a blade) when they are inserted during the EMG examination.[FN22] She did not, however, speak directly to the types of tips found on acupuncture needles.

FN20. The photographic depictions show the acupuncture needle as approximately three-quarters to one inch long, one of the needle-EMG needles appears to be roughly one-and-a-half inches long, and the remaining needle-EMG needle is approximately four or five inches long. However, Austin indicated that while the photographs accurately depicted the needles' comparative sizes, shapes, and configurations, the "photocopying process" had created some differences from their actual sizes.

FN21. Austin also referenced an attached magnified image of a needle tip showing such an edge.

FN22. Austin did not purport to opine as to whether the needle would be "incisive" in the sense that term is used in the statutory exclusion. To the extent her testimony might be so construed, we note that the testimony would amount to an incompetent legal conclusion. *See LMB,*

*Ltd. v. Moreno,* 201 S.W.3d 686, 689 (Tex.2006) (holding that bare legal conclusion is not competent summary-judgment evidence); *see also City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009) (observing that unsupported legal conclusions are not competent evidence and may not support a judgment even in the absence of an objection).

The Physician Parties portray this summary-judgment evidence as establishing conclusively that needle-EMG needles characteristically have a beveled or cutting edge. Consequently, they reason, the insertion of such a needle into the human body effects a "cut" or "incision" and, thus, is an "incisive procedure" within the meaning of the statutory exclusion. In reply, the Chiropractor Parties emphasize Dr. Austin's deposition testimony, which they presented with their summary-judgment response. During her deposition, Austin acknowledged that while she used needle-EMG needles that have a beveled, blade-like edge, some other practitioners performing the procedure instead used needles having a tapered or blunt edge.

[1] Our analysis of the parties' competing contentions begins, in the first instance, with a threshold question of whether the Legislature intended the term "incisive" procedure as used in the statutory exclusion to be afforded its ordinary meaning or a somewhat narrower technical meaning. *See City of Rockwall,* 246 S.W.3d at 625–26. Especially in the context of health care, "incisive" is used to refer to the act of cutting, usually tissue. *See Stedman's Medical Dictionary* 700 (5th Unabridged Lawyers' ed. 1982) (defining "incisive" as "cutting; having the power to cut"); *Dorland's Illustrated Medical Dictionary* 940 (31st ed. 2007) (defining "incisive" as "having the power or quality of cutting," and listing under its heading for "incision" various types of **\*480** medical tissue incisions). By contrast, the ordinary meaning of "incisive" embraces not only the concept of cutting, but also "piercing" ("run[ning] into or through as a pointed instrument ... does, stab [bing] ...[,] mak[ing] a hole in or through") and "penetrating" ("pass[ing] into or through").[FN23] A needle insertion into the human body would quite obviously satisfy the ordinary

meaning of "incisive," as such a procedure would plainly "penetrate" tissue, if not also "pierce" it. But it is a closer question whether a needle insertion likewise "cuts" tissue and meets the narrower, technical definition.

> FN23. *See Webster's Third New Int'l Dictionary* 1142 (defining "incisive" as "having a cutting edge or a piercing point"), 1670 (defining "penetrate"), 1712 (defining "pierce") (2002); *American Heritage College Dictionary* 687 (defining "incisive" as penetrating), 1010 (defining "penetrate" as "to enter or force a way into; pierce"), 1035 (defining "pierce" as "to cut or pass through with or as if with a sharp instrument; stab or penetrate") (2000).

In this case, our choice between the ordinary and technical meaning of "incisive" has been narrowed somewhat by TBCE's rule provision, unchallenged by the Physician Parties and undisturbed by the district court's judgment, construing the related term "incision." *See* Tex. Occ.Code Ann. § 201.002(c) (providing that " '[i]ncisive or surgical procedure' includes making an *incision* into any tissue, cavity, or organ by any person or implement ...) (emphasis added). Consistent with the technical meaning of "incisive," TBCE has defined "incision" to mean, in relevant part, "a cut or surgical wound." *See* 22 Tex. Admin. Code § 75.17(b)(3). Consequently, whether the use of a needle is "incisive" so as to be excluded from chiropractic turns on whether such use "cuts" or makes a "surgical wound" "into any tissue, cavity, or organ." And, in light of this rule definition, our analytical focus must shift to determining whether the three invalidated rules permitting needle EMG are premised on a construction and application of "cut" that is clearly erroneous or inconsistent with the rule's text and underlying statutes. *See* *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex.2011) ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, ... we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."); *Rodriguez,* 997 S.W.2d at 254 ("While we defer to the Commission's interpretation of

its own regulation, we cannot defer to an administrative interpretation that is 'plainly erroneous or inconsistent with the regulation.' " (quoting *Gulf State Utils. Co.,* 809 S.W.2d at 207)).

Here the summary-judgment evidence becomes relevant to our analysis. Although the summary-judgment evidence falls short of establishing conclusively that *all* needle-EMG needles have a beveled, blade-like edge, Dr. Austin's testimony remains undisputed that at least *some* of the types of needles used by practitioners in performing that procedure do have that feature. And the very purpose of having such an edge on a needle, as Austin further explained, is to make the needle cut or slice through tissue, like a blade or knife. This evidence conclusively establishes that at least some types of needles used in needle EMG "cut" into tissue under any conceivable definition of that term. In its ordinary usage, "cut" with reference to something being inserted into or applied to tissue means "to penetrate with or as if an edged instrument" or to separate into parts with a sharp instrument. *See Webster's Third New Int'l Dictionary* 560 (2002) (defining "cut" as "to penetrate with or as if with an edged instrument .... **\*481** make an incision in .... to separate into parts"); *American Heritage College Dictionary* 341 (2000) (defining "cut" as "to penetrate with a sharp edge; .... [t]o separate into parts with or as if with a sharp-edged instrument; sever"); *Random House Dictionary of the English Language* 494 (2d ed. 1987) (defining "cut" as "to penetrate with or as if with a sharp-edged instrument or object ... to divide with or as if with a sharp-edged instrument or object"). We also observe that in the context of health care, needles with beveled edges are said to "cut" or have a "cutting edge," as contrasted with differently edged needles that do not "cut." *Compare Dorland's* at 1255 (defining "cope needle" as "blunt-ended hook like needle with a concealed cutting edge and snare" *and* "Hagedorn's needles" as "surgical needles that are flat from side to side with a straight, cutting edge near the point") *with id.* (defining "spatula needle" as "minute needle with a flat or slightly curved concave surface that does not cut or pierce"). Further, while the question of whether acupuncture is within the chiropractic scope of practice is not be-

fore us, nor does the summary-judgment evidence address whether or not acupuncture needles have a beveled edge, this distinction between beveled, "cutting" needles and other kinds that do not "cut" would perhaps explain how, in the Legislature's view, acupuncture needles would be capable of being inserted into the body in a "nonincisive" and "nonsurgical" manner. *See* Tex. Occ.Code Ann. § 205.001(2)(A).

In contending that needle EMG is not a "cutting" or "incisive" procedure, the Chiropractor Parties ultimately rely upon an asserted distinction predicated on the size of a needle's cutting edge as compared to that of scalpels, knives, or other larger cutting instruments. As they explain their position on appeal, "[a] 'cut' or 'wound' involves an appreciable separation of tissue in at least two directions, as when a knife cuts into and along the body at the same time," (citing dictionary definition of "cut" as "an opening made with an edged instrument"), "[b]ut a needle entry typically creates an appreciable separation of tissue in only one direction—along the length of the needle—because the width of most needles is small." Consequently, in their view, "[t]he resulting hole is not obviously a 'cut,' " creating "a conceptually difficult question of interpretation: when does a needle entry qualify as a 'cut' or 'wound' (and hence become 'incisive')," answered in turn by TBCE's "rational" conclusion focused on tissue removal. But these musings about needle points ultimately miss the point—regardless of the relative size of the instrument, or whether its effects on tissue are "obvious," it remains that the insertion of a needle EMG needle having a beveled edge would "cut" tissue, as it is designed to do, under any definition of that term. It would, therefore, be an "incisive" use of a needle. Consequently, the Chiropractor Parties' construction is contrary to the text of its own definition of "incision" as well as the underlying statutes. *See Gulf State Utils. Co.,* 809 S.W.2d at 207; *City of Garland,* 165 S.W.3d at 819.

It follows that the three challenged rule provisions purport to authorize chiropractors to perform "incisive" procedures that are beyond chiropractic's statutory scope—75.17(c)(2)(D) and 75.17(c)(3)(A) authorize chi-

ropractors to perform needle EMG, and 75.17(a)(3) states that a procedure involving a needle is "incisive" only if it results in removal of tissue. In so doing, these rules exceed the statutory limits of chiropractic by, at a minimum, authorizing chiropractors to perform needle EMG with beveled-edged needles that are made to cut or incise tissue. They were, accordingly, beyond TBCE's statutory authority and void. *See* **\*482***Gulf States Utils. Co.,* 809 S.W.2d at 207. The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning needle EMG.

**MUA**

[2] TCA's first and TBCE's third issue challenge the district court's summary judgment invalidating a provision of the scope-of-practice rule, subsection 75.17(e)(2)(O), that included MUA among the treatment procedures or services that chiropractors are expressly authorized to perform. *See* 22 Tex. Admin. Code § 75.17(e)(2)(O). As previously noted, chiropractors are generally authorized to "perform[ ] nonsurgical, nonincisive procedures, including adjustment and manipulation, to improve the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ.Code Ann. § 201.002(b)(2); *see also* 22 Tex. Admin. Code § 75.17(a)(1)(B) (tracking the same language in TBCE's scope-of-practice rule). In their summary-judgment motions, the Physician Parties sought to invalidate the rule's authorization of MUA on two basic grounds. First, they asserted that the authorization was contrary to the prohibition in occupations code section 201.154 barring TBCE from "adopt[ing] a process to certify chiropractors to perform manipulation under anesthesia." *See* Tex. Occ.Code Ann. § 201.154. Second, the Physician Parties urged that MUA was a "surgical" procedure excluded from the scope of chiropractic. *See id.* § 201.002(b)(2), (c)(1). In this regard, they relied on the definition or description of "surgical procedure" added by the Legislature in 2005: " '[s]urgical procedure' includes a procedure described in the surgery section of the common procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services." *Id.* § 201.002(a)(4). The district court did not specify in its

summary-judgment order and judgment the ground or grounds on which it relied.[FN24] The Chiropractor Parties challenge both grounds on appeal, which they perceive to be related to one another.

> FN24. Although both sides reference explanatory letters from the district court that preceded its summary-judgment order and judgment, they acknowledge that the letters do not impact the standard or scope of our appellate review. *See Cherokee Water Co. v. Gregg County Appraisal Dist.,* 801 S.W.2d 872, 878 (Tex.1990) (holding that trial court's letter to parties was not competent evidence of the trial court's basis for judgment); *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (refusing to consider trial court's letter to parties explaining reasons why judge would grant summary judgment).

Regarding section 201.154's ban on TBCE "adopt[ing] a process to certify chiropractors to perform [MUA]," the Chiropractor Parties insist that a ban on "certifying" chiropractors to perform MUA means only that TBCE cannot create some sort of advanced training or "certification" process beyond licensing minimums as a prerequisite to being allowed to perform MUA, but does not prohibit chiropractors from performing the procedure itself. They add that such a ban further implies that MUA itself could not be banned anywhere in chapter 201, as otherwise section 201.154's "certification" ban would be redundant surplusage. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) (citing general rule that courts should avoid statutory constructions that create surplusage or fail to give effect to provisions).

As for the implications of occupations code 201.002(a)(4)'s definition or description of "surgical procedure" (i.e., the language added in 2005), TBCE in its scope-of-practice rule elaborated that "the common**\*483** procedure coding system as adopted by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services," referenced in the statute, referred to "the American Medical Association's annual Current Procedural Terminology Codebook (2004)," which "has been adopted by the Centers for Medicare and Medicaid Services ... as Level 1 of the common procedure coding system." *See* 22 Tex. Admin. Code § 75.17(b)(2) (defining "CPT Codebook"). Simply described, the CPT Codebook identifies several thousand medical procedures and services and provides a five-digit code and brief description for each. The American Medical Association began the development of the CPT coding system in 1966 to—

> encourage the use of standard terms and descriptors to document procedures in the medical record; help[ ] communicate accurate information on procedures and services to agencies concerned with insurance claims; provide[ ] the basis for a computer oriented system to evaluate operative procedures; and contribute [ ] basic information for actuarial and statistical purposes.

American Medical Association, *CPT Coding Billing & Insurance, CPT Application Process FAQ,* http:// www. ama- assn. org/ ama/ pub/ physician- resources/ solutions- managing- your- practice/ coding- billing- insurance/ cpt/ cpt- process- faq/ code- becomes- cpt. page (last visited Mar. 13, 2012). Currently, the CPT is used "to report medical procedures and services under public and private health insurance programs ... [and] is also used for administrative management purposes such as claims processing and developing guidelines for medical care review." *Id.* The AMA updates the CPT each year, effective January 1, to reflect new developments in medical procedures and services. *See id.; Practice Mgmt. Info. Corp. v. American Med. Ass'n,* 121 F.3d 516, 517 (9th Cir.1997). The summary-judgment record contains excerpts from what appears to be a CPT Codebook for 2007,[FN25] one of the versions in effect during the course of this litigation.

> FN25. *See* American Medical Association, *Current Procedural Terminology (CPT®) 2007* (4th ed. 2006).

The five-digit codes in the CPT are divided into three categories: Category I covers medical services and procedures; Category II includes codes related to performance measurement; and Category III lists the temporary codes for new and emerging technology. Category I is further divided into six sections—"evaluation," "anesthesia," "radiology," "pathology," "medicine," and, of relevance here, "surgery." *See* American Medical Association *Current Procedural Terminology (CPT®) 2007* xiv (4th ed. 2006). Within each section, procedures are arranged to enable the user to locate the code number readily. In the "surgical" section, the procedures are grouped according to the body system on which surgery is performed.

On appeal, TBCE concedes that "MUA is listed in the surgery section of the CPT Codebook and [is] thus a surgical procedure under the Chiropractic Act." *See also* 31 Tex. Reg. 4615 (2006) (Texas Bd. of Chiropractic Exam'rs) (stating the same thing). Nonetheless, TBCE insists that we must "harmonize" occupations code 201.002(a)(4), which would otherwise serve to exclude MUA from the scope of chiropractic, *see* Tex. Occ.Code Ann. § 201.002(c)(1), with the general statutory authorization of chiropractors to perform "adjustment and manipulation," *see id.* § 201.002(b)(2), and what it perceives to be **\*484** an implicit authorization or recognition in occupations code 201.154 that chiropractors can perform MUA because, as previously explained, TBCE maintains that the section's ban on "certification" of chiropractors to perform MUA would otherwise be redundant surplusage. Relatedly, TBCE also invokes the principle that when statutory provisions irreconcilably conflict, the "more specific" provision—what they view as the implicit authorization of MUA present in section 201.154—should control over the "general" statutory exclusion of surgical procedures from chiropractic. *See* Tex. Gov't Code Ann. § 311.026(b) (West 2005) (providing that specific provision prevails over general); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 670 n. 56 (Tex.2009) (citing to government code section 311.026(b) for same proposition).

In contrast to TBCE, TCA vigorously disputes that MUA is "described in the surgery section" of the CPT Codebook in any sense relevant to chiropractors. While not disputing that the "surgery" section of the book has contained a description of MUA at all times relevant to our inquiry here,[FN26] TCA insists that the reference "does not encompass chiropractic procedures." It emphasizes a cross-reference that appears in the 2007 CPT Codebook's description of MUA:

> FN26. In fact, the 1970 edition of the CPT Codebook lists "22505 MANIPULATION SPINE ANY REGION, REQUIRING ANESTHESIA" in the surgery section using the same five-digit code used in the most current version of the CPT. *See* American Medical Association, *Current Procedural Terminology* 135 (2d ed. 1970); American Medical Association, *Current Procedural Terminology CPT® 2012* 75 (4th ed. 2011) ("**22505** Manipulation of spine requiring anesthesia, any region").

**Manipulation**

(For spinal manipulation without anesthesia, use 97140)

**22505** Manipulation of spine requiring anesthesia, any region

American Medical Association, *2007 Current Procedural Terminology (CPT®) 2007* 85 (4th ed. 2006). TCA represents that the referenced code "97140" does not apply to chiropractors because there are different codes—98940 through 98943—that cover "chiropractic manipulative treatment." And because manipulation by chiropractors is not covered by the cross-referenced code 91740, it reasons, the "manipulation of spine requiring anesthesia" code from which the reference is made must likewise not apply to chiropractors. *See id.* at xiv, 85 (describing the "Surgery" section of the CPT codebook as including code numbers 10021 through

69990). The portions of the CPT Codebook concerning chiropractic manipulation do not appear in our record. Regardless, assuming that TCA's description of those codes is accurate, and even assuming it is correct in concluding that code 22505 ("manipulation of the spine requiring anesthesia," i.e., MUA) would not actually be the code applied by a chiropractor who was billing for the treatment, it remains undisputed that this code and accompanying description have appeared in the CPT Codebook's "surgery" section at all relevant times. This is all that the Legislature has required in order for MUA to be deemed a "surgical" procedure excluded from the scope of chiropractic: " '[s]urgical procedure' includes a procedure described in the surgery section of the [CPT Codebook]." *See* Tex. Occ.Code Ann. § 201.002(a)(4); 22 Tex. Admin. Code § 75.17(b)(2). The Legislature did not condition this requirement on the identity or type of health-care provider who performs the procedure. And in the face of this unambiguous statutory language, it is simply irrelevant whether, as TCA insists, a chiropractor **\*485** would actually bill under code 22505. To the contrary, such a fact would, if anything, further confirm that the Legislature intended procedures "described" in the Codebook's "surgical" section be off-limits to chiropractors.

Nor should we construe section 201.002(a)(4) any differently to "harmonize" or avoid "conflict" with section 201.154, the provision barring TBCE from "adopt[ing] a process to certify chiropractors to perform [MUA]." As an initial observation, the gravamen of the Chiropractor Parties' position concerning section 201.154 is that the Legislature, despite its *specific* prohibition barring chiropractors from performing procedures listed under the CPT surgery codes, intended to *impliedly* allow chiropractors to perform one of the listed procedures. Their position further suggests that the Legislature intended (without explicitly saying so) that chiropractors be allowed to perform MUA, yet went out of its way to bar TBCE from requiring any additional training or qualifications beyond licensing minimums to ensure that chiropractors perform that procedure safely. Such a construction yields what approaches "absurd results" that we presume the Legislature could not

possibly have intended. *See Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011) ( "The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results." (citing *City of Rockwall,* 246 S.W.3d at 625–26)). It is also unsupported by the text of section 201.154 itself.

The Chiropractor Parties' construction of section 201.154 assumes that the word "certify" expresses an intent to grant some special or additional type of authority to perform MUA beyond that conveyed through licensing. But "certify" simply means "to designate as having met the requirements for pursuing a certain kind of study or work." *See Webster's* 367 (defining "certify" and comparing to "license"); *see also Black's Law Dictionary* 258 (9th ed. 2009) (describing "certify" as "attest as being true or as meeting certain criteria"). It does not necessarily require some underlying, preexisting authority that would be enhanced, as it were, by the certification. In fact, the plain language of section 201.154—i.e., "the board may not adopt a process to certify chiropractors *to perform* [MUA]"—suggests that without certification, chiropractors lack the authority *to perform* MUA. *See* Tex. Occ.Code Ann. § 201.154 (emphasis added).

If the Legislature had intended "certify" to have the meaning that the Chiropractor Parties suggest here—i.e., that "certification" contemplates some special designation and presumes a status quo in which chiropractors can perform the procedure—a clearer statement of that intent would have been a prohibition against TBCE adopting a process to certify chiropractors, for example, "as an MUA specialist" or "in the field of MUA." *See, e.g.,* Tex. Occ.Code Ann. § 205.303(a) (West 2004) ("The medical board may certify a person *as an* acudetox *specialist....*") (emphasis added); *id.* § 1701.404(b) (West Supp. 2011) ("The commission may certify a sheriff, sheriff's deputy, constable, other peace officer, county jailer, or justice of the peace *as a special* officer for offenders with mental impairments....") (emphasis added). But the plain language of section 201.154 does not do this. Rather, it merely forbids TBCE from designating chiropractors as having met

the requirements *to perform* MUA. Therefore, it does not necessarily follow that chiropractors already have the authority to perform MUA.

For similar reasons, we also reject the TBCE's related contention that the "more specific" language of section 201.154 **\*486** should control over the statute's general ban on surgical procedures. But even if we were to apply this canon of construction, section 201.154 cannot be said to be "more specific" than the ban on surgical procedures with regard to whether chiropractors may perform MUA. At best, section 201.154 implies that chiropractors may perform MUA, but section 201.002(a)(4) specifically provides that chiropractors may not perform MUA. Thus, 201.002(a)(4) is the specific provision that should control.

Although our construction here could appear, at first glance, to render section 201.154 superfluous given the Act's ban on MUA as a surgical procedure, it also can be viewed as reinforcing the Legislature's intent that chiropractors not perform MUA. *See Nash,* 220 S.W.3d at 917–18 (noting that "there are times when redundancies are precisely what the Legislature intended"); *In re City of Georgetown,* 53 S.W.3d 328, 335–36 (Tex.2001) (construing duplicative provisions of the Open Records Act and concluding that "the Legislature repeated itself out of an abundance of caution, for emphasis or both"). In any event, occupations code section 201.002(a)(4) means what it says, and we cannot ignore this clear expression of legislative intent in the cause of avoiding any redundancy with section 201.154. *See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003) (" 'It is an elementary rule of construction that, *when possible to do so,* effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous.' ") (quoting *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915)).

Based on the unambiguous text of occupations code section 201.002(a)(4), we conclude that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic and that occupations code section 201.154 is not to the contrary. Although the Physician Parties also emphasize the anecdotal legislative history of section 201.154, the statutory text is dispositive here. *See DeQueen,* 325 S.W.3d at 635 (noting that courts should look first to the plain meaning of statutory text as expressing legislative intent); *Alex Sheshunoff,* 209 S.W.3d at 652 n. 4 (noting that reliance on secondary materials such as legislative history should be avoided when text is unambiguous). We must, however, consider one final argument asserted by TCA.

[3] TCA urges that if we construe section 201.002(a)(4) to deem MUA performed by chiropractors a "surgical procedure," we must invalidate the provision as an improper delegation of legislative authority that violates the separation-of-powers clause of the Texas Constitution.[FN27] *See* Tex. Const. art. III, § 1 (vesting the legislative power in the Senate and House of Representatives).[FN28] Specifically, the Chiropractor Parties assert that by effectively incorporating a coding system developed by the AMA—a private association (not to mention a longtime professional rival to chiropractors and chiropractic)—to supply a definition or description of "surgical procedure," the Legislature has delegated its **\*487** authority to the AMA in a manner that fails the eight-factor balancing test articulated by the supreme court in *Texas Boll Weevil Eradication Foundation, Inc.,* 952 S.W.2d at 472, for delegations of authority to private entities.[FN29] Although we agree that a delegation of unbridled discretion to the AMA to define "surgical procedures" would potentially raise constitutional concerns, *see id.* at 471–75, we disagree that the Legislature has delegated its authority in this situation.

> FN27. As was the case with TCA's assertion that MUA performed by chiropractors is not described in the surgical section of the CPT Codebook, TBCE does not join in this argument.

> FN28. Both the Physician Parties and the State of Texas assert that TCA waived this argument by non-suiting its affirmative claims for relief. To the contrary, TCA also raised this contention defensively, as a ground for denying the Physician

Parties' summary-judgment motion, thereby preserving it for appeal. *See* Tex.R. Civ. P. 166a(c). Furthermore, in its notice of non-suit, TCA explicitly disclaimed any intent to waive its right to assert any defensive arguments.

FN29. Although the text of section 201.002(a)(4) itself refers to an agency of the federal government rather than the AMA ("the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services"), there is no dispute that at all relevant times CMS has fully incorporated the AMA's CPT coding system, as TBCE has acknowledged in its rules. *See* Department of Health & Human Services Medical Data Code Sets Rule, 45 C.F.R. § 162(b)(1) (2012) (adopting AMA's CPT codebook for the period from October 16, 2003 through September 30, 2013); 22 Tex. Admin. Code § 75.17(a)(4) (2011) (Tex. Bd. of Chiropractic Exam'rs, Scope of Practice); *see also* HCPCS–General Information, Centers for Medicare & Medicaid Servs., https:// www. cms. gov/ Med HCPCSGen Info (last visited Mar. 13, 2012) ("Level I of the HCPCS is comprised of CPT (Current Procedural Terminology), a numeric coding system maintained by the American Medical Association (AMA)."). Consequently, the statutory reference to the "common procedure coding system adopted" by CMS was, at least at the time of the statute's 2005 enactment, tantamount to incorporating the AMA's CPT Codebook.

Whether the Legislature has, in fact, delegated its authority to define "surgical procedures" to the AMA depends initially on whether section 201.002(a)(4) incorporates (1) some fixed version of the CPT Codebook or (2) the CPT Codebook in whatever manner the AMA may revise or amend it in the future. If the former, the Legislature has not delegated its authority to define "surgical procedure," but has instead defined that term itself, albeit by reference to another source. *See Ex parte Elliott,* 973

S.W.2d 737, 741 (Tex.App.-Austin 1998, pet. ref'd). This sort of cross-reference to fixed external fact, source, or standard is no more a delegation of legislative authority than a statutory reference to a measure of time or volume.

Although no party has emphasized it, we observe that TBCE's scope-of-practice rule defines the "CPT Codebook" as the version published by the AMA in 2004. *See* 22 Tex. Admin. Code § 75.17(b)(2) (identifying "the American Medical Association's annual Current Procedural Terminology CodeBook (2004)"). That is, in fact, the version of the CPT Codebook that was in effect when the Legislature adopted section 201.002(a)(4) in May 2005.[FN30] Thus, TBCE has interpreted section 201.002(a)(4) to incorporate a fixed version of the CPT Codebook. *See Ex parte Elliott,* 973 S.W.2d at 741. Moreover, we would reach the same conclusion even in the absence of this rule. In *Ex parte Elliott,* we considered, in the context of a habeas proceeding, whether the Legislature's incorporation of the Environmental Protection Agency's definition of "hazardous waste" was an unconstitutional delegation of legislative authority. *See id.* at 741. We held that the Legislature intended to adopt the EPA's definition of hazardous waste that existed on the date the relevant legislation was enacted. *See id.* In reaching our holding, we relied on supreme court precedent that (1) a statute that **\*488** adopts another statute by reference adopts the referenced statute as it exists at the time of adoption, but not as it may be amended in the future, *see id.* (citing *Trimmier v. Carlton,* 116 Tex. 572, 296 S.W. 1070, 1074 (1927)), and that (2) we must construe a statute subject to varying interpretations in a manner that assumes the Legislature's intent to enact a constitutional statute. *See id.* at 742 (citing *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 715 (Tex.1990)); *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005) (establishing presumption that the Legislature intended for statutes to be constitutional); *but see id.* § 311.027 (West 2005) (providing that statutory references to a statute or rule applies to revisions or amendments to the statute or rule). In this case, we would similarly construe section 201.002(a)(4) so as to avoid the potential constitutional infirmities and hold that it references the version of the

CPT Codebook in effect on the date of its enactment, May 27, 2005. Under that construction, no delegation of the Legislature's authority to define "surgical procedure," much less an unlawful one, has occurred. *See Ex parte Elliott,* 973 S.W.2d at 742.

> FN30. According to the evidence in the record, the AMA publishes the CPT Codebook annually in the late summer or early fall, to be effective January 1. Thus, the CPT Codebook in effect for the calendar year 2005—i.e., *CPT 2005*—would have had a publication date of 2004. *See, e.g.,* American Medical Association *Current Procedural Terminology CPT 2012* (4th ed. 2011) (designated as "CPT 2012," but published in 2011).

TCA counters that construing section 201.002(a)(4) to adopt a fixed version of the CPT Codebook poses due-process concerns because the AMA updates the CPT Codebook annually and prior versions of the CPT Codebook are "inaccessible." We simply note that, in addition to the fact that there is no summary-judgment evidence in the record that the 2004 edition of the CPT Codebook was inaccessible to any party, our own independent research on the delegation question has confirmed that this specific publication is available through public sources, including interlibrary loan from the Texas State Law Library. Thus, although not as readily accessible as the current version of the CPT Codebook, the 2004 CPT Codebook is not inaccessible.

As previously noted, there is no dispute that MUA was described in the "surgical" section of the CPT Codebook throughout the period at issue, including in its 2004 version. As there is no constitutional barrier to section 201.002(a)(4)'s enforcement, we must give it effect and hold that MUA is a "surgical procedure" excluded from the statutory scope of chiropractic practice. *See* Tex. Occ.Code Ann. § 201.002(b)(2), (c)(1). Consequently, subsection 75.17(e)(2)(O), which purports to authorize chiropractors to perform MUA, is beyond TBCE's statutory authority and void. *See Gulf States Utils. Co.,* 809 S.W.2d at 207.

The district court did not err in granting summary judgment to that effect. We overrule the Chiropractor Parties' issues concerning MUA.

"**Diagnosis**"

In its remaining issues, TCA (but not TBCE) challenges the district court's judgment invalidating rules authorizing chiropractors to make certain "diagnoses." In addition to responding to TCA's issues, the Physician Parties assert what they term a "cross-point" urging affirmance based on the grounds they raised in their first motion for partial summary judgment, and also what is substantively a motion to dismiss one of TCA's issues for lack of subject-matter jurisdiction. Before turning to the parties' competing contentions, it is necessary to clarify, at some length, the specific rules at issue, the scope of the district court's ruling, and the procedural posture of the remaining issues on appeal.

The statutory scope of chiropractic, again, includes "us[ing] objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body" and "perform[ing] nonsurgical, nonincisive procedures ... to improve **\*489** the subluxation complex or the biomechanics of the musculoskeletal system." *See* Tex. Occ.Code Ann. § 201.002(b)(1), (2). In subpart (d)(1) of its scope-of-practice rule, TBCE construed these provisions to permit chiropractors to render certain "analyses," "diagnoses," and "other opinions":

(d) Analysis, Diagnosis, and Other Opinions

(1) In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:

(A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited

to, the following:

(i) the health and integrity of the structures of the system;

(ii) the coordination, balance, efficiency, strength, conditioning and functional health and integrity of the system;

(iii) the existence of structural pathology, functional pathology or other abnormality of the system;

(iv) the nature, severity, complicating factors and effects of said structural pathology, functional pathology, or other abnormality of the system;

(v) the etiology of said structural pathology, functional pathology or other abnormality of the system; and

(vi) the effect of said structural pathology, functional pathology or other abnormality of the system on the health of an individual patient or population of patients;

(B) An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system including, but not limited to, the following:

(i) the nature, severity, complicating factors and effects of said subluxation complex;

(ii) the etiology of said subluxation complex; and

(iii) the effect of said subluxation complex on the health of an individual patient or population of patients;

(C) An opinion regarding the treatment procedures that are indicated in the therapeutic care of a patient

or condition;

(D) An opinion regarding the likelihood of recovery of a patient or condition under an indicated course of treatment;

(E) An opinion regarding the risks associated with the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(F) An opinion regarding the risks associated with not receiving the treatment procedures that are indicated in the therapeutic care of a patient or condition;

(G) An opinion regarding the treatment procedures that are contraindicated in the therapeutic care of a patient or condition;

(H) An opinion that a patient or condition is in need of care from a medical or other class of provider;

(I) An opinion regarding an individual's ability to perform normal job functions and activities of daily living, and the assessment of any disability or impairment;

(J) An opinion regarding the biomechanical risks to a patient, **490** or patient population from various occupations, job duties or functions, activities of daily living, sports or athletics, or from the ergonomics of a given environment; and

(K) Other necessary or appropriate opinions consistent with the practice of chiropractic.

22 Tex. Admin. Code § 75.17(d)(1). In a subpart (d)(2) to the rule, however, TBCE described several examples of "analyses," "diagnoses," or "other opinions" that would be, in its view, outside the permissible scope of chiropractic practice:

(2) Analysis, diagnosis, and other opinions regarding the findings of examinations and evaluations which are outside the scope of chiropractic include:

(A) incisive or surgical procedures;

(B) the prescription of controlled substances, dangerous drugs, or any other drug that requires a prescription;

(C) the use of x-ray therapy or therapy that exposes the body to radioactive materials; or

(D) other analysis, diagnosis, and other opinions that are inconsistent with the practice of chiropractic and with the analysis, diagnosis, and other opinions described under this subsection.

*Id.* § 75.17(d)(2).

In their live pleadings, the Physician Parties sought two declarations that 75.17(d) was invalid for exceeding the scope of chiropractic practice and permitting chiropractors to practice medicine without a medical license, in turn violating the Medical Practice Act and, alternatively, article XVI, section 31 of the Texas Constitution. First, they sought a declaration that 75.17(d)'s use of "diagnosis" in itself rendered this rule and various related rules invalid, reasoning that the statutory scope of chiropractic permits licensees to "analyze, examine, or evaluate" certain conditions, but not to "diagnose" them, and that "diagnose" is instead reserved to the practice of medicine and certain other health care professions. *Compare* Tex. Occ.Code Ann. § 201.002(b)(1) (providing that one practices chiropractic if he or she "uses objective or subjective means to analyze, examine, or evaluate ...") *with id.* § 151.002(a)(3) (" '[p]racticing medicine' means the diagnosis, treatment, or offer to treat ..."). Second, they sought a narrower declaration that 75.17(d) exceeded the statutory scope of chiropractic by permitting licensees to "diagnose" conditions beyond the biomechanical condition of the spine and musculoskeletal system. Additionally, in the event

75.17(d) (or any of the challenged rules) were held to be within the statutory scope of chiropractic, TMA asserted an alternative constitutional challenge to the underlying statutes themselves under article XVI, section 31 of the Texas Constitution.

In their first motion for partial summary judgment, the Physician Parties sought judgment on their broader declaratory claim challenging 75.17(d). The Chiropractor Parties countered with their own motion for partial summary judgment seeking dismissal of the Physician Parties' claims that the use of the term "diagnosis" in its scope-of-practice rule exceeded chiropractic's statutory scope. They asserted that "diagnosis" in its ordinary meaning broadly denoted a process of analysis and evaluation and was, therefore, included or implicit in the express statutory authorizations of chiropractors to "analyze," "examine," and "evaluate," if not also the authorizations to treat certain conditions. The district court denied the Physician Parties' motion and granted the Chiropractors' motions "in part as to the Chiropractic **\*491** Board's use of the word 'diagnosis' in its rule." "However," the court emphasized in its order, it "reserve[d] judgment regarding 'diagnosis' as it relates to *scope of practice.*" (Emphasis in original.)

Subsequently, the Physician Parties filed a second motion for partial summary judgment seeking relief only as to two portions of 75.17(d)—(d)(1)(A), which authorized "analysis, diagnosis or other opinion" concerning a list of six specific subjects "regarding the biomechanical condition of the spine or musculoskeletal system"; and (d)(1)(B), which authorized "analysis, diagnosis or other opinion" concerning a list of three specific subjects "regarding a subluxation complex of the spine or musculoskeletal system." *See* 22 Tex. Admin. Code § 75.17(d)(1)(A), (B). In this motion, they relied on their narrower claim that these provisions exceeded chiropractic's statutory scope of practice and also violated article XVI, section 31 of the Texas Constitution by permitting chiropractors to "diagnose" conditions, such as diseases, that were beyond the "biomechanical condition[s] of the spine and musculoskeletal system of the human body" that

chiropractors were statutorily permitted to "analyze, examine, or evaluate." *See* Tex. Occ.Code Ann. § 201.002(b)(1). The Chiropractor Parties countered with a joint "supplemental" motion for partial summary judgment and request for judicial notice urging that "diagnose" (which, again, they viewed as synonymous or implicit in "analyze," "examine," and "evaluate") encompassed diagnosis of diseases and any other matter listed in 75.17(d)(1) and (2).[FN31] Without stating the specific grounds on which it relied, the district court granted the Physician Parties' second motion for partial summary judgment and, as before, denied the Chiropractor Parties' motions except to the extent of granting them "as to the use of the word 'diagnosis' in the rule." Both summary-judgment rulings were merged into and expressly memorialized in the final judgment, which further declared "22 Tex. Admin. Code §§ 75.17(d)(A) and (B), concerning diagnosis, ... invalid and void" and ordered that the parties take nothing on any claims for relief not awarded therein.

> FN31. Additionally, in the meantime, TBCE filed a motion for partial summary judgment seeking dismissal of the Physician Parties' constitutional claims challenging 75.17(d) and, alternatively, its underlying statutes. However, we cannot discern from the record that TBCE ever obtained a ruling on this motion.

In its third issue, TCA urges that the district court erred in concluding that (d)(1)(A) (concerning "analysis, diagnosis or other opinion" regarding what were termed aspects of "the biomechanical condition of the spine or musculoskeletal system") exceeded chiropractic's statutory scope of practice. In its fourth issue, it advances a similar contention as to the district court's invalidation of (d)(1)(B) (concerning "analysis, diagnosis or other opinion regarding a subluxation complex of the spine or musculoskeletal system"). In its fifth and final issue, TCA challenges the Physician Parties' alternative summary-judgment ground that (d)(1)(A) and (B) violated article XVI, section 31 of the Texas Constitution.

> [4] In addition to joining issue on the merits of TCA's

third and fourth issues, the Physician Parties assert what they style as a "cross-point" urging that we affirm the summary judgment as to (d)(1)(A) and (B) on the ground, originally presented in their first motion for partial summary judgment, that the statutory scope of chiropractic does not include "diagnosing" a condition, as opposed to "analyzing, examining, or evaluating" it. TCA **\*492** replies, and we agree, that the Physician Parties' "cross-point" seeks relief beyond that which they were afforded in the district court's judgment, which explicitly granted the Chiropractor Parties' motion for partial summary judgment and rendered a take-nothing judgment as to the Physician Parties' claims for a declaration that the use of "diagnosis" in itself rendered 75.17(d) invalid. Consequently, to raise this contention on appeal, the Physician Parties were required to file their own notice of appeal. *See* Tex.R.App. P. 25.1(c) ("A party who seeks to alter the trial court's judgment ... must file a notice of appeal."); *Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 584 (Tex.2002); *Quimby v. Texas Dep't of Transp.,* 10 S.W.3d 778, 781 (Tex.App.-Austin 2000, pet. denied). They did not do so. We thus lack jurisdiction to consider the Physician Parties' "cross-point" and dismiss it.[FN32] *See Tarrant Restoration v. TX Arlington Oaks Apartments, Ltd.,* 225 S.W.3d 721, 733–34 (Tex.App.-Dallas 2007, pet. dism'd w.o.j.).

> FN32. We emphasize that we express no opinions regarding the merits of the cross-point that the Physician Parties attempt to assert.

Conversely, the Physician Parties suggest that we lack subject-matter jurisdiction to consider TCA's fifth issue challenging the potential summary-judgment ground that 75.17(d)(1)(A) and (B) violate article XVI, section 31 of the Texas Constitution. Citing the portion of the district court's judgment stating that its summary-judgment rulings had rendered "moot" "TMA's and TMB's constitutional challenges," the Physician Parties accuse TCA of seeking an "advisory opinion" regarding a claim or issue that the district court never reached. We observe that while TMA's alternative constitutional challenges to the underlying statutes were never adjudicated below and would indeed

have been mooted by the district court's summary-judgment rulings, it is unclear whether the district court's reference to "moot" "constitutional challenges" was intended also to refer to the constitutional challenge to rule 75.17(d)(1)(A) and (B), as opposed to the statutes, that the Physician Parties had presented as a ground for partial summary judgment. Regardless, we ultimately agree with the Physician Parties that TCA's fifth issue is moot, if for no other reason than that the Physician Parties, by taking the position that the district court never reached their summary-judgment ground concerning the constitutionality of 75.17(d)(1)(A) and (B), have conceded that we cannot affirm the summary judgment invalidating those provisions on that basis.

Having thus clarified and narrowed the matters in dispute, the sole dispositive questions remaining before us in regard to 75.17(d)(1)(A) and (B) are whether those rule provisions exceed the statutory scope of chiropractic—assuming, as we must do in the present procedural posture, that TBCE's use of the term "diagnosis" does not in itself cause the provision to exceed the statutory or permissible constitutional scope of chiropractic practice.

### *"Diagnoses" and "opinions" regarding the "biomechanical condition of the spine or musculoskeletal system"*

[5] Subpart (d)(1)(A) of TBCE's scope-of-practice rule allows a chiropractor, again, to render "an analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system" and provides a non-exclusive list of examples of such analyses, diagnoses, and opinions that TBCE has determined fit within this provision. *See* 22 Tex. Admin. Code § 75.17(d)(1)(A). Although the **\*493** district court did not specify the grounds on which it relied to find this provision invalid, the Physician Parties argued in support of their motion for summary judgment, and also in their briefs to this Court, that this provision improperly allows chiropractors to diagnose diseases that cannot be considered biomechanical conditions of the spine or musculoskeletal system. On appeal, TCA responds that when read in the context of the rule as a whole, subpart (d)(1)(A) does not exceed the statutory scope of chiropractic because it limits chiropractors to making diagnoses only regarding the biomechanical condition of the spine or musculoskeletal system, consistent with the statutory scope of chiropractic. *See* Tex. Occ.Code Ann. § 201.002(b)(1); 22 Tex. Admin. Code § 75.17(d)(1)(A). We agree.

The effect of our procedurally required assumption that TBCE's use of the term "diagnosis" does not in itself cause the scope-of-practice rule to exceed the statutory scope of chiropractic is that the word "diagnose" is synonymous with the phrase "analyze, examine, or evaluate" in the statutory scope of chiropractic. *See* Tex. Occ.Code Ann. § 201.002(b)(1). As such, subpart (d)(1)(A) effectively tracks the Legislature's scope of chiropractic:

| Tex. Occ.Code Ann. § 201.002(b)(1) | 22 Tex. Admin. Code § 75.17(d)(1)(A) |
|---|---|
| (b) A person practices chiropractic under [the Chiropractic Act] if the person: | (1) In the practice of chiropractic, licensees may render and analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following: |
| (1) uses objective or subjective means to analyze, examine, or evaluate the biomechanical condition of the spine and musculoskeletal system of the human body[.] | (A) An analysis, diagnosis or other opinion regarding the biomechanical condition of the spine or musculoskeletal system including, but not limited to, the following [list of examples]. |

*Id.;* 22 Tex. Admin. Code § 75.17(d)(1)(A). Thus, the

plain language of (d)(1)(A) limits chiropractors to diagnosing—i.e., "analyzing, examining, or evaluating"—biomechanical conditions of the spine or musculoskeletal system. Further, because the list of non-exclusive examples of such "diagnoses" are grammatically dependent on or otherwise stem from the paragraph's initial statement that the diagnosis *regard* the biomechanical condition of the spine or musculoskeletal system, the listed examples are likewise limited to the biomechanical condition of the spine or musculoskeletal system of the human body. In other words, the non-exclusive list of example opinions or diagnoses cannot be read in isolation; rather, they must be read as being dependent upon or bounded by the restriction that they also regard the biomechanical condition of the spine or musculoskeletal system. To that extent, this complies with the statutory scope of chiropractic.

The Physician Parties counter that this provision does not restrict chiropractors to the biomechanical condition of the spine or musculoskeletal system because it allows them to diagnose diseases without limitation. In support of this contention, they point to the rule's "expansive definitions" of "musculoskeletal system" [FN33] and "subluxation**494** complex," [FN34] the rule's "broad catch-all phrases "including but not limited to," "structural pathology," "functional pathology," and "etiology," and finally to their assertion that the common, ordinary meaning of the word "diagnose" incorporates identification of diseases, *see Webster's* at 622 (defining "diagnose" as "to identify (as a disease or condition) by symptoms or distinguishing characteristics"); *American Heritage College Dictionary* at 383 (defining "diagnosis" as "act or process of determining the nature and cause of a disease or injury through examination of a patient"). Specifically, they assert that because "biomechanical" refers only to the application of mechanical principles—i.e., the action of forces on matter or material, *see Webster's* at 1401 (defining "mechanics" and "mechanical")—to living bodies and does not involve diseases of any kind, chiropractors may not render a diagnosis, which by definition involves the identification of a disease. Relatedly, they point to the rule's use of "pathology" and "etiology," which also involve the study of

disease, *see Dorland's* at 690 (defining "etiology" as "the study or theory of the factors that cause disease"), 1416 (defining "pathology" as "the branch of medicine that deals with the essential nature of disease"), to argue that this provision of the scope-of-practice rule allows chiropractors to diagnose a wide range of diseases and conditions, including various cancers, arthritis, osteoporosis, gout, ALS, and bone fractures.

> FN33. "The system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." 22 Tex. Admin. Code § 75.17(b)(4).

> FN34. "[A] neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them." *Id.* § 75.17(b)(7).

But apart from the fact that the common, ordinary meaning of "diagnosis" also includes the identification of a "condition" or an "injury," *see Webster's* at 622; *American Heritage College Dictionary* at 383, the Physician Parties' argument presumes that "disease" would extend beyond the biomechanical condition of the spine or musculoskeletal system of the human body. This construction, as previously suggested, ignores the plain language of the rule restricting any such diagnosis to the biomechanical condition of the spine or musculoskeletal system. The text and format of this provision plainly shows that "the system" discussed in each of the examples is "the biomechanical condition of the spine and musculoskeletal system" referred to at the beginning of the provision. Stated another way, each of the listed examples is limited to the Legislature's standard of "biomechanical condition of the spine and musculoskeletal system." Thus, regardless of whether diagnosis, pathology, or etiology invoke concepts of dis-

ease as the Physician Parties suggest, the bottom line is that paragraph (d)(1)(A) limits chiropractors to diagnoses regarding "the biomechanical condition of the spine and musculoskeletal system" as required by the statutory scope of chiropractic. Accordingly, the provision does not exceed the statutory scope of chiropractic.

In a related argument, the Physician Parties challenge TBCE's use of the phrase "could include, but are not limited to" in subpart (d)(1) of the scope-of-practice rule, suggesting that it, in combination with the issues discussed above, eviscerates any purported limitation on chiropractors' authority to diagnose by allowing chiropractors to "diagnose any diseases (pathology) that relate to the biomechanical condition of the spine and musculoskeletal system (redefined to include nerves and other tissues), determine their origins **\*495** (etiology) and provide a prognosis on the disease's effect." But this argument requires reading 75.17(d)(1) in an unnecessarily strained manner.

As set forth above, paragraph (d)(1) states that chiropractors "may render an analysis, diagnosis, or other opinion *regarding* the findings of examinations and evaluations. *Such opinions* could include, but are not limited to, the following[.]" *See* 22 Tex. Admin. Code § 75.17(d)(1) (emphases added). "But are not limited to" as it is used here merely means that the list of examples that follows is not a comprehensive list of every type of authorized opinion—i.e., there could be other types of opinions that fit within the parameters of the provision that are not mentioned in the list. Also, use of this phrase does not alter the limitation in the rule that the "diagnosis" referred to must regard the findings of "examinations and evaluations," a phrase that itself is described earlier in the scope-of-practice rule in terms of the statutory scope of chiropractic:

(c) Examination and Evaluation

(1) In the practice of Chiropractic, licensees of this board provide necessary examination and evalua-

tion services to:

(A) Determine the bio-mechanical condition of the spine and musculoskeletal system of the human body including, but not limited to, the following....

....

(B) Determine the existence of subluxation complexes of the spine and musculoskeletal system of the human body and to evaluate their condition including, but not limited to....

*Id.* § 75.17(c)(1)(A), (B). Thus, the plain language of 75.17(d)(1) provides that chiropractors may render diagnoses regarding findings and examinations within the statutory scope of chiropractic, and offers a non-exclusive list of examples of *such* opinions. It does not, by its plain language, allow them to render diagnoses that do not involve the statutory scope of chiropractic. As such, it does not exceed the statutory scope of chiropractic.

We sustain TCA's third issue.

*"Diagnoses" and "opinions" regarding "a subluxation complex of the spine or musculoskeletal system "*

[6] Relatedly, the Physician Parties argued successfully to the district court that the following paragraph of TBCE's scope-of-practice rule, (d)(1)(B), also exceeds the statutory scope of chiropractic:

(1) In the practice of chiropractic, licensees may render an analysis, diagnosis, or other opinion regarding the findings of examinations and evaluations. Such opinions could include, but are not limited to, the following:

...

(B) An analysis, diagnosis or other opinion regarding a subluxation complex of the spine or muscu-

loskeletal system including, but not limited to, the following: [list of examples].

22 Tex. Admin. Code § 75.17(d)(1)(B). Initially, the Physician Parties argue that this paragraph of the scope-of-practice rule is invalid because it allows chiropractors to *diagnose* a subluxation complex despite the fact that the statutory scope of chiropractic only allows chiropractors to *treat* the subluxation complex. *Compare* Tex. Occ.Code Ann. § 201.002(b)(1) (allowing chiropractors "*to analyze, examine, or evaluate* the biomechanical condition of the spine or musculoskeletal system") (emphasis added) *with id.* § 201.002(b)(2) (allowing chiropractors "*to ... perform procedures***496** to improve the subluxation complex or the biomechanics of the musculoskeletal system) (emphasis added). Stated another way, the Physician Parties argue that while chiropractors—again assuming our procedural limitations as to "diagnosis"—may diagnose the biomechanical condition of the spine or musculoskeletal system, they can only treat, but not diagnose, the subluxation complex. We find this argument unpersuasive.

This argument suggests that the Legislature intended to allow chiropractors to treat a condition that is undisputedly unique to the practice of chiropractic, while also deliberately depriving them of the ability to analyze, examine, evaluate, or (given our procedural posture) "diagnose" that condition. We cannot see how a chiropractor would know *to treat* a subluxation complex if he had not first determined from an analysis, examination, or evaluation/ "diagnosis" that there was a problem with the subluxation complex that needed chiropractic treatment. A more logical interpretation, and one supported by the text of both the occupations code and TBCE's scope-of-practice rule and by the summary-judgment evidence, is that a subluxation complex is part of the biomechanical condition of the spine or musculoskeletal system of the human body and, thus, may be analyzed, evaluated, examined, and diagnosed by chiropractors.

TBCE's unchallenged definition of "subluxation complex" establishes that it is a—

neuromusculoskeletal condition that involves an aberrant relationship between two adjacent articular structures that may have functional or pathological sequelae, causing an alteration in the biomechanical and/or neuro-physiological reflections of these articular structures, their proximal structures, and/or other body systems that may be directly or indirectly affected by them.

22 Tex. Admin. Code § 75.17(b)(7). The rule also defines "musculoskeletal system" as the "system of muscles and tendons and ligaments and bones and joints and associated tissues and nerves that move the body and maintain its form." *See id.* § 75.17(b)(4). "Neuro-" is a prefix meaning "nerve," *see Dorland's* at 1284, and "articular" refers to joints, *see id.* at 160. To a certain extent, then, use of the prefix "neuro-" with the adjective "articular" in connection with "musculoskeletal" is redundant in that TBCE's definition of "musculoskeletal system" already includes both nerves and joints. Nevertheless, the bottom line here is that 75.17(d)(1)(B) allows chiropractors to diagnose a condition that under unchallenged rules is part of the musculoskeletal system of the human body. To that extent, it comports with the statutory scope of chiropractic.

The Physician Parties also contend that the language of paragraph (d)(1)(B) allows chiropractors, in violation of the statutory scope of chiropractic, to diagnose neurological conditions, pathological and neuro-physiological consequences that effect the spine and musculoskeletal system, and "other body systems" that are affected by subluxation. We disagree that this provision sweeps so broadly. Although the definition of "subluxation complex" indicates that its existence may have functional or pathological consequences or that it may affect essentially every part of the body, the rule itself only allows chiropractors to render an analysis, diagnosis, or other opinion regarding a subluxation complex of the spine or musculoskeletal system. Accordingly, it does not exceed the statutory scope of chiropractic.

We sustain TCA's fourth issue.

## CONCLUSION

Having determined that, in the procedural posture of this appeal, the district **497** court erred in its judgment invalidating subparts 75.17(d)(1)(A) and (B) of TBCE's scope-of-practice rule, we reverse that portion of the judgment. In light of our reversal of the district court's summary judgment invalidating subparts 75.17(d)(1)(A) and (B) of the scope-of-practice rule, we remand the case for further proceedings regarding the Physician Parties' alternative constitutional challenges. Having otherwise overruled each of the Chiropractor Parties' issues on appeal, we affirm the remainder of the district court's judgment that subparts 75.17(a)(3), (c)(2)(D), (c)(3)(A), and (e)(2)(O) of TBCE's scope-of-practice rule are void.

Tex.App.–Austin,2012.
Texas Bd. of Chiropractic Examiners v. Texas Medical Ass'n
375 S.W.3d 464

END OF DOCUMENT